# Exhibit A

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss. SUPERIOR COURT

| | |
|---|---|
| CORPORATE TECHNOLOGIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>BRIAN HARNETT, and ONX USA LLC d/b/a ONX ENTERPRISE SOLUTIONS,<br><br>Defendants. | CIVIL ACTION NO. __________ |

**COMPLAINT**

***(JURY TRIAL DEMANDED ON ALL COUNTS SO TRIABLE)***

Plaintiff Corporate Technologies, Inc. ("CTI"), based on personal knowledge as to its own acts and the documents referred to herein, and upon information and belief as to the conduct of others, alleges as follows:

**Nature of the Action**

1. This case involves claims for breach of contract, tortious interference with advantageous business relations, tortious interference with contractual relations, unjust enrichment, and unfair and deceptive business practices in violation of G.L. c. 93A § 11.

2. Plaintiff CTI is a Massachusetts corporation that resells, designs, implements and supports customized information technology ("IT") systems for businesses and institutions. CTI also offers related services such as, for example, IT strategy and systems consulting, business application development, system monitoring and system maintenance support.

3. Defendant Brian Harnett ("Harnett") is a former Senior Account Executive of CTI. He worked in that position for CTI from February of 2003 until October 26, 2012, and was paid millions of dollars in compensation by the Plaintiff over that time period.

4. In consideration for his offer of employment from CTI, Harnett executed a written Nondisclosure and Nonsolicitation Agreement (the "Agreement") dated February 24, 2003. Harnett contractually committed in the Agreement that (i) he would not use or disclose CTI's confidential information except in the course of his employment with CTI; and (ii) for a period of 12 months after the conclusion of his CTI employment, he would not solicit any of CTI's customers or otherwise divert their business to any other person or entity.

5. In brazen disregard of his contractual commitments and common law duties, Harnett joined a competitor of CTI's upon resigning from the company and immediately began soliciting CTI clients, many of which are located in the Commonwealth of Massachusetts. In the process of doing so, Harnett intentionally used CTI's proprietary and confidential information about the customized IT systems that CTI consultants had designed and installed for his CTI clients, as well as other confidential sales and pricing information, all of which CTI carefully guards from disclosure to any of its competitors.

6. The competitor that hired Harnett – Defendant OnX USA LLC d/b/a OnX Enterprise Solutions ("OnX") – recruited him for the express purpose of "jump starting" OnX's business in the Northeast with respect to certain high-value products and services that he sold regularly while employed by CTI. OnX knew or should have known at all relevant times that Harnett was barred by the Agreement from using CTI's confidential information for OnX's benefit and from soliciting any CTI clients for 12 months, but nevertheless induced him to

breach those covenants immediately upon hiring. OnX's CEO was notified of CTI's concerns through counsel, but has not acknowledged the notice of breach.

7. Defendants' unlawful assault upon CTI's customer base has inflicted irreparable harm upon CTI in the form of, among other harms, lost customer and business partner goodwill and unauthorized use of CTI's proprietary and confidential information. The adverse impact of these injuries cannot possibly be fully quantified and will continue to mount unless and until the Defendants are enjoined from continuing their unlawful conduct.

8. Among other relief, CTI seeks an award of actual damages, treble damages pursuant to Chapter 93A because of the knowing and willful nature of his unfair and deceptive acts, the attorneys' fees and costs it incurs in prosecuting this action as required under Chapter 93A, statutory pre-judgment interest at an annual rate of 12%, and temporary, preliminary, and permanent injunctive relief.

**Parties**

9. Plaintiff CTI is a corporation formed and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business at 3 Burlington Woods, Burlington, Massachusetts.

10. Defendant OnX USA LLC, is a foreign limited liability company formed and existing under the laws of the State of Delaware, registered in the Commonwealth of Massachusetts, with a principal place of business in the State of Ohio, and an office located at 20 Mall Road, Suite 425, Burlington, Massachusetts 01803.

11. Defendant Brian Harnett is an individual residing at 188 Crowell Road, Hopkinton, New Hampshire 03229.

**Jurisdiction and Venue**

12. This Court has personal jurisdiction over the Defendants pursuant to G.L. c. 223A §§ 2, 3(a)-(d), because the Defendants either are located within the Commonwealth of Massachusetts and/or, *inter alia*, this cause of action arises out of Defendants' transaction of business in Massachusetts, Defendants' tortious conduct within Massachusetts, and/or their tortious acts outside Massachusetts that have caused injury in this state while Defendants were regularly conducting business, or had other persistent business contacts here in Massachusetts.

13. This Court has subject matter jurisdiction pursuant to G.L. c. 212 § 3, because Plaintiff's damages exceed $25,000.

14. Venue is proper in this Court pursuant to G.L. c. 223 § 1 because CTI's principal place of business and OnX's Massachusetts office are located within Middlesex County.

**Facts Common to All Counts**

***Background Regarding CTI***

15. Plaintiff CTI is a privately-owned company that was founded in 1994 by Harry Kasparian. Mr. Kasparian has served as CTI's Chief Executive Officer and the Chairman of its Board of Directors at all times since its formation 18 years ago. Under his leadership, CTI has grown from a single employee in 1994 to 79 employees today. The company's clients include corporations of varying size across an array of industries – including, among others, financial services and pharmaceutical companies – as well non-profit institutions. From a geographic perspective, CTI's clients extend from Maine to New Jersey, with the largest concentration of them here in Massachusetts.

16. As discussed above, CTI resells, designs, implements, and supports customized IT and business intelligence solutions for its clients and provides related consulting services and staffing. Utilizing state–of-the-art technologies from leading computer and communication

hardware and software vendors (*e.g.* IBM, HP, Quantum, Symantec, f5, Juniper, Oracle, NetApp, SAP, Infomatica), CTI creates integrated solutions that enable clients to make optimal use of their of data, increase revenue, reduce costs, and mitigate business and security risks.

17. CTI's sales cycle begins with a series of time- and cost-intensive information gathering meetings to ascertain each prospective client's business strategy, needs, challenges, goals, and existing IT systems and capabilities. Account Executives are heavily supported at this stage by CTI engineers. Based on the information gathered from the prospective client and its comprehensive knowledge of the IT and communication hardware and software product markets, CTI produces an architectural proposal designed specifically for the prospective customer, along with confidential pricing information. Through continued collaboration with the client, CTI ultimately produces a "Statement of Work" ("SOW") that outlines all of the components of the solution – hardware, software, and consulting services – with relevant pricing information. When the clients signs the Statement of Work, the parties have an agreement. Thereafter, CTI further researches and often tests various aspects of the solution in its own facility to assure that the solution works as designed, and then installs it for the customer. CTI's typical engagement also includes comprehensive training for the client's employees as to how to use and maintain each aspect of the system, as well as ongoing maintenance and user-support services. CTI also offers follow-on service to meet future client needs and integrate new software updates and features.

18. CTI's typical sales process and multi-year customer engagements involve investment of hundreds, if not thousands, of hours of pre- and post-engineering services, support, and expertise.

19. A vital part of CTI's business model is repeat business. For 2012, 92% of CTI's business to date has been from existing customers. All of Brian Harnett's ("Harnett") sales to customers in 2012 were repeat business (*i.e.*, no new CTI customers in 2012).

20. All of CTI's business processes, discovery efforts, and design work leading up to, implementing, and following up on a sales opportunity are highly confidential and proprietary information.

21. CTI has taken appropriate measures to protect its highly confidential and proprietary information by, among other measures, expressly including language in all of its Statements of Work indicating that the information contained therein is confidential and that the information regarding system design and pricing belong to CTI and cannot be disclosed to third parties. CTI also requires all of its Account Executives and engineers to sign Nondisclosure and Nonsolicitation Agreements such as the Agreement signed by Harnett. Exhibit A to CTI's Nondisclosure and Nonsolicitation Agreement specifies the type of information that it treats as confidential and proprietary.

22. The purpose of CTI's Nondisclosure and Nonsolicitation Agreements with its employees is to protect CTI's confidential information, good will, and clients that have been developed at substantial cost and effort by CTI over the course of almost two decades.

***Harnett's Employment with CTI***

23. Harnett signed the Agreement on February 24, 2003. With respect to confidential information, it states, in relevant part:

> The Employee shall not at any time (whether during or after any period in which Services are or have been provided) reveal to any person or entity Confidential Information or Development or information or development belonging to any third party which the Company is under an obligation to keep confidential, and shall keep secret all matters which have or may be entrusted to him or her and shall not use or attempt to use any Confidential Information or Development (or such information or development

> belonging to a third party) for his or her own benefit, or for the benefit of any third party or in any manner which may injure or cause loss or may be calculated to injure or cause loss (whether directly or indirectly) to the Company.

24. And with respect to Harnett's non-solicit obligations, the Agreement states in relevant part that:

> During any period in which Services are or have been provided, and for twelve (12) months following the last date on which the Employee provided Services, the Employee shall not, by the Employee's action, directly or indirectly, alone or as a partner, officer, director, employee, independent contractor, investor, lender, advisor or stockholder of or to any person or entity (a) solicit, divert or entice away existing customers or business of the Company . . . .

A true copy of the Agreement is attached as Exhibit A to the Affidavit of Harry Kasparian ("Kasparian Aff.") filed contemporaneously with this Complaint.

25. Over the course of almost ten years, CTI supported Harnett with resources, access to product inventory through CTI's credit and financing facilities with distributor relationships, training, and CTI's consultants' expertise that allowed him to win business from client companies.

26. In his role as Senior Account Executive at CTI, Harnett had access to, accessed and/or created sensitive, proprietary and confidential information of CTI, including but not limited to:

a. Product cost information;

b. Sales prices quoted/charged to customers;

c. Profit margins;

d. Statements of Work;

e. The sales strategies that inform proposals to prospective customers;

f. The product/manufacture pricing mix and strategy for proposals to prospective customers;

g. Customer contact information;

h. Customer purchasing and service preferences;

i. Vendor contact information;

j. Vendor preferences and tendencies; and

k. Customer plans for future project work and purchases.

27. The information identified in Paragraph 26 above was identified as confidential in Harnett's Agreement. See Exhibit A to the Agreement.

28. At the end of his nearly ten-year tenure with CTI, Harnett was a highly compensated employee earning several hundreds of thousands of dollars per year.

29. On October 26, 2012, Harnett voluntarily ended his employment at CTI to take a position at the Burlington, Massachusetts office of OnX, a direct competitor to CTI. As part of its standard practices, CTI asked Harnett for the identity of his future employer so that it could take appropriate steps to protect its business interests if his future employer would be a competitor. After giving notice of his resignation, Harnett rebuffed these inquiries by CTI management on several occasions because he claimed that he "did not have a firm offer in hand." In an exit meeting, CTI Human Resources Manager Adrienne Jones gave Harnett a copy of the Agreement and specifically reminded him that he could not solicit CTI clients for a one-year period following separation. Harnett signed an acknowledgment at the conclusion of the exit interview stating that he was familiar with the terms of the Agreement. A true copy of this acknowledgment is attached as Exhibit B to the Kasparian Affidavit.

***Harnett and OnX's Activity In Violation of the Agreement***

30. Harnett was recruited by OnX to "jump start" its business in the Northeast region for software products for which it previously had immaterial market share. Accordingly, OnX has encouraged and induced Harnett to solicit business from his former CTI customers.

31. OnX is a relative newcomer to this geographic region. Its Burlington, Massachusetts office, was acquired in a purchase of another company, Agilysys, in August 2011.

32. On information and belief, Harnett has contacted all of his former CTI customers, as well as other CTI customers, in an attempt to solicit and divert CTI business in violation of his Agreement with CTI. Harnett has also met with several former CTI customers in further violation of the Agreement.

33. On information and belief, Harnett claims, incorrectly, that he has a non-disclosure rather than a non-compete or non-solicitation agreement with CTI. Further, Harnett mistakenly claims that he can solicit business from CTI's clients as long as he does not initiate the contact. The Agreement clearly prohibits the diversion of CTI clients by any means.

34. On information and belief, Harnett has registered sales opportunities with vendors on behalf of OnX for his former CTI customers that were cultivated while Harnett was employed by CTI.

35. A registered opportunity is critical in CTI and OnX's industry because it places competitors on notice of a potential sale and entitles the registrant to significant exclusive discounts of up to 20% in pricing quotes from vendors to account for the resources invested in developing the sales opportunity. In other words, once a company files and is recognized for a registered opportunity with a vendor it will have an advantage as to all other competitors for a potential sale with a client.

36. CTI has recently learned that a vendor, NetApp, has issued a "dual registration" for a sales opportunity with one of Harnett's former clients, Demandware, listing both OnX and CTI as registrants.

37. A "dual registration" is a rare occurrence in this industry and results when both of the registrants have long standing relationships with the potential client and the vendor. By contrast, according to the market share data made available to CTI during business reviews, OnX has "immaterial installed base in the New England Area" with NetApp.

38. But for Harnett's contact with Demandware , in breach of the Agreement, OnX would not have been awarded a "dual registration" from NetApp based on its historic market share for that vendor and CTI's longstanding customer and vendor relationship.

39. The effect of the dual registration is that CTI has lost its competitive pricing advantage earned as a result of CTI's investment in Demandware over the past several years in relation to OnX for current and ongoing sales to Demandware. This loss of competitive advantage is compounded because CTI has invested its resources in and developed the Demandware relationship over the course of several years, while OnX has obtained a registered opportunity in a matter of weeks by utilizing a former CTI employee that previously handled the Demandware account.

40. On information and belief, Harnett has additional registered opportunities pending with other CTI clients.

41. Even pending registered opportunities negatively impact CTI. Specifically, if CTI tries to register an opportunity while Harnett's submissions are pending, CTI will have to prove to the vendor that it is better situated to complete the sale. This requires the expenditure of additional resources by CTI and its employees and reduces CTI's ability to pursue other sales,

thereby giving a competitive advantage to OnX. This also compromises CTI's relationship with their customer as it must seek the customer's support to allow it to continue to compete.

42. Upon information and belief, a large number of registrations by Harnett in the short time period since joining OnX would be indicative of one of two possibilities: (a) Harnett and OnX are fraudulently submitting registrations for opportunities in an attempt to dissuade competitors and obtain unfair advantage; or (b) Harnett breached his fiduciary duties to CTI by cultivating opportunities while employed by CTI, but not filing the opportunities until he went to OnX.

***Response by CTI and Potential Impact of Unlawful Behavior by Harnett and OnX***

43. On November 2, 2012, counsel for CTI issued a letter to Harnett on November 2, 2012, reiterating his obligations under the Agreement, including a list of the accounts from which he could not solicit business. A true copy of the letter with redacted customer names is attached as Exhibit C to the Kasparian Affidavit.

44. On November 8, 2012, counsel for CTI issued a letter to OnX informing it of the Agreement between Harnett and CTI, and its belief that Harnett was operating in violation of the Agreement by soliciting his former clients on behalf of OnX. CTI further requested in the letter that OnX confirm in writing that it would honor the terms of the Agreement and not employ Harnett in any way that would violate its terms. A true copy of the letter is attached as Exhibit D to the Kasparian Affidavit.

45. To date, neither Harnett nor OnX has responded to these letters.

46. If Harnett and OnX are allowed to continue to ignore and violate the Agreement, a substantial portion of CTI's business is placed at risk.

47. At the termination of his employment with CTI, Harnett was responsible for fifteen client accounts worth approximately 18% of CTI's annual revenue.

48. In a little over a month since his departure, Harnett has contacted his former CTI clients, helped OnX obtain a rare dual registration for a sales opportunity with one of those former clients (Demandware), and has additional registered opportunities pending.

49. It is simply impossible to quantify the damage and consequences that will result to CTI if Harnett and OnX's ongoing conduct is not stopped, including but not limited to future lost sales, loss of good will with customers and vendors, compromising highly confidential and proprietary business information and processes.

## COUNT I
## (Breach of Contract – Harnett)

50. CTI reincorporates and realleges the paragraphs above as if fully stated herein.

51. CTI and Harnett entered into an enforceable Employment Agreement which included the above referenced covenants regarding non-solicitation, and confidential information and non-disclosure provisions.

52. Harnett, by his conduct as set forth above, breached all of these covenants by his employment by OnX, a direct competitor located in the same town as CTI, by misusing and disclosing CTI's confidential information to solicit CTI customers within twelve (12) months of the termination of his employment at CTI.

53. As a result of Harnett's deliberate conduct, CTI has suffered, and continues to suffer, irreparable harm in the form of lost good will and lost profits.

## COUNT II
## (Tortious Interference with Business Relations – Harnett and OnX)

54. CTI reincorporates and realleges the paragraphs above as if fully stated herein.

55. CTI has advantageous business relationships with its clients and customers.

56. Because of its long standing relationships and reputation in the industry, CTI contemplates continued economically beneficial contracts with its clients and customers.

57. Defendants knew of, or should have known of, CTI's advantageous business relationships with it clients and customers.

58. Defendants have intentionally and wrongfully interfered with CTI's advantageous business relationships by soliciting their business and taking other actions in violation of the Agreement.

59. CTI has been damaged as a direct and proximate result of Defendants' illegal conduct.

**COUNT III**
**(Tortious Interference with Contractual Relations – OnX)**

60. CTI reincorporates and realleges the paragraphs above as if fully stated herein.

61. CTI is a party to a valid and binding Nondisclosure and Nonsolicitation Agreement with Harnett.

62. OnX knowingly induced Harnett to breach the Agreement with CTI.

63. OnX intentionally interfered with CTI's contractual relationships with Harnett using improper means, and/or with improper motive.

64. CTI has suffered injury proximately caused by the acts described in this Count.

**COUNT IV**
**(Unjust Enrichment)**

65. CTI reincorporates and realleges the paragraphs above as if fully stated herein.

66. CTI and Harnett entered into an enforceable Employment Agreement which included the above referenced covenants regarding non-solicitation, and confidential information and non-disclosure provisions.

67. Harnett, by his conduct as set forth above, breached all of these covenants by his employment by OnX, by misusing and disclosing CTI's confidential information to solicit CTI customers within twelve (12) months of the termination of his employment at CTI.

68. Harnett and OnX have been unjustly enriched by the use and enjoyment of CTI's confidential information to solicit CTI customers in violation of Harnett's Agreement.

**COUNT V**
**(Violation of G.L. c. 93A § 11 – Harnett and OnX)**

69. CTI reincorporates and realleges the paragraphs above as if fully stated herein.

70. At all times relevant to this Complaint, CTI and Defendants have been engaged in trade or commerce.

71. OnX's conduct since approximately October 26, 2012, including, without limitation, the wrongful acts alleged above committed directly or through its employee, Harnett, was unfair and deceptive and was perpetrated knowingly and willfully.

72. The conduct at issue in this Count occurred primarily and substantially in Massachusetts.

73. As a proximate result of said unfair and deceptive conduct, CTI has suffered losses of money and/or property and further irreparable harm.

WHEREFORE, CTI respectfully requests that this Court:

a) Enter judgment in favor of CTI on all Counts of the Complaint;

b) With respect to Count V, find that Defendants' unfair and deceptive conduct was perpetrated knowingly and willfully;

c) Award CTI actual damages for the injuries it has suffered in connection with Counts I, II, III, and IV;

e) Award CTI treble damages, but in no event less than double damages, for the injuries it has suffered in connection with Count V;

f) Award CTI attorney's fees and costs related to this action;

g) Temporarily, preliminarily, and permanently enjoin Defendant Brian Harnett, from:

i. soliciting, diverting or enticing away existing CTI clients or business, for a period of twelve months from the date of this Court's order; and

ii. revealing or using CTI's confidential information.

h) Temporarily, preliminarily, and permanently enjoin Defendant OnX USA LLC d/b/a OnX Enterprise Solutions, its agents and/or employees, from seeking to violate the terms of Harnett's Nondisclosure and Nonsolicitation Agreement or from encouraging or inducing Harnett to do the same.

i) Order expedited discovery in the form proposed by CTI.

j) Order OnX to segregate and maintain separate accounts and records of all services and products sold or provided, including price and cost to any existing CTI customer or client by Harnett or OnX. See Getman et al. v. USI Holdings Corp., 19 Mass.L. Rptr. 679, 2005 Mass. Super. LEXIS 407 (September 1, 2005) (J. Gants); and

k) Award CTI such other relief as the Court may deem just and appropriate.

***PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES SO TRIABLE.***

Respectfully submitted,

CORPORATE TECHNOLOGIES, INC.

By its attorneys,

Kevin J. O'Connor (BBO #555250)
Timothy F. Holahan (BBO #672760)
James J. Nagelberg (BBO #675656)
John A. Gallagher (BBO #679148)
HINCKLEY, ALLEN & SNYDER, LLP
28 State Street
Boston, MA 02109
Tel: 617-378-4394
Fax: 617-345-9020
koconnor@haslaw.com
tholahan@haslaw.com
jnagelberg@haslaw.com
jgallagher@haslaw.com

Dated: December 19, 2012