# Exhibit B

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX. ss.                                          SUPERIOR COURT

```
                                      )
CORPORATE TECHNOLOGIES. INC..         )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )    CIVIL ACTION NO. _____
                                      )
BRIAN HARNETT, and                    )
ONX USA LLC d/b/a ONX ENTERPRISE      )
SOLUTIONS,                            )
                                      )
          Defendants.                 )
                                      )
```

## AFFIDAVIT OF HARRY KASPARIAN

I, Harry Kasparian, hereby depose and say that:

1.      I am the Chief Executive Officer, President, and Chairman of the Board of

Corporate Technologies, Inc. ("CTI"). I have worked in the technology field for more than thirty

years and founded CTI in 1994. Since its founding, CTI has grown from a single employee in

1994 to 79 employees today. I am responsible for CTI's corporate strategy and organizational

development as well as the day-to-day operations of the company.

2.      I make this affidavit based upon personal knowledge and information obtained in

my official capacity.

3.      CTI resells, designs, implements and supports customized information technology

("IT") and business intelligence solutions for its clients and provides related consulting services

and staffing. Utilizing state-of-the-art technologies from leading computer and communication

hardware and software vendors (*e.g.*, IBM. HP, Quantum, Symantec, f5, Juniper. Oracle,

NetApp. SAP, Infomatica), CTI creates integrated solutions that enable clients to make optimal use of their of data and communications, increase revenue, reduce costs. and mitigate business and security risks.

4.     CTI's sales cycle begins with a series of time- and cost-intensive information gathering meetings to ascertain each prospective client's business strategy, needs, challenges goals, and existing IT systems and capabilities. Account Executives are heavily supported at this stage by CTI engineers. Based on the information gathered and its comprehensive knowledge of the IT and communication hardware and software product markets, CTI produces a solution and technology architecture proposal designed specifically for the prospective customer, along with confidential pricing information. Through continued collaboration with the client, CTI ultimately produces a "Statement of Work" ("SOW") that outlines all of the components of the solution – hardware, software, and services – with relevant pricing information. When the client signs the SOW, the parties have an agreement. Thereafter, CTI further researches and often tests various aspects of the solution in its own facility to assure that the solution works as designed, and then installs it for the customer. CTI's typical engagement also includes comprehensive training for the client's employees as to how to use and maintain each aspect of the system, as well as ongoing maintenance and user-support services. CTI also offers follow-on service to meet future client needs and integrate new software updates and features.

5.     CTI's typical sales process and engagement involves investment of hundreds, if not thousands. of hours of engineering services and expertise.

6.     A vital part of CTI's business model is repeat business. For 2012, 92% of CTI's business to date has been from existing customers. All of Brian Harnett's sales to customers in 2012 were repeat business (*i.e.*, no new CTI customers in 2012).

2

7.     CTI's success with repeat business is due in large part to the competitive advantage it gains from longstanding relationships and reputation. By working hand in hand with customers on a regular basis and having familiarity with the confidential IT solutions employed, CTI's Consultants and Account Executives learn about a customer's needs and goals well before any public solicitation for further IT services. This enables CTI to propose solutions that result in future sales.

8.     All of CTI's business processes and confidential information leading up to, implementing, and following up on a sales opportunity are highly confidential and proprietary information developed over the course of almost twenty years.

9.     CTI has taken appropriate measures to protect its highly confidential and proprietary information by, among other measures, expressly including language in all of its SOWs indicating that the information contained therein is confidential and that the information regarding system design and pricing belong to CTI and cannot be disclosed to third parties. As a condition of employment, CTI also requires all of its Account Executives and engineers to sign Nondisclosure and Nonsolicitation Agreements ("ND-NS Agreement"), such as the Agreement signed by Harnett. Exhibit A to CTI's ND-NS Agreement specifies the type of information that it treats as confidential and proprietary. Further, CTI's customers also complete Nondisclosure Agreements to protect CTI's confidential and proprietary information.

10.     The purpose of CTI's ND-NS Agreements with its employees is to protect CTI's confidential information, good will, and investment in acquiring clients that have been developed at substantial cost and effort by CTI over the course of almost two decades.

11.     On February 24, 2003, as a condition of his employment offer from CTI, Harnett signed a ND-NS Agreement stating in relevant part: "During any period in which Services are or

3

have been provided, and for twelve (12) months following the last date on which the Employee provided Services, the Employee shall not, by the Employee's action, directly or indirectly, alone or as a partner, officer, director, employee, independent contractor, investor, lender, advisor or stockholder of or to any person or entity (a) solicit, divert or entice away existing customers or business of the Company . . . ." Agreement § 3. A true copy of the Nonsolicitation Agreement is attached as Exhibit A.

12.    Similarly, the Nondisclosure provisions of the Agreement further prohibit the use of CTI's confidential information to benefit a third party: "The Employee . . . shall not use or attempt to use any Confidential Information or Development (or such information or development belonging to a third party) for his or her own benefit, or for the benefit of any third party or in any manner which may injure or cause loss or may be calculated to injure or cause loss (whether directly or indirectly) to the Company." Agreement § 2.

13.    Because CTI only seeks to protect its legitimate business interests, the ND-NS Agreement is narrow in scope and duration. The ND-NS Agreement only prevents former account executives such as Harnett from giving an unfair advantage to a competitor by prohibiting contact with and diversion of CTI's investment in developing and ongoing campaigns for future business via confidential information regarding existing CTI clients. This scope is very narrow in practice because CTI only works with approximately 300 companies, non-profits, and other institutions from Maine to New Jersey, with a focus in the greater Boston area. While CTI is an established and successful company, it does not have so dominant a market share in the region that a former employee would be unable to seek new sales opportunities without relocating.

4

14.     Over the course of almost ten years, CTI supported Harnett with resources, access to product inventory through our credit and financing facilities with distributor relationships, training, and our consultants' expertise that allowed him to win business from client companies.

15.     In his role as Senior Account Executive at CTI, Harnett had access to, accessed and/or created sensitive, proprietary and confidential information of CTI, including, but not limited to, the following:

     a.  Product cost information;

     b.  Sales prices quoted / charged to customers;

     c.  Profit margins;

     d.  Statements of Work;

     e.  The sales strategies that inform proposals to prospective customers;

     f.  The product/manufacture pricing mix and strategy for proposals to prospective customers;

     g.  Customer contact information;

     h.  Customer purchasing and service preferences;

     i.  Vendor contact information; and

     j.  Vendor preferences and tendencies; and

     k.  Customer plans for future project work and purchases.

16.     The information identified in the paragraph above was identified as confidential in Harnett's ND-NS Agreement.

17.     Notably, Harnett had access to customer information for all of CTI's clients, not just the accounts assigned to him through CTI's client relationship management ("CRM") database containing, among other confidential information, confidential documents customized

for CTI's clients, records of communications and sales with clients, and pricing information. This is why the ND-NS Agreement was written broad enough to cover the diversion of any CTI client, not simply those to which Harnett was assigned.

18.     At the end of his nearly ten-year tenure with CTI, Harnett was a highly compensated employee earning several hundreds of thousands of dollars per year. CTI paid Harnett millions of dollars in compensation over the course of his employment with our company.

19.     On October 26, 2012, Harnett voluntarily ended his employment at CTI to take a position at the Burlington, Massachusetts office of OnX Enterprise Solutions ("OnX"), a direct competitor to CTI. As part of its standard practices, CTI asks departing employees if they will be joining a company that we deem a competitor so that we might take appropriate steps to protect CTI's interests. After giving notice of his resignation, Harnett was asked several times by me and his supervisor as to the name of his new employer, but he refused to provide the information because he claimed that he "did not have a firm offer in hand." In an exit meeting, CTI Human Resources Manager Adrienne Jones ("Jones") gave Harnett a copy of the ND-NS Agreement and specifically reminded him that he could not solicit CTI clients for a one-year period following separation. Harnett signed an acknowledgment at the conclusion of the exit interview stating that he was familiar with the terms of the ND-NS Agreement. A true copy of this acknowledgment is attached as Exhibit B.

20.     On November 1, 2012, at a CTI sales forecast meeting, I learned that Harnett was believed to be calling on his previous clients from CTI to solicit business for OnX. Specifically, among other actions, I was informed by a member of my staff that OnX sent an email to Harnett's former CTI clients announcing Harnett's hiring by OnX.

6

21.     Based on this meeting, CTI's counsel issued a letter to Harnett on November 2, 2012, reiterating his obligations under the February 24, 2003 ND-NS Agreement, including a list of the accounts from which he could not solicit business. A true copy of the letter with customer names redacted is attached as Exhibit C.

22.     CTI periodically verifies the list of NetApp's top partners in the New England area. During CTI's last review, NetApp informed CTI that OnX had "minimal presence" in the New England NetApp market. Accordingly, CTI believes that Harnett was hired to "jump start" OnX's NetApp sales.

23.     OnX is also a relative newcomer to this geographic region. Its Burlington, Massachusetts office was acquired in a purchase of another company, Agilysys, in August 2011.

24.     Abigail Kane, the CTI Senior Account Executive who has assumed responsibility for the Demandware account following Harnett's departure, has learned from NetApp that a rare "dual registration" was recently issued to CTI and OnX for a sales opportunity with Demandware. Ms. Kane will be submitting an affidavit providing additional detail on this and other activity by Harnett related to CTI clients.

25.     CTI has also learned through its account executives that Harnett has registered a sales opportunity for another of his former clients, Ebsco, on behalf of OnX. This registered opportunity has neither been approved nor rejected by the vendor, f5, yet.

26.     Even a pending registered opportunity such as this one negatively impacts CTI. Specifically, if CTI tries to register an opportunity for f5 hardware for Ebsco while Harnett's submission is pending, CTI will have to prove to the vendor that it is better situated to complete the sale. This requires the expenditure of additional resources by CTI and its employees and reduces CTI's ability to pursue other sales, thereby giving a competitive advantage to OnX.

7

27.     CTI account executives have heard rumors that Harnett has attempted to register a
large number of opportunities since joining OnX. This development was surprising to CTI
account executives because of the limited number of registrations that an account executive
typically files over a similar time period and the amount of work required to develop a sales
opportunity. Upon information and belief, a large number of registrations by Harnett since
joining OnX would be indicative of one of two possibilities: (1) Harnett and OnX are
fraudulently submitting registrations for opportunities in an attempt to dissuade competitors and
obtain unfair advantage; or (2) Harnett breached his fiduciary duties to CTI by cultivating
opportunities while employed by CTI, but not filing the opportunities until he went to OnX.

28.     I believe that based on these actions, Harnett is operating under the premise with
CTI partners and clients that he has only a non-disclosure rather than a non-compete or non-
solicitation agreement with CTI. Further, I believe Harnett mistakenly assumes that he can
solicit business from CTI's clients as long as he does not initiate the contact. The ND-NS
Agreement clearly prohibits the diversion of CTI clients by any means.

29.     Disregard by Harnett of his contractual obligations CTI negatively impacts CTI's
relationships with vendors and customers. But for Harnett's misrepresentations, CTI's vendors
and customers would honor the terms of the ND-NS Agreement by not aiding and abetting
Harnett's breach of the Agreement.

30.     On November 8, 2012, counsel for CTI issued a letter to OnX informing it of the
ND-NS Agreement between Harnett and CTI, and its belief that Harnett was operating in
violation of that agreement by soliciting his former clients on behalf of OnX. CTI further
requested in the letter that OnX confirm in writing that it would honor the terms of the ND-NS

8

Agreement and not employ Harnett in any way that would violate its terms. A true copy of the letter is attached as Exhibit D.

31.    To date, neither Harnett nor OnX has responded to these letters.

32.    If Harnett and OnX are allowed to continue to ignore and violate the ND-NS Agreement, a substantial portion of CTI's business is placed at risk.

33.    At the termination of his employment with CTI, Harnett was responsible for fifteen client accounts worth approximately 18% of CTI's annual revenue.

34.    In a little over a month since his departure, Harnett has contacted at least three former clients, helped OnX obtain a rare dual registration for a sales opportunity with one of those former clients (Demandware), and attempted to register an opportunity for another (Ebsco).

35.    If this behavior is allowed to continue, OnX will gain a completely unfair and asymmetrical business advantage by reaping the benefits of customer relationships and business intelligence developed over the course of almost twenty years by CTI, including almost ten years supporting Harnett's efforts with the same clients that Harnett is now registering opportunities for on behalf of OnX. A competitor armed with CTI's highly confidential and proprietary information would have a roadmap to CTI's clients and their needs, and could offer similar services at a lower price than CTI because it did not have to incur costs developing a solution or learning a client's business.

36.    Further, CTI's customer profiles and SOWs are unknown outside of CTI and the client that is the counterparty to any given SOW. The information is not used for marketing purposes, nor is it published anywhere in the public domain. It would take months to years for a competitor to develop this information, if it could do so at all.

9

37.     It is simply impossible to quantify the damage and consequences that will result to CTI if Harnett and OnX's ongoing conduct is not stopped, including but not limited to future loss of sales. loss of good will with customers and vendors, and compromising highly confidential and proprietary business processes.

Signed under the pains and penalties of perjury this *18th* day of December, 2012

Harry Kasparian

#51043213

10

# EXHIBIT A

NONDISCLOSURE AND NONSOLICITATION AGREEMENT

This Nondisclosure and Nonsolicitation Agreement is made as of the _24th_ day of _February_ 2003, between Brian Harnett (the "Employee"), an individual residing at 335 Bay Road, North Easton, Massachusetts 02356 and Corporate Technologies, Inc. (the "Company"), a Massachusetts corporation with its principal place of business at 3 Burlington Woods, 3rd Floor, Burlington, Massachusetts 01803.

WITNESSETH

In consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Background and Acknowledgments.

(a) The Employee has provided and/or will provide services, as an employee, consultant or otherwise, to the Company. References herein to any such services of the Employee (whether past, present or future) are referred to herein as "Services."

(b) The Company possesses Confidential Information (as that term is defined in Exhibit A hereto) and Developments (as defined in Section 4 hereof) which are of substantial competitive as well as monetary value to the Company. Additional Confidential Information and Developments may be created or otherwise acquired by the Company in the future which will also be of significant competitive and monetary value to the Company. Confidential Information and Developments may be developed, or may have been developed, with the assistance of, communicated to or otherwise known by or available to the Employee in connection with the Services.

(c) All Confidential Information and Developments, whether developed or acquired by the Company prior to the date hereof or hereafter, are and shall be the property of the Company which is entitled to the provisions hereof to assure its ownership thereof and the protection thereof against loss.

2.      Nondisclosure Covenant. The Employee shall not at any time (whether during or after any period in which Services are or have been provided) reveal to any person or entity any Confidential Information or Development or information or development belonging to any third party which the Company is under an obligation to keep confidential, and shall keep secret all matters which have or may be entrusted to him or her and shall not use or attempt to use any Confidential Information or Development (or such information or development belonging to a third party) for his or her own benefit, or for the benefit of any third party or in any manner which may injure or cause loss or may be calculated to injure or cause loss (whether directly or indirectly) to the Company. The Employee shall take or omit to take such actions as the Company may reasonably request to preserve all Confidential Information and Developments as the sole and exclusive property of the Company.

Anything to the contrary herein notwithstanding, the Employee shall not at any time publish any Confidential Information or any information derived therefrom or concerning any Development, without the express written permission of the Company.

-1-

Upon request of the Company, the Employee shall immediately deliver all notes, memoranda, drawings, specifications, programs, data or other materials in his or her possession constituting Confidential Information and all copies of any of the foregoing to the Company.

The foregoing limitations on disclosure and use of Confidential Information shall not apply to any Confidential Information which is (a) known to the general public or available to the general public, provided that such Confidential Information became known or available to the general public other than through a breach of this Agreement, or (b) ordered disclosed by a court of competent jurisdiction, pursuant to an order from which no further right of appeal exists or cannot be stayed pending any such appeal (provided such disclosure is strictly in accordance with such order, and provided further that the Company shall have been given prompt prior notice of such order and of any request therefor and a reasonable opportunity, at the Company's expense, to object to or appeal from, or to require the Employee subject to such order or request to object to or appeal from, any such order or request and/or to obtain a protective order with respect thereto).

3.      Nonsolicitation Covenant. During any period in which Services are or have been provided, and for twelve (12) months following the last date on which the Employee provided Services, the Employee shall not, by the Employee's action, directly or indirectly, alone or as a partner, officer, director, employee, independent contractor, investor, lender, advisor or stockholder of or to any person or entity (a) solicit, divert or entice away existing customers or business of the Company, or (b) solicit, interfere with or endeavor to entice away, any employee of the Company.

4.      Ownership of Intellectual Property. The Employee acknowledges that any invention, modification, discovery, concept, idea, technology, software, program, method, product, design, development, improvement, process, formula, data, technique, know-how, secret or other intellectual property right or fixed expression of or interest in any of the foregoing (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) ("Intellectual Property") that (a) is developed by any employees or consultants to the Company (including by the Employee) and that constitutes a "derivative work," as defined under Section 101 of the U.S. Copyright Act, as amended (17 U.S.C. § 101, et. seq.), or otherwise incorporates any Intellectual Property that is owned by, licensed by, or was created, invented, or developed by the Company; (b) is developed by any employees or consultants to the Company (including by the Employee) on or using the Company's facilities or property or during Company time; or (c) has been or is used by the Company in any of its products or services or in the development or operation of its business as conducted or planned to be conducted (all of the foregoing Intellectual Property described in (a), (b), and (c) being hereinafter individually called a "Development" and, collectively, "Developments") are the sole and absolute property of the Company; provided, however, that this Section 4 shall not be deemed to apply to (x) the Employee's individual skills and know-how, or information or knowledge which is generally available to the public; or (y) any Intellectual Property developed by the Employee that is not a Development (individually or collectively, "Employee Intellectual Property").

Notwithstanding the foregoing, the Employee shall not, during the period in which Services are or have been provided, market, sell, or distribute any Employee Intellectual Property that a reasonable person would perceive as competitive in the relevant market with the Company's products or services. In the event that Employee violates the foregoing restriction, in addition to any other rights the Company may have, the Employee Intellectual Property that is the subject of such violation shall immediately without further action of any kind be and become the sole and absolute property of the Company and the Employee hereby assigns to the Company any right, title and interest the Employee may have or acquire in any such Employee Intellectual Property without further compensation. In such event, the Employee agrees to execute such documents, and do such acts, as the Company or its agents or attorneys may

reasonably require to vest in the Company, or evidence the Company's rights in, such Employee Intellectual Property.

5.     Remedies Upon Breach. It is acknowledged that any breach of this Agreement by the Employee could cause the Company irreparable damage and that in the event of such breach the Company shall have, in addition to any and all remedies at law, the right to an injunction, specific performance or other equitable relief to prevent the violation of any obligations of the Employee hereunder.

6.     No Waiver. Any waiver of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement or any subsequent breach hereof.

7.     Severability. The parties hereby agree that each provision hereof shall be treated as a separate and independent provision, and the unenforceability of any one provision shall in no way impair the enforceability of any other provision hereof. Moreover, if one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to scope, activity or subject so as to be unenforceable, such provision or provisions shall be construed by the appropriate judicial body so by limiting or reducing it or them, so as to be enforceable to the maximum extent permitted by applicable law.

8.     Survival of Obligations. The Employee's obligations hereunder are independent of his or her obligations relating to the Services and each such obligation under this Agreement shall survive the termination of the Employee's employment with the Company or any other arrangement with respect to such Services regardless of the manner of such termination and shall be binding upon the Employee's successors, assigns, legal representatives, heirs, executors, and administrators.

9.     Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts without regard to conflicts of law principles.

10.    Assignment by Company. The Company shall have the right to assign this Agreement to its successors and assigns, and all covenants and agreements hereunder shall inure to the benefit of and be enforceable by said successors or assigns, and any references to the "Company" shall also refer to any such successor or assign. Neither this Agreement nor the respective obligations hereunder may be assigned by the Employee to any other person or entity.

11.    Reasonableness of Provisions. The Employee acknowledges and agrees that the enforcement of this Agreement is necessary to ensure the preservation, protection and continuity of the business, trade secrets and goodwill of the Company and further acknowledges and agrees that, due to the confidential nature of the Company's businesses, the restrictions set forth in Sections 2, 3, and 4 of this Agreement are reasonable as to time and scope.

12.    Contest of Provisions. In the event of a dispute between the Company and the Employee as to the validity or applicability of Section 3 hereof in connection with the Employee's covenants contained therein, if the Company is successful in such dispute, the commencement date of the 12-month period referred to in Section 3 shall be that date upon which a court enters final judgment in favor of the Company from which no further appeal is possible.

13.    Priority of Agreement/Counterparts/Notice. This Agreement supersedes and replaces any other agreement between the Employee and the Company related to the same subject matter. This Agreement may be executed in any number of counterpart copies, each of which shall be an original and

-3-

legally binding upon all parties. Any notice required under this Agreement shall be given by Federal Express or other recognized overnight courier at the respective addresses set forth in the first paragraph of this Agreement or such other addresses of which notice in accordance with this Section shall have been provided and any notice shall be deemed delivered one business day after deposit with such courier.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as a sealed instrument as of the date first set forth above.

Employee Signature: _Brian Harnett_

Printed Name: _BRian Harnett_

CORPORATE TECHNOLOGIES, INC.

By: _Harry Kasparian_, CEO

-4-

## EXHIBIT A

The term "Confidential Information" shall include all information evidencing or relating to any of the following whether or not furnished or made available to the Employee by the Company or developed or acquired in whole or in part by the Employee alone or jointly with the Company or others on behalf of or for the Company:

(a)     All Developments; and

(b)     All Company client or customer lists, trade secrets, technical or scientific information and all information pertaining to the financial condition, business affairs, methods, technology, designs, products, processes, services, employees, developments or prospects of the Company including, without limitation: all information concerning the Company's customers, suppliers and other parties with which the Company has a business relationship; proprietary software; company forms and records (including financial statements and product specification sheets); pricing information; and information concerning costs of manufacture, delivery of services and specifications of equipment, software, and services supplied to customers. Without limiting the foregoing, Confidential Information shall include any information or development belonging to any third party which the Company is under an obligation to keep confidential.

(c)     Each of the foregoing shall be Confidential Information whether or not it is published or unpublished, in writing or otherwise reduced to tangible form, confidential or protected or susceptible to protection by patent, trademark, copyright or any other form of legal protection and whether or not any attempt has been made to secure such protection.

EXHIBIT B
NONDISCLOSURE AND NONSOLICITATION AGREEMENT

This Exhibit B Nondisclosure and Nonsolicitation Agreement is made as of the 26 day of February 20 10, between Brian Harnett _____ (the "Employee"), an individual residing at 25 Meeting House Lane Scituate MA and Corporate Technologies, Inc. (the "Company"), a Massachusetts corporation with its principal place of business at 3 Burlington Woods, 3rd Floor, Burlington, Massachusetts 01803.

Except as specifically required in the course of performing his/her duties as an employee of the Company, Employee shall not disclose or use any non-public personally identifiable information provided by the Company or any client of the Company to Employee. "Non-public personally identifiable information" is financial or medical information of or concerning a private person which either has been obtained from sources which are not available to the general public or obtained from the person who is the subject and which information is included in data files exchanged by the parties hereto. For the purposes hereof, the term shall be deemed to include all data elements such as names and addresses of individuals. Such non-public personally identifiable information shall not be reproduced or shared with any other party, except as may specifically be required for the fulfillment of Employee's duties and provided such disclosures shall comply with all state and federal statutes and regulations governing the disclosure of medical records and non-public personally identifiable information, including any state or federal laws pertaining to the confidentiality of medical records. Employee will immediately notify the Company of any breach or suspected breach of data security. Employee shall adhere to all federal and state privacy and data protection laws and regulatory rulings applicable to its gathering, processing, storing and transmitting of non-public personally identifiable information.

Employee Signature: _____

Printed Name: BRIAN HARNETT

# Exhibit B

**CORPORATE
TECHNOLOGIES**

Employee Name: _Brian Harnett_
Separation Date: _10|26|12_

## SEPARATION CHECKLIST - MA

| ☑ Access Key FOB | ☑ COBRA Notification | ☐ Expense Reports |
| ☑ Laptop | ☑ Flexible Spending Acct. | ☑ Commission/Bonus Advance |
| ☑ Keys – Office, Lab, Remote | ☑ 401(k) Documents | ☑ Life Insurance Conversion |
| ☑ NDA Copy | ☑ Partner/Client Access Card | ☐ Other |

I confirm that ☐ I DO  ☒ DO NOT  have:

✓ Equipment
✓ Documentation
✓ Company-owned confidential or technical information
✓ Client-owned confidential or technical information and property
✓ Other property

belonging to the company and/or CTI client(s) in my possession. I confirm that I will not leave the building today with anything other than my personal belongings.

Comments:_____

PLEASE READ AND ACKNOWLEDGE BELOW:

I have received the information bulletin, "How to File for Unemployment Insurance Benefits" for Massachusetts provided in this exit process

I understand that by the terms of the agreement I entered into with Corporate Technologies, Inc., at the commencement of my employment, I will not at any time divulge to others information or knowledge relating to Corporate Technologies' business learned by me during my employment which is not generally known to the public. I acknowledge that I have learned trade secrets and/or Corporate Technologies' Confidential Information (as defined in my Nondisclosure and Nonsolicitation Agreement) during my employment at Corporate Technologies, Inc. I am familiar with the terms of my Nondisclosure and Nonsolicitation Agreement and I agree not to use or reveal to any one any of Corporate Technologies' Confidential Information or trade secrets.

_Signature_

_Brian Harnett_
Print Name

_10/26/12_
Date

Forwarding Address:

_brianharnell@mac.com_

_____

_____

# EXHIBIT C

**HinckleyAllenSnyder**LLP
ATTORNEYS AT LAW

***Aaron A. Gilman***
agilman@haslaw.com
*(617) 378-4324*

November 2, 2012

***VIA FEDERAL EXPRESS and***
***VIA ELECTRONIC MAIL brianharnett@mac.com***

Mr. Brian Harnett
188 Crowell Road
Hopkinton, NH  03229

Re: **Corporate Technologies, Inc.**

Dear Mr. Harnett:

Please be advised that this office is legal counsel to Corporate Technologies, Inc. ("CTI").

As you are well aware, during the course of your prior employment with CTI, you entered into
and executed a Nondisclosure and Nonsolicitation Agreement dated February 24, 2003 (the
"Nonsolicitation Agreement"), a copy of which is enclosed herewith.  Pursuant to Section 3 of
the Nonsolicitation Agreement, you specifically agreed that, for a period of twelve (12) months
after the termination of your employment with CTI you would not "directly or indirectly, alone
or as a partner, officer, director, employee, independent contractor, investor, lender, advisor or
stockholder of or to any person or entity (a) solicit, divert or entice away existing customers or
business of the Company or (b) solicit, interfere with, or endeavor to entice away, any employee
of the Company.

Please be advised that CTI expects your full and unequivocal compliance with your contractual
obligations as set forth in the Nonsolicitation Agreement, including, but not limited to, those
obligations set forth above.  Please be advised that the express terms and conditions of the
Nonsolicitation Agreement preclude you, for a period of twelve (12) months following the last
date on which you provided services to CTI, from soliciting, diverting or enticing away any of
CTI's existing customers or business.  In that regard, the Agreement specifically prohibits you
from soliciting, diverting, or enticing away any business of the following customers of CTI with
whom you transacted business on behalf of CTI during the course of your employment with CTI:

Mr. Brian Harnett
November 2, 2012
Page 2

**HinckleyAllenSnyder**LLP
ATTORNEYS AT LAW

While the foregoing is not meant to be an exhaustive list of all existing customers and business of CTI whom you are prohibited from soliciting, CTI is identifying the above customers with which you had a relationship in your capacity as an employee of CTI. CTI will not tolerate any effort of any nature by you or by any entity with which you may be affiliated to in any manner solicit the aforementioned customers or to entice such customers away from CTI.

Please be advised that if you fail to comply with your contractual obligations under the Nonsolicitation Agreement, including, but not limited to, those obligations set forth above, CTI will proceed with immediate legal action against you, including, but not limited to seeking injunctive relief against any such violations of the Nonsolicitation Agreement. CTI will as well seek to recover any and all damages which it may sustain as a result of any violation by you of the Nonsolicitation Agreement. Please be assured that CTI fully intends to enforce all of its rights under the Nonsolicitation Agreement and will not tolerate any disregard by you of your obligations thereunder.

#50988762

Mr. Brian Harnett
November 2, 2012
Page 3

**HinckleyAllenSnyder**LLP
ATTORNEYS AT LAW

If you should have any questions regarding the foregoing, please contact the undersigned at your earliest possible opportunity.

Sincerely,

Aaron A. Gilman

AAG/cz
Enclosure

cc:     Harry Kasparian, Corporate Technologies
        Adrienne Jones, Corporate Technologies

#50988762

### NONDISCLOSURE AND NONSOLICITATION AGREEMENT

This Nondisclosure and Nonsolicitation Agreement is made as of the 24th day of *February* 2003, between Brian Harnett (the "Employee"), an individual residing at 335 Bay Road, North Easton, Massachusetts 02356 and Corporate Technologies, Inc. (the "Company"), a Massachusetts corporation with its principal place of business at 3 Burlington Woods, 3rd Floor, Burlington, Massachusetts 01803.

### WITNESSETH

In consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   **Background and Acknowledgments.**

(a)  The Employee has provided and/or will provide services, as an employee, consultant or otherwise, to the Company.  References herein to any such services of the Employee (whether past, present or future) are referred to herein as "Services."

(b)  The Company possesses Confidential Information (as that term is defined in Exhibit A hereto) and Developments (as defined in Section 4 hereof) which are of substantial competitive as well as monetary value to the Company.  Additional Confidential Information and Developments may be created or otherwise acquired by the Company in the future which will also be of significant competitive and monetary value to the Company.  Confidential Information and Developments may be developed, or may have been developed, with the assistance of, communicated to or otherwise known by or available to the Employee in connection with the Services.

(c)  All Confidential Information and Developments, whether developed or acquired by the Company prior to the date hereof or hereafter, are and shall be the property of the Company which is entitled to the provisions hereof to assure its ownership thereof and the protection thereof against loss.

2.   **Nondisclosure Covenant.**  The Employee shall not at any time (whether during or after any period in which Services are or have been provided) reveal to any person or entity any Confidential Information or Development or information or development belonging to any third party which the Company is under an obligation to keep confidential, and shall keep secret all matters which have or may be entrusted to him or her and shall not use or attempt to use any Confidential Information or Development (or such information or development belonging to a third party) for his or her own benefit, or for the benefit of any third party or in any manner which may injure or cause loss or may be calculated to injure or cause loss (whether directly or indirectly) to the Company.  The Employee shall take or omit to take such actions as the Company may reasonably request to preserve all Confidential Information and Developments as the sole and exclusive property of the Company.

Anything to the contrary herein notwithstanding, the Employee shall not at any time publish any Confidential Information or any information derived therefrom or concerning any Development, without the express written permission of the Company.

-1-

Upon request of the Company, the Employee shall immediately deliver all notes, memoranda, drawings, specifications, programs, data or other materials in his or her possession constituting Confidential Information and all copies of any of the foregoing to the Company.

The foregoing limitations on disclosure and use of Confidential Information shall not apply to any Confidential Information which is (a) known to the general public or available to the general public, provided that such Confidential Information became known or available to the general public other than through a breach of this Agreement, or (b) ordered disclosed by a court of competent jurisdiction, pursuant to an order from which no further right of appeal exists or cannot be stayed pending any such appeal (provided such disclosure is strictly in accordance with such order, and provided further that the Company shall have been given prompt prior notice of such order and of any request therefor and a reasonable opportunity, at the Company's expense, to object to or appeal from, or to require the Employee subject to such order or request to object to or appeal from, any such order or request and/or to obtain a protective order with respect thereto).

3.      Nonsolicitation Covenant. During any period in which Services are or have been provided, and for twelve (12) months following the last date on which the Employee provided Services, the Employee shall not, by the Employee's action, directly or indirectly, alone or as a partner, officer, director, employee, independent contractor, investor, lender, advisor or stockholder of or to any person or entity (a) solicit, divert or entice away existing customers or business of the Company, or (b) solicit, interfere with or endeavor to entice away, any employee of the Company.

4.      Ownership of Intellectual Property. The Employee acknowledges that any invention, modification, discovery, concept, idea, technology, software, program, method, product, design, development, improvement, process, formula, data, technique, know-how, secret or other intellectual property right or fixed expression of or interest in any of the foregoing (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) ("Intellectual Property") that (a) is developed by any employees or consultants to the Company (including by the Employee) and that constitutes a "derivative work," as defined under Section 101 of the U.S. Copyright Act, as amended (17 U.S.C. § 101, et. seq.), or otherwise incorporates any Intellectual Property that is owned by, licensed by, or was created, invented, or developed by the Company; (b) is developed by any employees or consultants to the Company (including by the Employee) on or using the Company's facilities or property or during Company time; or (c) has been or is used by the Company in any of its products or services or in the development or operation of its business as conducted or planned to be conducted (all of the foregoing Intellectual Property described in (a), (b), and (c) being hereinafter individually called a "Development" and, collectively, "Developments") are the sole and absolute property of the Company; provided, however, that this Section 4 shall not be deemed to apply to (x) the Employee's individual skills and know-how, or information or knowledge which is generally available to the public; or (y) any Intellectual Property developed by the Employee that is not a Development (individually or collectively, "Employee Intellectual Property").

Notwithstanding the foregoing, the Employee shall not, during the period in which Services are or have been provided, market, sell, or distribute any Employee Intellectual Property that a reasonable person would perceive as competitive in the relevant market with the Company's products or services. In the event that Employee violates the foregoing restriction, in addition to any other rights the Company may have, the Employee Intellectual Property that is the subject of such violation shall immediately without further action of any kind be and become the sole and absolute property of the Company and the Employee hereby assigns to the Company any right, title and interest the Employee may have or acquire in any such Employee Intellectual Property without further compensation. In such event, the Employee agrees to execute such documents, and do such acts, as the Company or its agents or attorneys may

-2-

reasonably require to vest in the Company, or evidence the Company's rights in, such Employee Intellectual Property.

5.     Remedies Upon Breach.  It is acknowledged that any breach of this Agreement by the Employee could cause the Company irreparable damage and that in the event of such breach the Company shall have, in addition to any and all remedies at law, the right to an injunction, specific performance or other equitable relief to prevent the violation of any obligations of the Employee hereunder.

6.     No Waiver.  Any waiver of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement or any subsequent breach hereof.

7.     Severability.  The parties hereby agree that each provision hereof shall be treated as a separate and independent provision, and the unenforceability of any one provision shall in no way impair the enforceability of any other provision hereof.  Moreover, if one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to scope, activity or subject so as to be unenforceable, such provision or provisions shall be construed by the appropriate judicial body by limiting or reducing it or them, so as to be enforceable to the maximum extent permitted by applicable law.

8.     Survival of Obligations.  The Employee's obligations hereunder are independent of his or her obligations relating to the Services and each such obligation under this Agreement shall survive the termination of the Employee's employment with the Company or any other arrangement with respect to such Services regardless of the manner of such termination and shall be binding upon the Employee's successors, assigns, legal representatives, heirs, executors, and administrators.

9.     Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts without regard to conflicts of law principles.

10.    Assignment by Company.  The Company shall have the right to assign this Agreement to its successors and assigns, and all covenants and agreements hereunder shall inure to the benefit of and be enforceable by said successors or assigns, and any references to the "Company" shall also refer to any such successor or assign.  Neither this Agreement nor the respective obligations hereunder may be assigned by the Employee to any other person or entity.

11.    Reasonableness of Provisions.  The Employee acknowledges and agrees that the enforcement of this Agreement is necessary to ensure the preservation, protection and continuity of the business, trade secrets and goodwill of the Company and further acknowledges and agrees that, due to the confidential nature of the Company's businesses, the restrictions set forth in Sections 2, 3, and 4 of this Agreement are reasonable as to time and scope.

12.    Contest of Provisions.  In the event of a dispute between the Company and the Employee as to the validity or applicability of Section 3 hereof in connection with the Employee's covenants contained therein, if the Company is successful in such dispute, the commencement date of the 12-month period referred to in Section 3 shall be that date upon which a court enters final judgment in favor of the Company from which no further appeal is possible.

13.    Priority of Agreement/Counterparts/Notice.  This Agreement supersedes and replaces any other agreement between the Employee and the Company related to the same subject matter.  This Agreement may be executed in any number of counterpart copies, each of which shall be an original and

-3-

legally binding upon all parties. Any notice required under this Agreement shall be given by Federal Express or other recognized overnight courier at the respective addresses set forth in the first paragraph of this Agreement or such other addresses of which notice in accordance with this Section shall have been provided and any notice shall be deemed delivered one business day after deposit with such courier.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as a sealed instrument as of the date first set forth above.

Employee Signature: _____

Printed Name: _Brian Harnett_

CORPORATE TECHNOLOGIES, INC.

By: _____
Harry Kasparian, CEO

## EXHIBIT A

The term "Confidential Information" shall include all information evidencing or relating to any of the following whether or not furnished or made available to the Employee by the Company or developed or acquired in whole or in part by the Employee alone or jointly with the Company or others on behalf of or for the Company:

(a)     All Developments; and

(b)     All Company client or customer lists, trade secrets, technical or scientific information and all information pertaining to the financial condition, business affairs, methods, technology, designs, products, processes, services, employees, developments or prospects of the Company including, without limitation: all information concerning the Company's customers, suppliers and other parties with which the Company has a business relationship; proprietary software; company forms and records (including financial statements and product specification sheets), pricing information; and information concerning costs of manufacture, delivery of services and specifications of equipment, software, and services supplied to customers. Without limiting the foregoing, Confidential Information shall include any information or development belonging to any third party which the Company is under an obligation to keep confidential.

(c)     Each of the foregoing shall be Confidential Information whether or not it is published or unpublished, in writing or otherwise reduced to tangible form, confidential or protected or susceptible to protection by patent, trademark, copyright or any other form of legal protection and whether or not any attempt has been made to secure such protection.

EXHIBIT B
NONDISCLOSURE AND NONSOLICITATION AGREEMENT

This Exhibit B Nondisclosure and Nonsolicitation Agreement is made as of the _26_ day of _February_, 20 _10_, between _Brian Harnett_____ (the "Employee"), an individual residing at _25 Marting Hane Lane Scituate_, and Corporate Technologies, Inc. (the "Company"), a Massachusetts corporation with its principal place of business at 3 Burlington Woods, 3rd Floor, Burlington, Massachusetts 01803.

Except as specifically required in the course of performing his/her duties as an employee of the Company, Employee shall not disclose or use any non-public personally identifiable information provided by the Company or any client of the Company to Employee. "Non-public personally identifiable information" is financial or medical information of or concerning a private person which either has been obtained from sources which are not available to the general public or obtained from the person who is the subject and which information is included in data files exchanged by the parties hereto. For the purposes hereof, the term shall be deemed to include all data elements such as names and addresses of individuals. Such non-public personally identifiable information shall not be reproduced or shared with any other party, except as may specifically be required for the fulfillment of Employee's duties and provided such disclosures shall comply with all state and federal statutes and regulations governing the disclosure of medical records and non-public personally identifiable information, including any state or federal laws pertaining to the confidentiality of medical records. Employee will immediately notify the Company of any breach or suspected breach of data security. Employee shall adhere to all federal and state privacy and data protection laws and regulatory rulings applicable to its gathering, processing, storing and transmitting of non-public personally identifiable information.

Employee Signature: _____

Printed Name: _BRIAN HARNETT_

# EXHIBIT D

# HinckleyAllenSnyder LLP
ATTORNEYS AT LAW

*Aaron A. Gilman*
agilman@haslaw.com
*(617) 378-4324*

28 State Street
Boston, MA 02109-1775
TEL. 617.345.9000
FAX 617 345.9020
www.haslaw.com

November 8, 2012

*VIA FEDERAL EXPRESS*

Mr. Edward Vos
President and CEO
OnX Enterprise Solutions
155 Commerce Valley Drive East
Thornhill, Ontario L3T7T2

Re: **Corporate Technologies, Inc. and Brian Harnett**

Dear Mr. Vos:

Please be advised that this office is legal counsel to Corporate Technologies, Inc. ("CTI"). In that capacity, we are writing you regarding the employment of Brian Harnett by OnX Enterprise Solutions ("OnX"). We understand that OnX is an IT solutions provider, and thus, is in direct competition with CTI. Further, we are informed and believe that Mr. Harnett has been employed by OnX for the express purpose of expanding OnX's NetApp Solutions business, which is the exact business in which Mr. Harnett was engaged during the course of his employment with CTI.

Please be advised that during his employment with CTI, Mr. Harnett executed a Nondisclosure and Nonsolicitation Agreement dated February 24, 2003 (the "Nonsolicitation Agreement"), a copy of which is enclosed herewith. Pursuant to Section 3 of the Nonsolicitation Agreement, Mr. Harnett specifically agreed that, for a period of twelve months after the termination of his employment with CTI, he would not "directly or indirectly, alone or as a partner, officer, director, employee, independent contractor, investor, lender, advisor, or stockholder of or to any person or entity (a) solicit, divert, or entice away existing customers or business of the [CTI] or (b) solicit, interfere with, or endeavor to entice away any employee of the [CTI]."

CTI has notified Mr. Harnett that it expects its full and unequivocal compliance with his contractual obligations as set forth in the Nonsolicitation Agreement, including, but not limited to those obligations set forth above. However, CTI is informed and believes that Mr. Harnett is in direct violation of his Nonsolicitation Agreement, has been contacting and soliciting customers which he formerly serviced during the course of his employment at CTI and is attempting to divert and entice away such customers and cause such customers to terminate their

51002777

50 Kennedy Plaza, Suite 1500, Providence, RI 02903-2319  TEL 401 274.2000  FAX. 401 277 9600
20 Church Street  Hartford, CT 06103-1221  TEL 860 725 6200  FAX. 860.278 3802
11 South Main Street, Suite 400, Concord, NH 03301 4846  TEL 603 225 4334  FAX 603 224 8350
20 South Pearl Street, Suite 901, Albany  NY 12207-3492  TEL. 518 396 3100  FAX 518 396 3101

Ed Boss, President and CEO
November 8, 2012
Page 2

**HinckleyAllenSnyder**ᴸᴸᴾ
ATTORNEYS AT LAW

relationship with CTI and utilize OnX.  CTI is in the course of investigating Mr. Harnett's actions and conduct, and is monitoring the situation very closely.

The purpose of this letter is to place OnX on notice of the existing enclosed Nonsolicitation Agreement.  It appears that Mr. Harnett's actions and conduct as described above in the course of his current employment may violate his contractual obligations to CTI.  Therefore, on behalf of CTI, we hereby request written confirmation that OnX will honor the terms of the enclosed Nonsolicitation Agreement, and will not employ Mr. Harnett in any fashion which would cause him to violate his contractual obligations to CTI.

If we do not hear from you with such appropriate assurances, CTI will be left with no alternative but to pursue appropriate injunctive relief and damages and will use all legal means available to it to ensure compliance by Mr. Harnett with his contractual obligations to CTI.

Your immediate attention to this matter is requested.

Sincerely,

Aaron A. Gilman

AAG/cz

cc:  Harry Kasparian, CEO, Corporate Technologies
     Adrienne Jones. Corporate Technologies

#51002777

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                        SUPERIOR COURT

|  |  |
|---|---|
| CORPORATE TECHNOLOGIES, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BRIAN HARNETT, and ) <br> ONX USA LLC d/b/a ONX ENTERPRISE ) <br> SOLUTIONS, ) <br> ) <br> Defendants. ) | CIVIL ACTION NO. _____ |

## AFFIDAVIT OF HARRY KASPARIAN

I, Harry Kasparian, hereby depose and say that:

1.     I am the Chief Executive Officer, President, and Chairman of the Board of Corporate Technologies, Inc. ("CTI"). I have worked in the technology field for more than thirty years and founded CTI in 1994. Since its founding, CTI has grown from a single employee in 1994 to 79 employees today. I am responsible for CTI's corporate strategy and organizational development as well as the day-to-day operations of the company.

2.     I make this affidavit based upon personal knowledge and information obtained in my official capacity.

3.     CTI resells, designs, implements and supports customized information technology ("IT") and business intelligence solutions for its clients and provides related consulting services and staffing. Utilizing state-of-the-art technologies from leading computer and communication hardware and software vendors (*e.g.*, IBM, HP, Quantum, Symantec, f5, Juniper, Oracle,

NetApp, SAP, Infomatica), CTI creates integrated solutions that enable clients to make optimal use of their of data and communications, increase revenue, reduce costs. and mitigate business and security risks.

4.      CTI's sales cycle begins with a series of time- and cost-intensive information gathering meetings to ascertain each prospective client's business strategy, needs. challenges goals, and existing IT systems and capabilities. Account Executives are heavily supported at this stage by CTI engineers. Based on the information gathered and its comprehensive knowledge of the IT and communication hardware and software product markets, CTI produces a solution and technology architecture proposal designed specifically for the prospective customer, along with confidential pricing information. Through continued collaboration with the client, CTI ultimately produces a "Statement of Work" ("SOW") that outlines all of the components of the solution – hardware, software, and services – with relevant pricing information. When the client signs the SOW, the parties have an agreement. Thereafter, CTI further researches and often tests various aspects of the solution in its own facility to assure that the solution works as designed, and then installs it for the customer. CTI's typical engagement also includes comprehensive training for the client's employees as to how to use and maintain each aspect of the system, as well as ongoing maintenance and user-support services. CTI also offers follow-on service to meet future client needs and integrate new software updates and features.

5.      CTI's typical sales process and engagement involves investment of hundreds, if not thousands. of hours of engineering services and expertise.

6.      A vital part of CTI's business model is repeat business. For 2012, 92% of CTI's business to date has been from existing customers. All of Brian Harnett's sales to customers in 2012 were repeat business (*i.e.*, no new CTI customers in 2012).

2

7.     CTI's success with repeat business is due in large part to the competitive advantage it gains from longstanding relationships and reputation. By working hand in hand with customers on a regular basis and having familiarity with the confidential IT solutions employed, CTI's Consultants and Account Executives learn about a customer's needs and goals well before any public solicitation for further IT services. This enables CTI to propose solutions that result in future sales.

8.     All of CTI's business processes and confidential information leading up to, implementing, and following up on a sales opportunity are highly confidential and proprietary information developed over the course of almost twenty years.

9.     CTI has taken appropriate measures to protect its highly confidential and proprietary information by, among other measures, expressly including language in all of its SOWs indicating that the information contained therein is confidential and that the information regarding system design and pricing belong to CTI and cannot be disclosed to third parties. As a condition of employment, CTI also requires all of its Account Executives and engineers to sign Nondisclosure and Nonsolicitation Agreements ("ND-NS Agreement"), such as the Agreement signed by Harnett. Exhibit A to CTI's ND-NS Agreement specifies the type of information that it treats as confidential and proprietary. Further, CTI's customers also complete Nondisclosure Agreements to protect CTI's confidential and proprietary information.

10.     The purpose of CTI's ND-NS Agreements with its employees is to protect CTI's confidential information, good will, and investment in acquiring clients that have been developed at substantial cost and effort by CTI over the course of almost two decades.

11.     On February 24, 2003, as a condition of his employment offer from CTI, Harnett signed a ND-NS Agreement stating in relevant part: "During any period in which Services are or

3

have been provided, and for twelve (12) months following the last date on which the Employee provided Services, the Employee shall not, by the Employee's action, directly or indirectly, alone or as a partner, officer, director, employee, independent contractor. investor, lender, advisor or stockholder of or to any person or entity (a) solicit, divert or entice away existing customers or business of the Company . . . ." Agreement § 3. A true copy of the Nonsolicitation Agreement is attached as Exhibit A.

12.     Similarly, the Nondisclosure provisions of the Agreement further prohibit the use of CTI's confidential information to benefit a third party: "The Employee . . . shall not use or attempt to use any Confidential Information or Development (or such information or development belonging to a third party) for his or her own benefit, or for the benefit of any third party or in any manner which may injure or cause loss or may be calculated to injure or cause loss (whether directly or indirectly) to the Company." Agreement § 2.

13.     Because CTI only seeks to protect its legitimate business interests, the ND-NS Agreement is narrow in scope and duration. The ND-NS Agreement only prevents former account executives such as Harnett from giving an unfair advantage to a competitor by prohibiting contact with and diversion of CTI's investment in developing and ongoing campaigns for future business via confidential information regarding existing CTI clients. This scope is very narrow in practice because CTI only works with approximately 300 companies. non-profits, and other institutions from Maine to New Jersey, with a focus in the greater Boston area. While CTI is an established and successful company, it does not have so dominant a market share in the region that a former employee would be unable to seek new sales opportunities without relocating.

4

14.     Over the course of almost ten years, CTI supported Harnett with resources, access to product inventory through our credit and financing facilities with distributor relationships, training, and our consultants' expertise that allowed him to win business from client companies.

15.     In his role as Senior Account Executive at CTI, Harnett had access to, accessed and/or created sensitive, proprietary and confidential information of CTI, including, but not limited to, the following:

      a.  Product cost information;

      b.  Sales prices quoted / charged to customers;

      c.  Profit margins;

      d.  Statements of Work;

      e.  The sales strategies that inform proposals to prospective customers;

      f.  The product/manufacture pricing mix and strategy for proposals to prospective customers;

      g.  Customer contact information;

      h.  Customer purchasing and service preferences;

      i.  Vendor contact information; and

      j.  Vendor preferences and tendencies; and

      k.  Customer plans for future project work and purchases.

16.     The information identified in the paragraph above was identified as confidential in Harnett's ND-NS Agreement.

17.     Notably, Harnett had access to customer information for all of CTI's clients, not just the accounts assigned to him through CTI's client relationship management ("CRM") database containing, among other confidential information, confidential documents customized

5

for CTI's clients, records of communications and sales with clients, and pricing information. This is why the ND-NS Agreement was written broad enough to cover the diversion of any CTI client, not simply those to which Harnett was assigned.

18.     At the end of his nearly ten-year tenure with CTI, Harnett was a highly compensated employee earning several hundreds of thousands of dollars per year. CTI paid Harnett millions of dollars in compensation over the course of his employment with our company.

19.     On October 26, 2012, Harnett voluntarily ended his employment at CTI to take a position at the Burlington, Massachusetts office of OnX Enterprise Solutions ("OnX"), a direct competitor to CTI. As part of its standard practices, CTI asks departing employees if they will be joining a company that we deem a competitor so that we might take appropriate steps to protect CTI's interests. After giving notice of his resignation, Harnett was asked several times by me and his supervisor as to the name of his new employer, but he refused to provide the information because he claimed that he "did not have a firm offer in hand." In an exit meeting, CTI Human Resources Manager Adrienne Jones ("Jones") gave Harnett a copy of the ND-NS Agreement and specifically reminded him that he could not solicit CTI clients for a one-year period following separation. Harnett signed an acknowledgment at the conclusion of the exit interview stating that he was familiar with the terms of the ND-NS Agreement. A true copy of this acknowledgment is attached as Exhibit B.

20.     On November 1, 2012, at a CTI sales forecast meeting, I learned that Harnett was believed to be calling on his previous clients from CTI to solicit business for OnX. Specifically, among other actions, I was informed by a member of my staff that OnX sent an email to Harnett's former CTI clients announcing Harnett's hiring by OnX.

6

21. Based on this meeting, CTI's counsel issued a letter to Harnett on November 2, 2012, reiterating his obligations under the February 24, 2003 ND-NS Agreement, including a list of the accounts from which he could not solicit business. A true copy of the letter with customer names redacted is attached as Exhibit C.

22. CTI periodically verifies the list of NetApp's top partners in the New England area. During CTI's last review, NetApp informed CTI that OnX had "minimal presence" in the New England NetApp market. Accordingly, CTI believes that Harnett was hired to "jump start" OnX's NetApp sales.

23. OnX is also a relative newcomer to this geographic region. Its Burlington, Massachusetts office was acquired in a purchase of another company, Agilysys, in August 2011.

24. Abigail Kane, the CTI Senior Account Executive who has assumed responsibility for the Demandware account following Harnett's departure, has learned from NetApp that a rare "dual registration" was recently issued to CTI and OnX for a sales opportunity with Demandware. Ms. Kane will be submitting an affidavit providing additional detail on this and other activity by Harnett related to CTI clients.

25. CTI has also learned through its account executives that Harnett has registered a sales opportunity for another of his former clients, Ebsco, on behalf of OnX. This registered opportunity has neither been approved nor rejected by the vendor, f5, yet.

26. Even a pending registered opportunity such as this one negatively impacts CTI. Specifically, if CTI tries to register an opportunity for f5 hardware for Ebsco while Harnett's submission is pending, CTI will have to prove to the vendor that it is better situated to complete the sale. This requires the expenditure of additional resources by CTI and its employees and reduces CTI's ability to pursue other sales, thereby giving a competitive advantage to OnX.

7

27.     CTI account executives have heard rumors that Harnett has attempted to register a large number of opportunities since joining OnX. This development was surprising to CTI account executives because of the limited number of registrations that an account executive typically files over a similar time period and the amount of work required to develop a sales opportunity. Upon information and belief, a large number of registrations by Harnett since joining OnX would be indicative of one of two possibilities: (1) Harnett and OnX are fraudulently submitting registrations for opportunities in an attempt to dissuade competitors and obtain unfair advantage; or (2) Harnett breached his fiduciary duties to CTI by cultivating opportunities while employed by CTI, but not filing the opportunities until he went to OnX.

28.     I believe that based on these actions, Harnett is operating under the premise with CTI partners and clients that he has only a non-disclosure rather than a non-compete or non-solicitation agreement with CTI. Further, I believe Harnett mistakenly assumes that he can solicit business from CTI's clients as long as he does not initiate the contact. The ND-NS Agreement clearly prohibits the diversion of CTI clients by any means.

29.     Disregard by Harnett of his contractual obligations CTI negatively impacts CTI's relationships with vendors and customers. But for Harnett's misrepresentations, CTI's vendors and customers would honor the terms of the ND-NS Agreement by not aiding and abetting Harnett's breach of the Agreement.

30.     On November 8, 2012, counsel for CTI issued a letter to OnX informing it of the ND-NS Agreement between Harnett and CTI, and its belief that Harnett was operating in violation of that agreement by soliciting his former clients on behalf of OnX. CTI further requested in the letter that OnX confirm in writing that it would honor the terms of the ND-NS

8

Agreement and not employ Harnett in any way that would violate its terms. A true copy of the letter is attached as Exhibit D:

31.   To date, neither Harnett nor OnX has responded to these letters.

32.   If Harnett and OnX are allowed to continue to ignore and violate the ND-NS Agreement, a substantial portion of CTI's business is placed at risk.

33.   At the termination of his employment with CTI, Harnett was responsible for fifteen client accounts worth approximately 18% of CTI's annual revenue.

34.   In a little over a month since his departure, Harnett has contacted at least three former clients, helped OnX obtain a rare dual registration for a sales opportunity with one of those former clients (Demandware), and attempted to register an opportunity for another (Ebsco).

35.   If this behavior is allowed to continue, OnX will gain a completely unfair and asymmetrical business advantage by reaping the benefits of customer relationships and business intelligence developed over the course of almost twenty years by CTI, including almost ten years supporting Harnett's efforts with the same clients that Harnett is now registering opportunities for on behalf of OnX. A competitor armed with CTI's highly confidential and proprietary information would have a roadmap to CTI's clients and their needs, and could offer similar services at a lower price than CTI because it did not have to incur costs developing a solution or learning a client's business.

36.   Further, CTI's customer profiles and SOWs are unknown outside of CTI and the client that is the counterparty to any given SOW. The information is not used for marketing purposes, nor is it published anywhere in the public domain. It would take months to years for a competitor to develop this information, if it could do so at all.

9

37.   It is simply impossible to quantify the damage and consequences that will result to CTI if Harnett and OnX's ongoing conduct is not stopped, including but not limited to future loss of sales, loss of good will with customers and vendors, and compromising highly confidential and proprietary business processes.

Signed under the pains and penalties of perjury this 18th day of December, 2012

Harry Kasparian

#51043213

10

# EXHIBIT A

NONDISCLOSURE AND NONSOLICITATION AGREEMENT

This Nondisclosure and Nonsolicitation Agreement is made as of the 24th day of February 2003, between Brian Harnett (the "Employee"), an individual residing at 335 Bay Road, North Easton, Massachusetts 02356 and Corporate Technologies, Inc. (the "Company"), a Massachusetts corporation with its principal place of business at 3 Burlington Woods, 3rd Floor, Burlington, Massachusetts 01803.

WITNESSETH

In consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Background and Acknowledgments.

(a)  The Employee has provided and/or will provide services, as an employee, consultant or otherwise, to the Company.  References herein to any such services of the Employee (whether past, present or future) are referred to herein as "Services."

(b)  The Company possesses Confidential Information (as that term is defined in Exhibit A hereto) and Developments (as defined in Section 4 hereof) which are of substantial competitive as well as monetary value to the Company.  Additional Confidential Information and Developments may be created or otherwise acquired by the Company in the future which will also be of significant competitive and monetary value to the Company.  Confidential Information and Developments may be developed, or may have been developed, with the assistance of, communicated to or otherwise known by or available to the Employee in connection with the Services.

(c)  All Confidential Information and Developments, whether developed or acquired by the Company prior to the date hereof or hereafter, are and shall be the property of the Company which is entitled to the provisions hereof to assure its ownership thereof and the protection thereof against loss.

2.    Nondisclosure Covenant.  The Employee shall not at any time (whether during or after any period in which Services are or have been provided) reveal to any person or entity any Confidential Information or Development or information or development belonging to any third party which the Company is under an obligation to keep confidential, and shall keep secret all matters which have or may be entrusted to him or her and shall not use or attempt to use any Confidential Information or Development (or such information or development belonging to a third party) for his or her own benefit, or for the benefit of any third party or in any manner which may injure or cause loss or may be calculated to injure or cause loss (whether directly or indirectly) to the Company.  The Employee shall take or omit to take such actions as the Company may reasonably request to preserve all Confidential Information and Developments as the sole and exclusive property of the Company.

Anything to the contrary herein notwithstanding, the Employee shall not at any time publish any Confidential Information or any information derived therefrom or concerning any Development, without the express written permission of the Company.

GSDocs-974407-8

Upon request of the Company, the Employee shall immediately deliver all notes, memoranda, drawings, specifications, programs, data or other materials in his or her possession constituting Confidential Information and all copies of any of the foregoing to the Company.

The foregoing limitations on disclosure and use of Confidential Information shall not apply to any Confidential Information which is (a) known to the general public or available to the general public, provided that such Confidential Information became known or available to the general public other than through a breach of this Agreement, or (b) ordered disclosed by a court of competent jurisdiction, pursuant to an order from which no further right of appeal exists or cannot be stayed pending any such appeal (provided such disclosure is strictly in accordance with such order, and provided further that the Company shall have been given prompt prior notice of such order and of any request therefor and a reasonable opportunity, at the Company's expense, to object to or appeal from, or to require the Employee subject to such order or request to object to or appeal from, any such order or request and/or to obtain a protective order with respect thereto).

3.     Nonsolicitation Covenant. During any period in which Services are or have been provided, and for twelve (12) months following the last date on which the Employee provided Services, the Employee shall not, by the Employee's action, directly or indirectly, alone or as a partner, officer, director, employee, independent contractor, investor, lender, advisor or stockholder of or to any person or entity (a) solicit, divert or entice away existing customers or business of the Company, or (b) solicit, interfere with or endeavor to entice away, any employee of the Company.

4.     Ownership of Intellectual Property. The Employee acknowledges that any invention, modification, discovery, concept, idea, technology, software, program, method, product, design, development, improvement, process, formula, data, technique, know-how, secret or other intellectual property right or fixed expression of or interest in any of the foregoing (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) ("Intellectual Property") that (a) is developed by any employees or consultants to the Company (including by the Employee) and that constitutes a "derivative work," as defined under Section 101 of the U.S. Copyright Act, as amended (17 U.S.C. § 101, et. seq.), or otherwise incorporates any Intellectual Property that is owned by, licensed by, or was created, invented, or developed by the Company; (b) is developed by any employees or consultants to the Company (including by the Employee) on or using the Company's facilities or property or during Company time; or (c) has been or is used by the Company in any of its products or services or in the development or operation of its business as conducted or planned to be conducted (all of the foregoing Intellectual Property described in (a), (b), and (c) being hereinafter individually called a "Development" and, collectively, "Developments") are the sole and absolute property of the Company; provided, however, that this Section 4 shall not be deemed to apply to (x) the Employee's individual skills and know-how, or information or knowledge which is generally available to the public; or (y) any Intellectual Property developed by the Employee that is not a Development (individually or collectively, "Employee Intellectual Property").

Notwithstanding the foregoing, the Employee shall not, during the period in which Services are or have been provided, market, sell, or distribute any Employee Intellectual Property that a reasonable person would perceive as competitive in the relevant market with the Company's products or services. In the event that Employee violates the foregoing restriction, in addition to any other rights the Company may have, the Employee Intellectual Property that is the subject of such violation shall immediately without further action of any kind be and become the sole and absolute property of the Company and the Employee hereby assigns to the Company any right, title and interest the Employee may have or acquire in any such Employee Intellectual Property without further compensation. In such event, the Employee agrees to execute such documents, and do such acts, as the Company or its agents or attorneys may

GSDocs-974407-8

reasonably require to vest in the Company, or evidence the Company's rights in, such Employee Intellectual Property.

     5.    Remedies Upon Breach. It is acknowledged that any breach of this Agreement by the Employee could cause the Company irreparable damage and that in the event of such breach the Company shall have, in addition to any and all remedies at law, the right to an injunction, specific performance or other equitable relief to prevent the violation of any obligations of the Employee hereunder.

     6.    No Waiver. Any waiver of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement or any subsequent breach hereof.

     7.    Severability. The parties hereby agree that each provision hereof shall be treated as a separate and independent provision, and the unenforceability of any one provision shall in no way impair the enforceability of any other provision hereof. Moreover, if one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to scope, activity or subject so as to be unenforceable, such provision or provisions shall be construed by the appropriate judicial body by limiting or reducing it or them, so as to be enforceable to the maximum extent permitted by applicable law.

     8.    Survival of Obligations. The Employee's obligations hereunder are independent of his or her obligations relating to the Services and each such obligation under this Agreement shall survive the termination of the Employee's employment with the Company or any other arrangement with respect to such Services regardless of the manner of such termination and shall be binding upon the Employee's successors, assigns, legal representatives, heirs, executors, and administrators.

     9.    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts without regard to conflicts of law principles.

     10.    Assignment by Company. The Company shall have the right to assign this Agreement to its successors and assigns, and all covenants and agreements hereunder shall inure to the benefit of and be enforceable by said successors or assigns, and any references to the "Company" shall also refer to any such successor or assign. Neither this Agreement nor the respective obligations hereunder may be assigned by the Employee to any other person or entity.

     11.    Reasonableness of Provisions. The Employee acknowledges and agrees that the enforcement of this Agreement is necessary to ensure the preservation, protection and continuity of the business, trade secrets and goodwill of the Company and further acknowledges and agrees that, due to the confidential nature of the Company's businesses, the restrictions set forth in Sections 2, 3, and 4 of this Agreement are reasonable as to time and scope.

     12.    Contest of Provisions. In the event of a dispute between the Company and the Employee as to the validity or applicability of Section 3 hereof in connection with the Employee's covenants contained therein, if the Company is successful in such dispute, the commencement date of the 12-month period referred to in Section 3 shall be that date upon which a court enters final judgment in favor of the Company from which no further appeal is possible.

     13.    Priority of Agreement/Counterparts/Notice. This Agreement supersedes and replaces any other agreement between the Employee and the Company related to the same subject matter. This Agreement may be executed in any number of counterpart copies, each of which shall be an original and

legally binding upon all parties. Any notice required under this Agreement shall be given by Federal Express or other recognized overnight courier at the respective addresses set forth in the first paragraph of this Agreement or such other addresses of which notice in accordance with this Section shall have been provided and any notice shall be deemed delivered one business day after deposit with such courier.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as a sealed instrument as of the date first set forth above.

Employee Signature: _____

Printed Name: _Brian  Harnett_

CORPORATE TECHNOLOGIES, INC.

By: _____
Harry Kasparian, CEO

-4-

## EXHIBIT A

The term "Confidential Information" shall include all information evidencing or relating to any of the following whether or not furnished or made available to the Employee by the Company or developed or acquired in whole or in part by the Employee alone or jointly with the Company or others on behalf of or for the Company:

    (a)    All Developments; and

    (b)    All Company client or customer lists, trade secrets, technical or scientific information and all information pertaining to the financial condition, business affairs, methods, technology, designs, products, processes, services, employees, developments or prospects of the Company including, without limitation: all information concerning the Company's customers, suppliers and other parties with which the Company has a business relationship; proprietary software; company forms and records (including financial statements and product specification sheets); pricing information; and information concerning costs of manufacture, delivery of services and specifications of equipment, software, and services supplied to customers. Without limiting the foregoing, Confidential Information shall include any information or development belonging to any third party which the Company is under an obligation to keep confidential.

    (c)    Each of the foregoing shall be Confidential Information whether or not it is published or unpublished, in writing or otherwise reduced to tangible form, confidential or protected or susceptible to protection by patent, trademark, copyright or any other form of legal protection and whether or not any attempt has been made to secure such protection.

EXHIBIT B
NONDISCLOSURE AND NONSOLICITATION AGREEMENT

This Exhibit B Nondisclosure and Nonsolicitation Agreement is made as of the _26_ day of _February_ 20_10_, between _Brian Harnett_ (the "Employee"), an individual residing at _22 Meeting Horse Lane Scituate_ and Corporate Technologies, Inc. (the "Company"), a Massachusetts corporation with its principal place of business at 3 Burlington Woods, 3rd Floor, Burlington, Massachusetts 01803.

Except as specifically required in the course of performing his/her duties as an employee of the Company, Employee shall not disclose or use any non-public personally identifiable information provided by the Company or any client of the Company to Employee. "Non-public personally identifiable information" is financial or medical information of or concerning a private person which either has been obtained from sources which are not available to the general public or obtained from the person who is the subject and which information is included in data files exchanged by the parties hereto. For the purposes hereof, the term shall be deemed to include all data elements such as names and addresses of individuals. Such non-public personally identifiable information shall not be reproduced or shared with any other party, except as may specifically be required for the fulfillment of Employee's duties and provided such disclosures shall comply with all state and federal statutes and regulations governing the disclosure of medical records and non-public personally identifiable information, including any state or federal laws pertaining to the confidentiality of medical records. Employee will immediately notify the Company of any breach or suspected breach of data security. Employee shall adhere to all federal and state privacy and data protection laws and regulatory rulings applicable to its gathering, processing, storing and transmitting of non-public personally identifiable information.

Employee Signature: _____

Printed Name: _Brian Harnett_

# Exhibit B

CORPORATE
TECHNOLOGIES

Employee Name: _Brian Harnett_
Separation Date: _10/26/12_

## SEPARATION CHECKLIST - MA

| | | |
|---|---|---|
| ☑ Access Key FOB | ☑ COBRA Notification | ☐ Expense Reports |
| ☑ Laptop | ☑ Flexible Spending Acct. | ☑ Commission/Bonus Advance |
| ☑ Keys – Office, Lab, Remote | ☑ 401(k) Documents | ☑ Life Insurance Conversion |
| ☑ NDA Copy | ☑ Partner/Client Access Card | ☐ Other |

I confirm that ☐ I DO   ☒ DO NOT  have:

___ Equipment
___ Documentation
___ Company-owned confidential or technical information
___ Client-owned confidential or technical information and property
___ Other property

belonging to the company and/or CTI client(s) in my possession.  I confirm that I will not leave the building today with anything other than my personal belongings.

Comments:_____

### PLEASE READ AND ACKNOWLEDGE BELOW:

I have received the information bulletin, "How to File for Unemployment Insurance Benefits" for Massachusetts provided in this exit process

I understand that by the terms of the agreement I entered into with Corporate Technologies, Inc., at the commencement of my employment, I will not at any time divulge to others information or knowledge relating to Corporate Technologies' business learned by me during my employment which is not generally known to the public.  I acknowledge that I have learned trade secrets and/or Corporate Technologies' Confidential Information (as defined in my Nondisclosure and Nonsolicitation Agreement) during my employment at Corporate Technologies, Inc.  I am familiar with the terms of my Nondisclosure and Nonsolicitation Agreement and I agree not to use or reveal to any one any of Corporate Technologies' Confidential Information or trade secrets.

Signature                                                    Date _10/26/12_

_Brian Harnett_
Print Name

Forwarding Address:                      _brianharnette@mac.com_

_____

_____

Company Confidential                                                      Rev D

# EXHIBIT C

**HinckleyAllenSnyder**LLP
ATTORNEYS AT LAW

**Aaron A. Gilman**
agilman@haslaw.com
(617) 378-4324

November 2, 2012

**VIA FEDERAL EXPRESS and
VIA ELECTRONIC MAIL** brianharnett@mac.com

Mr. Brian Harnett
188 Crowell Road
Hopkinton, NH 03229

Re: **Corporate Technologies, Inc.**

Dear Mr. Harnett:

Please be advised that this office is legal counsel to Corporate Technologies, Inc. ("CTI").

As you are well aware, during the course of your prior employment with CTI, you entered into and executed a Nondisclosure and Nonsolicitation Agreement dated February 24, 2003 (the "Nonsolicitation Agreement"), a copy of which is enclosed herewith. Pursuant to Section 3 of the Nonsolicitation Agreement, you specifically agreed that, for a period of twelve (12) months after the termination of your employment with CTI you would not "directly or indirectly, alone or as a partner, officer, director, employee, independent contractor, investor, lender, advisor or stockholder of or to any person or entity (a) solicit, divert or entice away existing customers or business of the Company or (b) solicit, interfere with, or endeavor to entice away, any employee of the Company.

Please be advised that CTI expects your full and unequivocal compliance with your contractual obligations as set forth in the Nonsolicitation Agreement, including, but not limited to, those obligations set forth above.  Please be advised that the express terms and conditions of the Nonsolicitation Agreement preclude you, for a period of twelve (12) months following the last date on which you provided services to CTI, from soliciting, diverting or enticing away any of CTI's existing customers or business.  In that regard, the Agreement specifically prohibits you from soliciting, diverting, or enticing away any business of the following customers of CTI with whom you transacted business on behalf of CTI during the course of your employment with CTI:

Mr. Brian Harnett
November 2, 2012
Page 2

**HinckleyAllenSnyder**ₗₗₚ
ATTORNEYS AT LAW

While the foregoing is not meant to be an exhaustive list of all existing customers and business of CTI whom you are prohibited from soliciting, CTI is identifying the above customers with which you had a relationship in your capacity as an employee of CTI. CTI will not tolerate any effort of any nature by you or by any entity with which you may be affiliated to in any manner solicit the aforementioned customers or to entice such customers away from CTI.

Please be advised that if you fail to comply with your contractual obligations under the Nonsolicitation Agreement, including, but not limited to, those obligations set forth above, CTI will proceed with immediate legal action against you, including, but not limited to seeking injunctive relief against any such violations of the Nonsolicitation Agreement. CTI will as well seek to recover any and all damages which it may sustain as a result of any violation by you of the Nonsolicitation Agreement. Please be assured that CTI fully intends to enforce all of its rights under the Nonsolicitation Agreement and will not tolerate any disregard by you of your obligations thereunder.

#50988762

Mr. Brian Harnett
November 2, 2012
Page 3

**HinckleyAllenSnyder**LLP
ATTORNEYS AT LAW

If you should have any questions regarding the foregoing, please contact the undersigned at your earliest possible opportunity.

Sincerely,

Aaron A. Gilman

AAG/cz
Enclosure

cc:    Harry Kasparian, Corporate Technologies
       Adrienne Jones, Corporate Technologies

#50988762

NONDISCLOSURE AND NONSOLICITATION AGREEMENT

This Nondisclosure and Nonsolicitation Agreement is made as of the 24th day of February 2003, between Brian Harnett (the "Employee"), an individual residing at 335 Bay Road, North Easton, Massachusetts 02356 and Corporate Technologies, Inc. (the "Company"), a Massachusetts corporation with its principal place of business at 3 Burlington Woods, 3rd Floor, Burlington, Massachusetts 01803.

WITNESSETH

In consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Background and Acknowledgments.

(a)  The Employee has provided and/or will provide services, as an employee, consultant or otherwise, to the Company.  References herein to any such services of the Employee (whether past, present or future) are referred to herein as "Services."

(b)  The Company possesses Confidential Information (as that term is defined in Exhibit A hereto) and Developments (as defined in Section 4 hereof) which are of substantial competitive as well as monetary value to the Company.  Additional Confidential Information and Developments may be created or otherwise acquired by the Company in the future which will also be of significant competitive and monetary value to the Company.  Confidential Information and Developments may be developed, or may have been developed, with the assistance of, communicated to or otherwise known by or available to the Employee in connection with the Services.

(c)  All Confidential Information and Developments, whether developed or acquired by the Company prior to the date hereof or hereafter, are and shall be the property of the Company which is entitled to the provisions hereof to assure its ownership thereof and the protection thereof against loss.

2.     Nondisclosure Covenant.  The Employee shall not at any time (whether during or after any period in which Services are or have been provided) reveal to any person or entity any Confidential Information or Development or information or development belonging to any third party which the Company is under an obligation to keep confidential, and shall keep secret all matters which have or may be entrusted to him or her and shall not use or attempt to use any Confidential Information or Development (or such information or development belonging to a third party) for his or her own benefit, or for the benefit of any third party or in any manner which may injure or cause loss or may be calculated to injure or cause loss (whether directly or indirectly) to the Company.  The Employee shall take or omit to take such actions as the Company may reasonably request to preserve all Confidential Information and Developments as the sole and exclusive property of the Company.

Anything to the contrary herein notwithstanding, the Employee shall not at any time publish any Confidential Information or any information derived therefrom or concerning any Development, without the express written permission of the Company.

-1-

Upon request of the Company, the Employee shall immediately deliver all notes, memoranda, drawings, specifications, programs, data or other materials in his or her possession constituting Confidential Information and all copies of any of the foregoing to the Company.

The foregoing limitations on disclosure and use of Confidential Information shall not apply to any Confidential Information which is (a) known to the general public or available to the general public, provided that such Confidential Information became known or available to the general public other than through a breach of this Agreement, or (b) ordered disclosed by a court of competent jurisdiction, pursuant to an order from which no further right of appeal exists or cannot be stayed pending any such appeal (provided such disclosure is strictly in accordance with such order, and provided further that the Company shall have been given prompt prior notice of such order and of any request therefor and a reasonable opportunity, at the Company's expense, to object to or appeal from, or to require the Employee subject to such order or request to object to or appeal from, any such order or request and/or to obtain a protective order with respect thereto).

3.     Nonsolicitation Covenant.  During any period in which Services are or have been provided, and for twelve (12) months following the last date on which the Employee provided Services, the Employee shall not, by the Employee's action, directly or indirectly, alone or as a partner, officer, director, employee, independent contractor, investor, lender, advisor or stockholder of or to any person or entity (a) solicit, divert or entice away existing customers or business of the Company, or (b) solicit, interfere with or endeavor to entice away, any employee of the Company.

4.     Ownership of Intellectual Property.  The Employee acknowledges that any invention, modification, discovery, concept, idea, technology, software, program, method, product, design, development, improvement, process, formula, data, technique, know-how, secret or other intellectual property right or fixed expression of or interest in any of the foregoing (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection) ("Intellectual Property") that (a) is developed by any employees or consultants to the Company (including by the Employee) and that constitutes a "derivative work," as defined under Section 101 of the U.S. Copyright Act, as amended (17 U.S.C. § 101, et. seq.), or otherwise incorporates any Intellectual Property that is owned by, licensed by, or was created, invented, or developed by the Company; (b) is developed by any employees or consultants to the Company (including by the Employee) on or using the Company's facilities or property or during Company time; or (c) has been or is used by the Company in any of its products or services or in the development or operation of its business as conducted or planned to be conducted (all of the foregoing Intellectual Property described in (a), (b), and (c) being hereinafter individually called a "Development" and, collectively, "Developments") are the sole and absolute property of the Company; provided, however, that this Section 4 shall not be deemed to apply to (x) the Employee's individual skills and know-how, or information or knowledge which is generally available to the public; or (y) any Intellectual Property developed by the Employee that is not a Development (individually or collectively, "Employee Intellectual Property").

Notwithstanding the foregoing, the Employee shall not, during the period in which Services are or have been provided, market, sell, or distribute any Employee Intellectual Property that a reasonable person would perceive as competitive in the relevant market with the Company's products or services.  In the event that Employee violates the foregoing restriction, in addition to any other rights the Company may have, the Employee Intellectual Property that is the subject of such violation shall immediately without further action of any kind be and become the sole and absolute property of the Company and the Employee hereby assigns to the Company any right, title and interest the Employee may acquire in any such Employee Intellectual Property without further compensation.  In such event, the Employee agrees to execute such documents, and do such acts, as the Company or its agents or attorneys may

-2-

reasonably require to vest in the Company, or evidence the Company's rights in, such Employee Intellectual Property.

5.      Remedies Upon Breach. It is acknowledged that any breach of this Agreement by the Employee could cause the Company irreparable damage and that in the event of such breach the Company shall have, in addition to any and all remedies at law, the right to an injunction, specific performance or other equitable relief to prevent the violation of any obligations of the Employee hereunder.

6.      No Waiver. Any waiver of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement or any subsequent breach hereof.

7.      Severability. The parties hereby agree that each provision hereof shall be treated as a separate and independent provision, and the unenforceability of any one provision shall in no way impair the enforceability of any other provision hereof. Moreover, if one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to scope, activity or subject so as to be unenforceable, such provision or provisions shall be construed by the appropriate judicial body by limiting or reducing it or them, so as to be enforceable to the maximum extent permitted by applicable law.

8.      Survival of Obligations. The Employee's obligations hereunder are independent of his or her obligations relating to the Services and each such obligation under this Agreement shall survive the termination of the Employee's employment with the Company or any other arrangement with respect to such Services regardless of the manner of such termination and shall be binding upon the Employee's successors, assigns, legal representatives, heirs, executors, and administrators.

9.      Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts without regard to conflicts of law principles.

10.     Assignment by Company. The Company shall have the right to assign this Agreement to its successors and assigns, and all covenants and agreements hereunder shall inure to the benefit of and be enforceable by said successors or assigns, and any references to the "Company" shall also refer to any such successor or assign. Neither this Agreement nor the respective obligations hereunder may be assigned by the Employee to any other person or entity.

11.     Reasonableness of Provisions. The Employee acknowledges and agrees that the enforcement of this Agreement is necessary to ensure the preservation, protection and continuity of the business, trade secrets and goodwill of the Company and further acknowledges and agrees that, due to the confidential nature of the Company's businesses, the restrictions set forth in Sections 2, 3, and 4 of this Agreement are reasonable as to time and scope.

12.     Contest of Provisions. In the event of a dispute between the Company and the Employee as to the validity or applicability of Section 3 hereof in connection with the Employee's covenants contained therein, if the Company is successful in such dispute, the commencement date of the 12-month period referred to in Section 3 shall be that date upon which a court enters final judgment in favor of the Company from which no further appeal is possible.

13.     Priority of Agreement/Counterparts/Notice. This Agreement supersedes and replaces any other agreement between the Employee and the Company related to the same subject matter. This Agreement may be executed in any number of counterpart copies, each of which shall be an original and

-3-

legally binding upon all parties.  Any notice required under this Agreement shall be given by Federal Express or other recognized overnight courier at the respective addresses set forth in the first paragraph of this Agreement or such other addresses of which notice in accordance with this Section shall have been provided and any notice shall be deemed delivered one business day after deposit with such courier.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as a sealed instrument as of the date first set forth above.

Employee Signature: _____

Printed Name: _Brian Harnett_

CORPORATE TECHNOLOGIES, INC.

By: _____
Harry Kasparian, CEO

## EXHIBIT A

The term "Confidential Information" shall include all information evidencing or relating to any of the following whether or not furnished or made available to the Employee by the Company or developed or acquired in whole or in part by the Employee alone or jointly with the Company or others on behalf of or for the Company:

(a)     All Developments; and

(b)     All Company client or customer lists, trade secrets, technical or scientific information and all information pertaining to the financial condition, business affairs, methods, technology, designs, products, processes, services, employees, developments or prospects of the Company including, without limitation: all information concerning the Company's customers, suppliers and other parties with which the Company has a business relationship; proprietary software; company forms and records (including financial statements and product specification sheets); pricing information; and information concerning costs of manufacture, delivery of services and specifications of equipment, software, and services supplied to customers.  Without limiting the foregoing, Confidential Information shall include any information or development belonging to any third party which the Company is under an obligation to keep confidential.

(c)     Each of the foregoing shall be Confidential Information whether or not it is published or unpublished, in writing or otherwise reduced to tangible form, confidential or protected or susceptible to protection by patent, trademark, copyright or any other form of legal protection and whether or not any attempt has been made to secure such protection.

-4-

EXHIBIT B
NONDISCLOSURE AND NONSOLICITATION AGREEMENT

This Exhibit B Nondisclosure and Nonsolicitation Agreement is made as of the 26 day of February 20 10, between Brian Harnett (the "Employee"), an individual residing at 95 Marion Hane lane Scituate and Corporate Technologies, Inc. (the "Company"). a Massachusetts corporation with its principal place of business at 3 Burlington Woods, 3rd Floor, Burlington, Massachusetts 01803.

Except as specifically required in the course of performing his/her duties as an employee of the Company, Employee shall not disclose or use any non-public personally identifiable information provided by the Company or any client of the Company to Employee. "Non-public personally identifiable information" is financial or medical information of or concerning a private person which either has been obtained from sources which are not available to the general public or obtained from the person who is the subject and which information is included in data files exchanged by the parties hereto. For the purposes hereof, the term shall be deemed to include all data elements such as names and addresses of individuals. Such non-public personally identifiable information shall not be reproduced or shared with any other party, except as may specifically be required for the fulfillment of Employee's duties and provided such disclosures shall comply with all state and federal statutes and regulations governing the disclosure of medical records and non-public personally identifiable information, including any state or federal laws pertaining to the confidentiality of medical records. Employee will immediately notify the Company of any breach or suspected breach of data security. Employee shall adhere to all federal and state privacy and data protection laws and regulatory rulings applicable to its gathering, processing, storing and transmitting of non-public personally identifiable information.

Employee Signature: _____

Printed Name: Brian Harnett

# EXHIBIT D

# HinckleyAllenSnyder LLP

*Aaron A. Gilman*
agilman@haslaw.com
*(617) 378-4324*

November 8, 2012

*VIA FEDERAL EXPRESS*

Mr. Edward Vos
President and CEO
OnX Enterprise Solutions
155 Commerce Valley Drive East
Thornhill, Ontario L3T7T2

Re: **Corporate Technologies, Inc. and Brian Harnett**

Dear Mr. Vos:

Please be advised that this office is legal counsel to Corporate Technologies, Inc. ("CTI"). In that capacity, we are writing you regarding the employment of Brian Harnett by OnX Enterprise Solutions ("OnX"). We understand that OnX is an IT solutions provider, and thus, is in direct competition with CTI. Further, we are informed and believe that Mr. Harnett has been employed by OnX for the express purpose of expanding OnX's NetApp Solutions business, which is the exact business in which Mr. Harnett was engaged during the course of his employment with CTI.

Please be advised that during his employment with CTI, Mr. Harnett executed a Nondisclosure and Nonsolicitation Agreement dated February 24, 2003 (the "Nonsolicitation Agreement"), a copy of which is enclosed herewith. Pursuant to Section 3 of the Nonsolicitation Agreement, Mr. Harnett specifically agreed that, for a period of twelve months after the termination of his employment with CTI, he would not "directly or indirectly, alone or as a partner, officer, director, employee, independent contractor, investor, lender, advisor, or stockholder of or to any person or entity (a) solicit, divert, or entice away existing customers or business of the [CTI] or (b) solicit, interfere with, or endeavor to entice away any employee of the [CTI]."

CTI has notified Mr. Harnett that it expects its full and unequivocal compliance with his contractual obligations as set forth in the Nonsolicitation Agreement, including, but not limited to those obligations set forth above. However, CTI is informed and believes that Mr. Harnett is in direct violation of his Nonsolicitation Agreement, has been contacting and soliciting customers which he formerly serviced during the course of his employment at CTI and is attempting to divert and entice away such customers and cause such customers to terminate their

51002777

Ed Boss, President and CEO
November 8, 2012
Page 2

**HinckleyAllenSnyder**LLP
ATTORNEYS AT LAW

relationship with CTI and utilize OnX.  CTI is in the course of investigating Mr. Harnett's
actions and conduct, and is monitoring the situation very closely.

The purpose of this letter is to place OnX on notice of the existing enclosed Nonsolicitation
Agreement.  It appears that Mr. Harnett's actions and conduct as described above in the course of
his current employment may violate his contractual obligations to CTI.  Therefore, on behalf of
CTI, we hereby request written confirmation that OnX will honor the terms of the enclosed
Nonsolicitation Agreement, and will not employ Mr. Harnett in any fashion which would cause
him to violate his contractual obligations to CTI.

If we do not hear from you with such appropriate assurances, CTI will be left with no alternative
but to pursue appropriate injunctive relief and damages and will use all legal means available to
it to ensure compliance by Mr. Harnett with his contractual obligations to CTI.

Your immediate attention to this matter is requested.

Sincerely,

*[signature]*

Aaron A. Gilman

AAG/cz

cc:  Harry Kasparian, CEO, Corporate Technologies
     Adrienne Jones, Corporate Technologies

#51002777

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                    SUPERIOR COURT

```
                                    )
CORPORATE TECHNOLOGIES, INC.,       )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )    CIVIL ACTION NO. _____
                                    )
BRIAN HARNETT, and                  )
ONX USA LLC d/b/a ONX ENTERPRISE    )
SOLUTIONS,                          )
                                    )
        Defendants.                 )
                                    )
```

## AFFIDAVIT OF ABIGAIL KANE

I, Abigail Kane, hereby depose and say that:

1.      I am a Senior Account Executive at Corporate Technologies, Inc. ("CTI") and have worked at CTI in various sales positions since December 1998. In this capacity, I am responsible for managing sales activities, working with vendors, contacting prospective customers, maintaining existing customer relationships, and staying informed on competitors' activities.

2.      I make this affidavit based upon personal knowledge and information obtained in my official capacity.

3.      As the current CTI account representative for Demandware, a former Harnett client, I recently learned that a vendor, NetApp, has issued a "dual registration" for a sales opportunity with Demandware listing both OnX and CTI as registrants.

4.     A registered opportunity is critical in CTI and OnX's industry entitles the registrant to significant exclusive discounts of up to 20% in pricing quotes from vendors. These discounts are necessary to justify the substantial business expenses and engineering expenses invested by IT solution companies such as CTI in developing a sales opportunity. Once a company files and is recognized for a registered opportunity with a vendor, it gains a significant competitive advantage for that potential sale with a client.

5.     A "dual registration" is a rare occurrence in this industry. In my entire career, and to the best of my knowledge, I have experienced only one other "dual registration" awarded by NetApp. In that instance, both of the registrants had long standing relationships with the potential client and the vendor. By contrast, according to the vendor, OnX has "almost zero presence" with NetApp.

6.     But for Harnett's contact with Demandware, in breach of the Nonsolicitation Agreement, I do not believe OnX would have been awarded a "dual registration" from NetApp based on its historic market share for that vendor and CTI's longstanding customer and vendor relationship.

7.     The effect of the dual registration is that CTI would lose its competitive pricing advantage in relation to OnX for a sale to Demandware. This loss of competitive advantage is compounded because CTI has already invested its resources in and developed the Demandware relationship over the course of several years, while OnX has obtained a registered opportunity in a matter of weeks by utilizing a former CTI employee that previously handled the Demandware account.

Signed under the pains and penalties of perjury this 18 day of December, 2012.

Abigail Kane

#51042483

2

NATIXIS CASPIAN PRIVATE EQUITY, LLC

CONFIDENTIALITY, NONSOLICITATION AND
ASSIGNMENT OF INVENTION AGREEMENT

The undersigned, *Andrew Kripke* (the "Employee"), acknowledges the importance to Natixis Caspian Private Equity LLC and its affiliates (collectively, the "Company") of protecting its confidential information and other legitimate business interests, including, without limitation, its goodwill. The Employee further acknowledges the Company's practice of obtaining agreements such as this from its employees. Therefore, in consideration of the Employee's employment with the Company, in consideration of the Employee's being granted access to trade secrets and other confidential information of the Company, and for other good and valuable consideration, the receipt and sufficiency of which the Employee acknowledges, the Employee hereby agrees as follows:

1.       Protection of Confidential Information.  The Employee will comply with the policies and procedures of the Company, as amended from time to time, for protecting Confidential Information, and will never disclose to any Person (except as required by applicable law, order or regulation or for the proper performance of the Employee's duties and responsibilities to the Company), or use for the Employee's own or any third party's benefit or gain, any Confidential Information without the prior written consent of a specifically authorized representative designated by the Board of Managers of Natixis Caspian Private Equity LLC (the "Board").  The Employee will protect the integrity of Confidential Information, and will keep confidential all documents, records, tapes and other media of every kind and description relating to the business, present or otherwise, of the Company and any copies or derivatives, in whole or in part, thereof (the "Documents") containing Confidential Information.  The Employee acknowledges that all Documents, whether or not containing Confidential Information and whether or not prepared by or with the assistance of the Employee, are the sole and exclusive property of the Company.  The Employee will safeguard all Documents in the Employee's possession, and all Confidential Information they contain, and shall surrender to the Company at the time the Employee's employment terminates, or at such earlier time or times as the Board or its designee may specify, all Documents then in the Employee's possession or control.  The Employee further acknowledges that the foregoing provisions shall continue to apply after the Employee's employment terminates, regardless of the reason for such termination.

2.       Use of Proprietary Information.  The Employee acknowledges that all Proprietary Information is and shall remain the sole and exclusive property of the Company.  The Employee will not disclose or use for the Employee's own benefit or gain, and will not permit any future employer to disclose or use for its own benefit or gain, any Proprietary Information obtained by the Employee incident to the Employee's employment with the Company or developed during the term of the Employee's employment.  The Employee acknowledges that the production and development of Proprietary Information during the term of the Employee's employment with the Company, and the business results and performance records related thereto, are the result of a team effort by all the professionals employed by the Company during such term, and the Employee agrees never to claim or suggest otherwise to third parties.  The Employee further acknowledges that the foregoing provisions shall continue to apply after the Employee's employment terminates, regardless of the reason for such termination.

3.     Fiduciary Obligations.  The Employee acknowledges that Confidential Information and Proprietary Information are of critical importance to the Company, and that a violation of this Agreement would seriously and irreparably impair and damage the Company.  The Employee has at all times kept, and will maintain at all times that the Employee is employed by the Company, all Confidential Information and Proprietary Information in a fiduciary capacity for the sole benefit of the Company.  During the term of the Employee's employment with the Company, the Employee will not, without the prior written approval of the Board, undertake any outside activity, whether or not competitive with the business of the Company, that could reasonably give rise to a conflict of interest or otherwise interfere with the Employee's duties and obligations to the Company.

4.     Non-Competition/Non-Solicitation.  To prevent harm to the Company, including loss of trade secrets, confidential business information and customer good will, and to prevent other forms of disruption of its business, during the term of the Employee's employment and for a period of one year immediately following termination of the Employee's employment, and regardless of the reason for such termination (in the aggregate, the "Non-Solicitation Period"), the Employee will not (a) hire or attempt to hire (or employ or continue to employ) any employee of the Company, (b) assist in such hiring by any Person, (c) encourage any such employee to terminate or diminish his or her relationship with the Company, (d) solicit or encourage any clients or others who do business with the Company to terminate or diminish their relationship with the Company or to violate any agreement with the Company, or, except as otherwise expressly provided in this Agreement, to conduct with any Person any business or activity that such client or other Person conducts or (in the case of investment management or advisory services or products, including mutual funds) could conduct with the Company, or (e) conduct mutual fund, investment management or investment advisory business with, or accept such business from, any client of the Company or any prospective client of the Company whom the Employee personally solicited on behalf of the Company.  The Employee further agrees that, during the term of the Employee's employment and for a period of six months immediately following the termination thereof (in the aggregate, the "Non-Competition Period"), the Employee will not, directly or indirectly, and whether as owner, employee, independent contractor or otherwise, engage in, work for, provide services to or otherwise assist any business that competes with the Company.  For purposes of this Paragraph, an "employee" or "client" of the Company includes any individual then occupying such status or who, at any time during the preceding six months, occupied such status.  The periods of restriction defined as the Non-Solicitation Period and Non-Competition Period shall be tolled, and shall not run, during any period of time in which the Employee is in breach of the provisions of this paragraph, in order to afford the Company the full temporal protection of the covenants set forth in this Agreement.

5.     Assignment of Intellectual Property.  The Employee will promptly and fully disclose to the Company all Intellectual Property.  The Employee hereby assigns and will assign to the Company (or as otherwise directed by the Company) the Employee's full right, title and interest to all Intellectual Property.  The Employee will execute any and all applications for domestic and foreign patents, copyrights and other proprietary rights and do such other acts (including, among other things, the execution and delivery of instruments of further assurance or confirmation) requested by the Company to assign the Intellectual Property to the Company and to permit the Company to enforce any patents, copyrights and other proprietary rights in the Intellectual Property.  The Employee will not charge the Company for time spent in complying with these obligations.  All copyrightable works that the Employee creates shall be considered "work made for hire."

6.    Remedies.  In signing this Agreement, the Employee gives the Company assurance that the Employee has carefully read and considered all the terms and conditions of this Agreement, including the restraints imposed under paragraphs 4 and 5 hereof.  The Employee acknowledges without reservation that each of the restraints contained in this Agreement is necessary for the reasonable and proper protection of the goodwill, Confidential Information, Proprietary Information and other legitimate business interests of the Company, and that each and every one of those restraints is reasonable in respect to subject matter, length of time and geographic area.  The Employee therefore acknowledges that, in the event of such a breach or threatened breach, the Company shall, in addition to any other remedies available to it, have the right to obtain preliminary and permanent injunctive relief against any such breach without having to post bond, and shall likewise be entitled to reasonable attorney's fees incurred in the enforcement of its rights hereunder.  In the event that any provision of paragraphs 4 or 5 hereof shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, such provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law.

7.    Definitions.  For purposes of this Agreement, the following definitions apply:

    (a)    "Confidential Information" means any and all information of the Company that is not generally known by others with whom the Company competes or does business, or with whom, to the Employee's knowledge, the Company plans to compete or do business, and any and all information that if disclosed would assist in competition against the Company. Confidential Information includes, without limitation, such information relating to (i) the development, research, marketing and financial activities of the Company; (ii) the Products and Services; (iii) the financial performance and strategic plans of the Company; (iv) the identity and special needs of the clients of the Company; and (v) the people and organizations with whom the Company has, or previously has had, business relationships and the substance of those relationships, in each case only to the extent the Employee has knowledge of such matters. Confidential Information also includes comparable information that the Company receives, or has received, belonging to clients or others who do business with the Company or any other information that is, or has been, received by the Company with any agreement that such information will not be disclosed.  Confidential Information shall not include general skills and general knowledge of an industry obtained by reason of the Employee's association with the Company or any information that is in the public domain, provided that such information has not entered the public domain as a result of a breach or violation by the Employee of an agreement with the Company or applicable law.

    (b)    "Intellectual Property" means inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by the Employee (whether alone or with others and whether or not during normal business hours or on or off Company premises) during the term of the Employee's employment that relate in any way to the business, products or services of the Company or to any prospective activity of the Company.

    (c)    "Person" means any individual, partnership, corporation, limited liability company, association, trust, joint venture, unincorporated organization, and any

government, governmental department or agency or political subdivision thereof, other than the Company.

(d)     "Products and Services" means all products and services offered, planned, researched, developed, tested, sold, licensed, marketed or otherwise provided by the Company during the term of the Employee's employment.

(e)     "Proprietary Information" means any and all information related to the performance of any accounts or funds as to which the Employee, alone or in conjunction with others, has provided investment advice or services, including without limitation the performance record thereof.

8.     No Conflicts.  The Employee represents and warrants that the Employee's employment and the execution and performance of this Agreement will not breach or be in conflict with any other agreement to which the Employee is a party or is bound, and that the Employee is not now subject to any covenants against competition or similar restrictions or any other obligations to third parties that would affect the performance of the Employee's obligations hereunder or of the Employee's duties and responsibilities to the Company.  The Employee will not disclose to or use on behalf of the Company any proprietary information of a third party without that party's consent.

9.     Assignment.  Neither the Company nor the Employee may make any assignment of this Agreement or any interest in it, by operation of law or otherwise, without the prior written consent of the other; provided, however, that the Company may assign its rights and obligations under this Agreement without the Employee's consent in the event that the Company shall hereafter effect a reorganization, consolidate with, or merge into any Person or transfer all or substantially all of its properties or assets to any Person.  This Agreement shall inure to the benefit of, and be binding upon, the Employee and the Company, and each of their respective successors, executors, administrators, heirs, representatives and permitted assigns.

10.     No Employment Agreement.  The Employee acknowledges and agrees that this Agreement is not an employment agreement and does not in any way obligate the Company to retain the Employee's services for a fixed period or at a fixed level of compensation, nor does it in any way restrict the Employee's right or that of the Company to terminate the Employee's employment at any time, with or without notice or cause.

11.     Governing Law.  This contract shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of laws principles thereof.

12.     Execution of Agreement.  In signing this Agreement, the Employee gives the Company assurance that the Employee has had a full and reasonable opportunity to consider the terms of this Agreement and to consult with any person of the Employee's choosing before signing this Agreement, and that the Employee has signed this Agreement knowingly and voluntarily.

13.     Miscellaneous.  This Agreement sets forth the entire agreement between the Employee and the Company, and replaces all prior communications, agreements and understandings, written or oral, with respect to the subject matter hereof.  This Agreement may not be modified or

amended, and no breach shall be deemed to be waived, unless agreed to in writing by the Employee and an expressly authorized officer of the Company. If any provision of this Agreement should, for any reason, be held invalid or unenforceable in any respect, it shall not affect any other provisions and it shall be construed by limiting it so as to be enforceable to the maximum extent permissible by law. This Agreement, and each of the Employee's obligations under it, shall survive the termination of the Employee's employment, regardless of the reason for such termination.

14.    Notwithstanding anything to the contrary herein, Proprietary Information and/or Confidential Information shall not include information, contacts, analytics, investment strategy, working knowledge, industry knowledge and the like which (A) is or becomes generally available or known to the public, (B) is or becomes available to the Employee from any source other than the Company, (C) was or is developed by the Employee prior to or after the Employment Period, (D) was known or becomes known by the Employee prior to or after the Employment Period, or (E) is or becomes available to the Employee from any source following the termination of Employee's Employment Period.

Intending to be legally bound hereby, the Employee has signed this Agreement under seal as of the day and year written below.

Signature: _____

Date Accepted and Agreed: _____

NATIXIS CASPIAN PRIVATE EQUITY

By: _____

Title: _____ COO / CFO _____

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                    SUPERIOR COURT

|  |  |
|---|---|
| CORPORATE TECHNOLOGIES, INC., | ) |
| Plaintiff, | ) |
| v. | ) CIVIL ACTION NO. ___ _____ |
| BRIAN HARNETT, and ONX USA LLC d/b/a ONX ENTERPRISE SOLUTIONS | ) |
| Defendants. | ) |

### PLAINTIFF'S EMERGENCY MOTION FOR EXPEDITED DISCOVERY

Plaintiff Corporate Technologies, Inc. ("CTI") respectfully submits this memorandum of law in support of its emergency motion for expedited discovery, pursuant to Mass. R. Civ. P. 30(a), 33(a)(3), and 34(b), and Mass. Super. Ct. R. 9A(e)(1), for limited expedited discovery regarding Plaintiff's Complaint filed contemporaneously with this motion and in order to determine whether a motion for preliminary injunction should be filed. As stated more fully in the memorandum submitted in support of this motion, as well as the Complaint and supporting affidavits, CTI has learned from multiple sources that a former employee is actively soliciting his former CTI clients in violation of a Nondiscolosure and Nonsolicitation Agreement. To further investigate these breaches, CTI seeks expedited, limited discovery in the form of responses to requests for production of documents and interrogatories within five business days of an Order from this Court and depositions within ten business days of an Order from this Court.

Respectfully submitted,

CORPORATE TECHNOLOGIES, INC.

By its attorneys,

Kevin J. O'Connor (BBO #555250)
Timothy F. Holahan (BBO #672760)
James J. Nagelberg (BBO #675656)
John A. Gallagher (BBO #679148)
HINCKLEY, ALLEN & SNYDER, LLP
28 State Street
Boston, MA 02109
Tel:  617-378-4394
Fax:  617-345-9020
koconnor@haslaw.com
tholahan@haslaw.com
jnagelberg@haslaw.com
jgallagher@haslaw.com

Date:  December 19, 2012

#51150970                                    2

CERTIFICATE OF SERVICE

Brian Harnett                      OnX USA LLC
188 Crowell Road                   c/o CT Corporation System
Hopkinton, NH 03229                155 Federal Street, Ste. 700
                                   Boston, MA 02110

    I hereby certify that a copy of the foregoing was served upon all parties, by special process server, on December 19, 2012.

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                                 SUPERIOR COURT

|   |   |
|---|---|
| CORPORATE TECHNOLOGIES, INC., | ) |
| Plaintiff, | ) |
| v. | ) |
| BRIAN HARNETT, and | ) |
| ONX USA LLC d/b/a | ) |
| ONX ENTERPRISE SOLUTIONS | ) |
| Defendants. | ) |

CIVIL ACTION NO. _____

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS
## EMERGENCY MOTION FOR EXPEDITED DISCOVERY

Plaintiff Corporate Technologies, Inc. ("CTI") respectfully submits this memorandum of

law in support of its emergency motion for expedited discovery, pursuant to Mass. R. Civ. P.

30(a), 33(a)(3), and 34(b), and Mass. Super. Ct. R. 9A(e)(1), for limited expedited discovery

regarding Plaintiff's Complaint filed contemporaneously with this motion and in order to

determine whether a motion for preliminary injunction should be filed. As stated more fully

herein, CTI has learned from multiple sources that a former employee is actively soliciting his

former CTI clients in violation of a Nondiscolosure and Nonsolicitation Agreement. To further

investigate these breaches, CTI seeks expedited, limited discovery in the form of responses to

requests for production of documents and interrogatories within five business days of an Order

from this Court and depositions within ten business days of an Order from this Court.

## I.     STATEMENT OF FACTS

The facts underlying this Motion are fully set forth in CTI's Complaint and supporting affidavits and exhibits, which are incorporated herein by reference.

**A.    Background**

CTI resells, designs, implements and supports customized information technology ("IT") and business intelligence solutions for its clients and provides related consulting services and staffing.  Affidavit of Harry Kasparian ("Kasparian Aff.") ¶ 3.  Specifically, CTI utilizes state-of–the-art hardware and software technologies to create integrated solutions that allow clients to make optimal use of their data, increase revenue, reduce costs, and mitigate business and security risks.  Id.  This work begins with a time- and cost-intensive sales cycle involving CTI engineering resources and account executives who engage with existing and potential clients to discover a client's business strategy, needs, goals, and existing IT systems and capabilities.  Id. ¶ 4.  Based on the information gathered and its comprehensive knowledge of the IT and communication hardware and software product markets, CTI produces an architectural proposal designed specifically for the prospective customer, along with confidential pricing information.  Id.  Through continued collaboration with the client, CTI ultimately produces a "Statement of Work" ("SOW") that outlines all of the components of the solution – hardware, software, and services – with relevant pricing information.  Id.  When the client signs the SOW, the parties have an agreement.  Id.  Thereafter, CTI further researches and often tests various aspects of the solution in its own facility to assure that the solution works as designed, and then installs it for the customer.  Id.  CTI's typical engagement also includes comprehensive business software application development, training for the client's employees as to how to use and maintain each aspect of the software application and system, as well as ongoing maintenance and user-support

services.  Id.  CTI also offers follow-on service to meet future client needs and integrate new

software updates and features.  Id.

### B.    The Nondisclosure and Nonsolicitation Agreement

CTI's two most important assets are its client relationships and proprietary information

developed during the course of almost twenty years in business.  First, the lifeblood of CTI's

business model is repeat business.  Id. ¶ 6.  For 2012, 92% of CTI's business to date has been

from existing customers.  Id.  Indeed, all of Harnett's sales to customers in 2012 for CTI were

repeat business to existing customers.  Id.  Second, all of CTI's business processes and

confidential information leading up to, implementing, and following up on a sales opportunity

are highly confidential and proprietary information.  Id. ¶ 8.

CTI has taken appropriate measures to protect both its client relationships and its highly

confidential and proprietary information by, among other measures, appropriately marking its

SOWs as confidential, requiring a Nondisclosure Agreement from clients, and requiring a

Nondisclosure and Nonsolicitation Agreement ("ND-NS Agreement") of all of its Account

Executives.  Id. ¶ 9.  The purpose of the ND-NS Agreement is to protect CTI's confidential

information, good will, and clients that have been developed at substantial cost and effort by CTI

over almost two decades.  Id. ¶ 10.

On February 24, 2003, Harnett, as a condition of his offer of employment, signed a ND-

NS Agreement that states in relevant part:

> During any period in which Services are or have been provided, and for twelve
> (12) months following the last date on which the Employee provided Services, the
> Employee shall not, by the Employee's action, directly or indirectly, alone or as a
> partner, officer, director, employee, independent contractor, investor, lender,
> advisor or stockholder of or to any person or entity (a) solicit, divert or entice
> away existing customers or business of the Company . . . .

Id. ¶ 11, Ex. A § 3. The Agreement further prohibits the use of CTI's confidential information to benefit third parties:

> The Employee . . . shall not use or attempt to use any Confidential Information or Development (or such information or development belonging to a third party) for his or her own benefit, or for the benefit of any third party or in any manner which may injure or cause loss or may be calculated to injure or cause loss (whether directly or indirectly) to the Company.

Id. ¶ 12, Ex. A § 2.

### C.    Harnett's Continuing Breaches of the ND-NS Agreement

Over the course of almost ten years, CTI supported Harnett with substantial resources, training, and expertise that allowed him to develop client contacts. Id. ¶ 14. Harnett was handsomely compensated for his services to the tune of several hundreds of thousands of dollars per year. Id. ¶ 18. On October 26, 2012, Harnett joined a direct competitor, OnX, with an office in the same town as CTI. Id. ¶ 19. Despite acknowledging his obligations under the ND-NS Agreement in writing during an exit interview, see id. Ex. B, Harnett began to immediately take advantage of his access to CTI's highly confidential and proprietary information and client contacts for the benefit of OnX.

On November 1, 2012, at a CTI sales forecast meeting, CTI learned that Harnett was calling on his previous clients from CTI to solicit business for OnX. Id. ¶ 20. Specifically, among other actions, CTI learned that OnX sent an email to Harnett's former CTI clients announcing Harnett's hiring by OnX. Id.

Through a periodic business review with a vendor, CTI learned that OnX had "minimal presence" in the NetApp market and believes that Harnett was hired to "jump start" OnX's NetApp sales. Id. ¶ 22.

CTI believes Harnett has actively or passively misrepresented to clients and vendors that he has a non-disclosure rather than a non-compete or non-solicitation agreement with CTI. Id. ¶ 27. Further, CTI believes Harnett has misrepresented that he can solicit business from CTI's clients as long as he does not initiate the contact. Id. ¶ 28. Harnett's misrepresentations cannot be the product of mere misunderstanding as he signed a written acknowledgement of the terms of the ND-NS Agreement in his exit interview where he also received a copy of the Agreement. Instead, Harnett, induced by OnX, has consciously decided to disregard his obligations under the ND-NS Agreement – an agreement without which he never would have been employed by CTI nor had the opportunity to develop his current skill set and client relationships. Further, by misrepresenting the terms of the Agreement to existing CTI clients, Harnett and OnX have gained access they would not otherwise have from clients that would honor CTI's employment agreements. Id.

Harnett and OnX's unlawful behavior has already yielded tangible gains at CTI's expense. NetApp, has issued a "dual registration" for a sales opportunity with the former client that Harnett met with on November 2, 2012 – Demandware. Id. ¶ 24; Affidavit of Abigail Kane ("Kane Aff.") ¶ 3. Under the dual registration, both OnX and CTI are listed as registrants. Kane Aff. ¶ 3. A dual registration is a rare occurrence in this industry usually limited to instances where both registrants have long-standing relationships with the client and vendor. Id. ¶ 5. Such is not the case here, where OnX has done immaterial business with NetApp in New England. Id. But for Harnett's contact with Demandware in breach of the ND-NS Agreement, OnX would not have been awarded a dual registration from NetApp based on its historic market share for that vendor and CTI's longstanding customer and vendor relationship. Id. ¶ 6. The effect of the dual registration is that CTI has lost its competitive pricing advantage earned as a result of CTI's

investment in Demandware over the past several years in relation to OnX for current and ongoing sales to Demandware.  Id. ¶ 7.  This loss of competitive advantage is compounded because CTI has invested its resources in and developed the Demandware relationship over the course of several years, while OnX has obtained a registered opportunity in a matter of weeks by utilizing a former CTI employee that previously handled the Demandware account.  Id.

Harnett has also registered another opportunity recently for one of his former CTI clients, Ebsco.  Kasparian Aff. ¶ 25.  This registered opportunity has yet to be approved or rejected by the vendor (F5), but it continues to negatively impact CTI.  Id. ¶¶ 25-26.  Specifically, if CTI tries to register an opportunity for F5 hardware for Ebsco while Harnett's submission is pending, CTI will have to prove to the vendor that it is better situated to complete the sale.  Id. ¶ 26.  This requires the expenditure of additional resources by CTI and its employees and reduces CTI's ability to pursue other sales, thereby giving a competitive advantage to OnX.  Id.

CTI has also heard that Harnett has attempted to register a number of other opportunities since joining OnX approximately one month ago.  Id. ¶ 27.  A large volume of registered opportunities in such a short time frame is inconsistent with the small number of registrations that an Account Executive typically files over a similar time period because of the amount of work required to develop a sales opportunity.  Id.  A large number of registrations by Harnett since joining OnX would be indicative of one of two possibilities: (a) Harnett and OnX are fraudulently submitting registrations for opportunities in an attempt to obtain unfair advantage; or (b) Harnett breached his fiduciary duties to CTI by cultivating opportunities while employed by CTI, but not filing the opportunities until he joined OnX.  Id.  Either possibility is additional evidence of the unfair business practices being employed by Harnett and OnX.

## III.    ARGUMENT

A.      The Legal Standard for Expediting Discovery

Mass. R. Civ. P. 30(a), 33(a)(3), and 34(b), commit to the discretion of the Court the

ordering of an expedited time period for the taking of depositions, responses to interrogatories,

and production of documents, respectively. "The question presented in determining the

appropriateness of expedited [discovery] is whether in the circumstances the plaintiff has

articulated a sufficiently colorable claim and shown a sufficient possibility of a threatened

irreparable injury, as would  justify imposing on the defendants and the public the extra (and

sometimes substantial) costs of an expedited proceeding." Weitman v. Tutor, 2008 Mass. Super.

LEXIS 244, at *3-4 (Mass. Super. Ct. Aug. 13, 2008) (internal quotation marks and citation

omitted).

Stated otherwise, "[t]he inquiry for the court is whether the movant has established good

cause for expedited discovery." Wheeler v. HXI, LLC, 2010 U.S. Dist. LEXIS 90328, at *4

(D.N.H. July 28, 2010) (citing 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Fed.

Pract. and Proc. § 2046.1, at 592 (2d ed. 1994); McMann v. Doe, 460 F. Supp. 2d 259, 265 (D.

Mass. 2006)).[1] "Good cause may be found where the need for expedited discovery, in

consideration of the administration of justice, outweighs the prejudice to the responding party."

Semitool, Inc. v. Tokyo Electron Am., Inc., 208 F.R.D. 273, 276 (N.D. Cal. 2002). In evaluating

whether good cause exists, Courts should consider factors including "the purpose for the

discovery, the ability of the discovery to preclude demonstrated irreparable harm, plaintiff's

likelihood of success on the merits, the burden of discovery on the defendant, and the degree of

---

[1] Though reported case law from Massachusetts state courts for the standards applied to motions for expedited
discovery is sparse, federal precedent interpreting analogous federal rules are instructive. See Strom v. American
Honda Motor Co., 423 Mass. 330, 335 (1996) ("Because the Massachusetts Rules of Civil Procedure are patterned
after the Federal rules, we interpret our rules consistently with the construction given their Federal counterparts,
absent compelling reasons to the contrary or significant differences in content." (internal quotation marks and
citations omitted)).

prematurity." McMann, 460 F. Supp. 2d at 265. A request for expedited discovery should be allowed when the scope of discovery requested is narrow and central to a possible preliminary injunction inquiry, and the burden on the defendant is modest. See Wheeler, 2010 U.S. Dist. LEXIS 90328, at *5. A preliminary injunction motion need not be pending when the request for expedited discovery is made, and the fact that a defendant has not yet filed an answer does not prevent a court from granting a motion for expedited discovery. OMG Fid., Inc. v. Sirius Technologies, Inc., 239 F.R.D. 300, 301 (N.D.N.Y. 2006) (granting expedited discovery when time to answer had not lapsed and motion for preliminary injunction had not yet been filed). What matters is that the movant can show that good cause exists, in light of all the circumstances, to advance some portion of discovery because "it may clarify matters outside of [a movant's] knowledge and may ultimately lead to the prompt and efficient disposition of [the] litigation and the parties' underlying dispute." Wachovia Secs., LLC v. Stanton, 571 F. Supp. 2d 1014, 1050 (N.D. Iowa 2008). Furthermore, "[C]ourts have recognized that good cause is frequently found in cases involving claims of . . . unfair competition." Semitool, 208 F.R.D. at 276.

B.      Good Cause Exists To Order Expedited Discovery

### *1.  CTI has articulated colorable claims.*

A court will enforce a post-employment covenant against a former employee when the covenant is: (a) necessary to protect the legitimate business interests of the employer; (b) is supported by consideration; (c) is reasonably limited in duration and scope; and (d) is consistent with public policy. See Boulanger v. Dunkin' Donuts, Inc., 442 Mass. 635, 639 (2004); Marine Contractors Co. v. Hurley, 365 Mass. 280, 287-290 (1974); Economy Grocery Stores Corp. v. McMenamy, 290 Mass. 549, 551 (1935). Legitimate business interests include a company's

customer good will and confidential business information. See All Stainless, Inc. v. Colby, 364 Mass. 773, 779-80 (1974); Fortune Pers. Consultants of Boston, Inc. v. Hagopian, 1997 Mass. Super. LEXIS 52, at *6 (Mass. Super. Ct. Dec. 30, 1997). Similarly, courts will enforce non-disclosure and non-solicitation agreements if the agreements reasonably support an employer's legitimate business interests. See Alexander & Alexander, Inc. v. Danahy, 21 Mass. App. Ct. 488, 497-98 (1986); Macam Corp. v. Orchard, 885 F. Supp. 294, 296 (D. Mass. 1995).

### a. CTI's Post-Employment Covenants Are Necessary to Protect CTI's Legitimate Business Interests.

The post-employment covenants in CTI's ND-NS Agreement with Harnett protect CTI's legitimate business interests. First, the covenants protect CTI's good will. Courts in the Commonwealth have long recognized good will as a legitimate business interest which an employer may protect through the use of post-employment covenants. New England Canteen Service, Inc. v. Ashley, 372 Mass. 671, 674 (1977); Marine Contractors, 365 Mass. at 287; Kroeger v. Stop & Shop Cos., 13 Mass. App. Ct. 310, 316 (1982); Bowne v. Merkert Enterprises, Inc., 1998 Mass. Super. LEXIS 316, at *12-13 (Mass. Super. Ct. 1998). Indeed, a company's good will is a legitimate business interest sufficient in virtually all contexts to warrant enforcement of a non-competition clause. See, e.g., New England Canteen Service, 372 Mass. at 674 (involving only good will and no claims related to trade secrets or confidential data). Employer good will is any intangible business attribute that "tends to enable the business to retain the [customer's] patronage" including the employer's positive reputation in the eyes of its customers and potential customers. See Slate Co. v. Bikash, 343 Mass. 172, 175-76 (1961) (internal quotation marks and citations omitted); Marine Contractors, 365 Mass. at 287-88; Hagopian, 1997 Mass. Super. LEXIS 52, at *5. Here, CTI's good will takes the form of

relationships with their actual and prospective clients.  See Marine Contractors, 365 Mass. at 287-88.

Harnett's breach of his ND-NS Agreement with CTI directly threatens CTI's good will. A former employee is in a position where he can harm an employer's good will either because: (1) of his close association with his former employer's customers; or (2) he has knowledge of confidential business information.  See All Stainless, Inc., 364 Mass. at 779-80.  Harnett was a Senior Account Executive with CTI and was privy to CTI's confidential information.  As such, Harnett is in a position to harm CTI's good will for both reasons and, indeed, has taken affirmative steps to do so.

Immediately after Harnett left CTI to work for OnX, he began conducting business with one of CTI's existing customers, Demandware (which, was also a customer that had a prior relationship with Harnett while he was employed by CTI).  Kasparian Aff. ¶ 24; Kane Aff. ¶¶ 3-6.  Harnett has also reached out to other customers and clients of CTI since joining OnX. Kasparian Aff. ¶¶ 20, 25, 27.  Courts recognize that an employer's good will is threatened when a salesman calls on his former employer's customers to solicit business on behalf of his new employer.  See All Stainless, Inc., 364 Mass. at 780, 781; Hagopian, 1997 Mass. Super. LEXIS 52, at *6-7; Browne v. Merkert Enters., Inc., 1998 Mass. Super. LEXIS 316, at *13 (Mass. Super. Ct. Mar. 30, 1998).

Second, Harnett possesses confidential business information, such as pricing information and customer preferences, prior purchase history, belonging to CTI, which, if used by OnX, would harm CTI.  Specifically, when calling on his former CTI clients, Harnett would have knowledge, including, but not limited to, CTI's product cost information, sales prices quoted/charged to customers, profit margins, SOWs, sales strategies, product/manufacture mix,

customer contact information, customer purchasing and service preferences, vendor contact information, vendor preferences and tendencies, and customer plans for future project work and purchases. Kasparian Aff. ¶ 15. Further, while Harnett was employed at CTI, he had access to CTI's client relationship management ("CRM") database containing, among other confidential information, confidential documents customized for CTI's clients, records of communications with the client, and pricing information for all CTI clients. Id. ¶ 17. CTI has a legitimate interest in protecting its confidential data. CTI would be harmed if one of its competitors, such as OnX, were able to use this information. See All Stainless, Inc., 364 Mass. at 779-80.

To determine whether business information is confidential, several factors are relevant:

(1)     The extent to which the information is known outside of the business;

(2)     The extent of the measures taken by the employer to guard the secrecy of the information; and

(3)     the ease or difficulty with which the information could be properly acquired.

See Augut Inc. v. Aegis, Inc., 409 Mass. 165, 169-70 (1991) (citing Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972)). CTI's customer profiles and SOWs are unknown outside of CTI and the client that is the counter-party to any given SOW. The information is not used for marketing purposes, nor is it published anywhere in the public domain. It would take months to years for a competitor to develop this information, if it could do so at all. Kasparian Aff. ¶ 36. Other information, such as CTI's marketing strategy and pricing information cannot be "properly" acquired by a competitor. This information was kept confidential by CTI. Id. ¶¶ 4, 9, 17. To further protect this information, CTI entered into agreements with its employees, including Harnett. Id. ¶ 9.

CTI's confidential information would be invaluable to CTI's competitors. Armed with CTI's price structure and customer profiles, a competitor would instantly know the specific

services each of CTI's customers require.  A competitor of CTI would be able to forego spending years establishing long-term business relationships in order to gain this information as CTI has done.  A competitor could then offer similar services to CTI's customers at a price lower than the price negotiated with CTI, harming its good will.  In short, access to CTI's customer profiles, SOW, pricing information and marketing strategy would allow OnX to focus their own marketing efforts in an attempt to preempt CTI's plans.  See Kroeger, 13 Mass.App.Ct. at 317-18 (affirming that marketing strategy was protectable business interest).

Harnett's knowledge about certain CTI accounts, combined with the nature of his work for OnX's sales division, makes it inevitable that he will use CTI's confidential information at OnX, particularly with regard to Harnett's former clients from CTI.  Harnett worked at CTI for almost ten years, during which time he was immersed in CTI's confidential information – costs, pricing, profit margin strategies, customer preferences and contact information, and so forth. Harnett is now working in the same capacity at OnX, and is attempting to lure CTI's clients. Given Harnett's deep experience in CTI's business and confidential information, particularly with respect to his former CTI clients, and the similarity of CTI's services with OnX's, it is unavoidable that Harnett will use the comprehensive confidential information he has learned at CTI to its grave disadvantage, for the benefit of OnX, including, but not limited to, soliciting and/or diverting business from CTI's existing customers.  See Aspect Software, Inc. v. Barnett, 787 F. Supp. 2d 118, 129-30 (D. Mass. 2011); Lombardi Med. Tech., Inc. v. Johannessen, 729 F. Supp. 2d 432, 442 (D. Mass. 2010) (granting injunction and holding that "given the similarities among the products and the defendants' position at the companies, I find that disclosure would be inevitable").

Harnett has intimate familiarity with CTI's confidential business information, from precise cost and pricing data, to CTI's broader sales and profit margin strategies, to the preferences of CTI's exclusive customers. CTI took reasonable efforts to maintain the secrecy of this information. Nonetheless, Harnett's employment with OnX presents a clear and inevitable danger of his disclosure of confidential information.

### b.  The Agreement is supported by valid consideration.

Massachusetts law recognizes that where a restrictive covenant is entered into as a condition of employment, future employment constitutes valid consideration. See Economy Grocery Stores Corp., 290 Mass. at 552 ("The contract was not void for lack of consideration. When accepted and acted on by the plaintiff, it implied according to its reasonable construction a promise on the part of the plaintiff to employ the defendant."). Because the ND-NS Agreement was a condition of Harnett's employment when he joined CTI in 2003, see Kasparian Aff. ¶ 9, the ND- NS Agreement is supported by valid consideration. See Stone Legal Res. Grp., Inc. v. Glebus, 2002 Mass. Super. LEXIS 555, at *12 (Mass. Super. Ct. Dec. 17, 2002) ("When a non-competition provision is signed at the beginning of employment, there is sufficient consideration."). Further, the parties recognized in the text of the ND-NS Agreement that valid consideration existed. See Kasparian Aff. Ex. A at 1 ("In consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows . . . .").

### c.  The Agreement Is Reasonable In Duration and Scope.

The post-employment covenants in Harnett's ND-NS Agreement are reasonable in all aspects. Pursuant to Section 2 of the ND-NS Agreement, Harnett agreed not to reveal any confidential information that he gained during his employment with CTI. See id. Pursuant to

Section 3 of the ND-NS Agreement, Harnett agreed that, for a period of twelve months after the termination of his employment with CTI, he would not "solicit, divert or entice away existing customers or business of [CTI]." See id. Massachusetts courts have regularly upheld restrictions of longer than the twelve month period specified in this ND-NS Agreement. See, e.g., Marine Contractors, 365 Mass. at 290 (three years reasonable); All Stainless, Inc., 364 Mass. at 779 (two years reasonable); Novelty Bias Binding Co. v. Shevrin, 342 Mass. 714, 718 (1961) (three years reasonable). Likewise, Harnett is free to work for OnX, and solicit anyone, apart from CTI's existing customers. Narrowly drawn non-solicitation restrictions such as this are reasonable. See WordWave Inc. v. Owens, 2004 Mass. Super. LEXIS 661, at *10-11 (Mass. Super. Ct. 2004); Modis, Inc. v. Revolution Grp., 1999 Mass. Super. LEXIS 542, at *24-26 (Mass. Super. Ct. 1999) ("The reasonableness of these provisions is underlined by the fact that each of the individual employees is still able to compete against their former employer immediately.").

CTI has developed strong business relationships through years of developing its own good will. It is not unreasonable to prevent Harnett from damaging CTI's good will by prohibiting him from soliciting CTI's customers and clients, especially by utilizing CTI's confidential business information. There is no non-compete clause in Harnett's ND-NS Agreement. Rather, CTI has taken a very narrow and reasonable approach in practice prohibiting contact with its existing customers comprising approximately 300 companies, non-profits, and other institutions from Maine to New Jersey, with a focus in the greater Boston area. Kasparian Aff. ¶ 13. While CTI is an established and successful company, it does not have so dominant a market share in the region that a former employee would be unable to seek new sales opportunities without relocating from the thousands of other potential customers not covered by

the ND-NS Agreement. Id. In fact, it would be unreasonable to not enforce Harnett's ND-NS Agreement with CTI.

### d. Public Policy Will Not Be Ill Served By Enforcement Of This Agreement.

Because the ND-NS Agreement is necessary to protect CTI's legitimate business interests, it does not unreasonably restrain trade. See Marine Contractors, 365 Mass. at 287-88. Furthermore, Harnett voluntarily entered into, and remained a party to, the ND-NS Agreement for consideration, including, among other benefits, the opportunity to receive substantial annual compensation from CTI. Finally, "[t]he public interest favors enforcement of contractual obligations voluntarily entered into for consideration." EMC Corp. v. Allen, 1997 Mass. Super. LEXIS 102, at *13 (Mass. Super. Ct. 1997). Here, it would be against the public interest to allow Harnett to appropriate CTI's good will in the service of a competitor in violation of a valid contract. See New England Tree Expert Co. v. Russell, 306 Mass. 504, 509 (1940).

### 2. A sufficient possibility of threatened irreparable injury exists.

Without enforcement of Harnett's ND-NS Agreement, CTI will suffer irreparable harm. Harnett and CTI explicitly recognized this fact in the ND-NS Agreement. Kasparian Aff. Ex. A § 5 ("It is acknowledged that any breach of this Agreement by the Employee could cause the Company irreparable damage and that in the event of such breach the Company shall have, in addition to any and all remedies at law, the right to an injunction, specific performance or other equitable relief to prevent the violation of any obligations of the Employee hereunder."). CTI invests a tremendous amount of time and resources on customized planning, investigation, and design for each client, which takes years to research and develop. It is impossible to quantify the damage of Harnett's re-entry into CTI's customer accounts. Id. ¶ 37. If Harnett continues to violate the ND-NS Agreement, CTI will suffer not only financial losses but also the loss of

valued business relationships, a loss which cannot be remedied solely by a damage award.  See,

e.g., Kroeger, 13 Mass. App. Ct. at 322 ("[T]he task of quantifying the consequences of violating

a noncompetition clause is a particularly difficult and elusive one."); Shiply Co. v. Clark, 728 F.

Supp. 818, 827 (D. Mass. 1990) ("Certainly, as to any unknown or future violations of the

covenants by defendants, [plaintiff's] loss of 'good will' is irreparable.").

### 3. The discovery requested is narrowly tailored to inform the parties and the Court on whether preliminary injunctive relief is appropriate.

The discovery requested by CTI from defendants is limited only to that information that

would be relevant to a potential motion for a preliminary injunction as confirmation of the

information CTI has received concerning Harnett's contact with CTI clients.  As set forth in the

proposed Order and discovery requests, CTI asks for the following:

#### Requests for Production of Documents (within 5 business days)

a) All communications between OnX and Harnett related to the allegations in the
    Complaint including, but not limited to, discussions of CTI clients formerly assigned
    to Harnett and the ND-NS Agreement between Harnett and CTI;

b) All employment applications completed by Harnett and submitted to OnX;

c) All employment agreements between OnX and Harnett, and any drafts thereof;

d) All communications, including, but not limited to, emails, sent by OnX to CTI clients
    announcing the hiring of Harnett;

e) All calendars, schedules, or other documents containing Harnett's appointments for
    the period of October 26, 2012 to present; and

f) All documents taken from CTI by Harnett.

#### Interrogatories (within 5 business days)

a) State the date when Harnett accepted an offer of employment from OnX;

b) State the date when Harnett became an employee at OnX;

c) For each communication with a client or customer of CTI by Harnett and OnX, list the name of the customer or client contacted, the date(s) of contact, the method of communication (e.g., in-person meeting, telephone call, email, text message, etc.), who initiated the contact (i.e., Harnett or client), and a summary of the substance of the communication; and

d) List all registrations for sales opportunities filed by Harnett on behalf of OnX including the date of the registration, the name of the potential client, and the name of the vendor.

### Depositions (within 10 business days)

a) Brian Harnett; and

b) OnX USA LLC d/b/a OnX Enterprise Solutions pursuant to Mass. R. Civ. P. 30(b)(6) covering the following topics:

- The recruitment and hiring of Brian Harnett;
- All communications by OnX and/or Harnett concerning Harnett's ND-NS Agreement with CTI;
- The announcement of the hiring of Brian Harnett;
- Brian Harnett's contact with CTI clients; and
- Brian Harnett's registered sales opportunities on behalf of OnX.

### *4. The burden on defendants is outweighed by considerations for the administration of justice.*

While CTI recognizes the burden imposed on defendants by expedited discovery in the middle of the holiday season, CTI requests what it believes to be the most reasonable approach available for all parties and the Court. CTI has attempted to address the issues raised in its

Complaint informally with both Harnett and OnX on several occasions since October to no avail. CTI initially attempted to address these issues in multiple inquiries to Harnett after he gave notice of his resignation but before he ended his employment at CTI. Kasparian Aff. ¶ 19. Harnett actively concealed his future employment with OnX by rebuffing these inquiries and claiming that he "did not have a firm offer in hand." Id. To ensure that Harnett knew his obligations under the ND-NS Agreement, CTI's human resources manager went over the ND-NS Agreement's provisions and provided Harnett with a copy in his exit interview, which he acknowledged in writing. Id. ¶ 19, Ex. B. When CTI began to receive reports that Harnett was contacting his former CTI clients on behalf of OnX, CTI's counsel again notified Harnett of his obligations under the ND-NS Agreement and invited Harnett to contact him if he had any questions. Id. ¶ 21, Ex. C. Harnett never responded to this letter. Id. ¶ 31. As CTI learned of additional reports that Harnett was contacting his former clients on behalf of OnX, CTI's counsel wrote to OnX notifying it of Harnett's ongoing breaches of the ND-NS Agreement and requesting an acknowledgement that OnX would honor the terms of the ND-NS Agreement. Id. ¶ 30, Ex. D. OnX also ignored this outreach from CTI. Id. ¶ 31.

But for Hartnett and OnX's absolute non-responsiveness, and Harnett's earlier deception, this entire lawsuit might not be necessary. Instead, both Harnett and OnX have shown complete disregard for the solemn agreement between Harnett and CTI. Even now, while it is suffering actual irreparable harm, CTI has taken a reasonable approach by merely requesting limited expedited discovery instead of moving immediately for a preliminary injunction. Clearly, the interests of justice favor imposing a measure of inconvenience on Harnett and OnX by requiring them to finally respond to CTI, so that CTI can evaluate the merits of proceeding with a future motion for preliminary injunction.

## V.     CONCLUSION

For the reasons set forth above, CTI has good cause for expedited discovery because it has colorable claims, is suffering and will continue to suffer irreparable harm, has asked only for limited discovery focused on the issues that would face this Court in any future motion for preliminary injunctive relief, and the burden on defendants is outweighed by the interests of justice. As such, CTI requests that this Court grant expedited discovery in in the form proposed by CTI so that it may further evaluate the appropriateness of a future motion for a preliminary injunction.

Respectfully submitted,

CORPORATE TECHNOLOGIES, INC.

By its attorneys,

_____
Kevin J. O'Connor (BBO #555250)
Timothy F. Holahan (BBO #672760)
James J. Nagelberg (BBO #675656)
John A. Gallagher (BBO #679148)
HINCKLEY, ALLEN & SNYDER, LLP
28 State Street
Boston, MA 02109
Tel: 617-378-4394
Fax: 617-345-9020
koconnor@haslaw.com
tholahan@haslaw.com
jnagelberg@haslaw.com
jgallagher@haslaw.com

Date: December 19, 2012

CERTIFICATE OF SERVICE

Brian Harnett                           OnX USA LLC
188 Crowell Road                        c/o CT Corporation System
Hopkinton, NH 03229                     155 Federal Street, Ste. 700
                                        Boston, MA 02110

I hereby certify that a copy of the foregoing was served upon all parties, by special process server, on December 19, 2012.

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                        SUPERIOR COURT

_____
                                )
CORPORATE TECHNOLOGIES, INC.,   )
                                )
            Plaintiff,          )
                                )
v.                              )          CIVIL ACTION NO. _____
                                )
BRIAN HARNETT, and              )
ONX USA LLC d/b/a               )
ONX ENTERPRISE SOLUTIONS        )
                                )
            Defendants.         )
_____)

## PROPOSED ORDER GRANTING EXPEDITED DISCOVERY

There came before the Court the Plaintiff's Emergency Motion for Expedited Discovery

and, after due consideration of said motion, and after hearing, it is hereby ORDERED AND

ADJUDGED, pursuant to Mass. R. Civ. P. 30(a), 33(a)(3), and 34(b), that Defendants Brian

Harnett ("Harnett") and OnX USA LLC d/b/a OnX Enterprise Solutions ("OnX"), and their

respective officers, agents, servants, employees, attorneys and all persons acting in concert with

them, are ordered to respond to any discovery requests propounded by Plaintiff consistent with

the following:

1. **Requests for Production of Documents**

Within five (5) days of the date of this Order, defendants shall provide responsive

documents to requests consistent with the following:

a) All communications between OnX and Harnett related to the allegations in the Complaint including, but not limited to, discussions of CTI clients formerly assigned to Harnett and the ND-NS Agreement between Harnett and CTI;

b) All employment applications completed by Harnett and submitted to OnX;

c) All employment agreements between OnX and Harnett, and any drafts thereof;

d) All communications, including, but not limited to, emails, sent by OnX to CTI clients announcing the hiring of Harnett;

e) All calendars, schedules, or other documents containing Harnett's appointments for the period of October 26, 2012 to present; and

f) All documents taken from CTI by Harnett.

2. **Interrogatories**

Within five (5) days of the date of this Order, defendants shall provide respond to interrogatories consistent with the following:

a) State the date when Harnett accepted an offer of employment from OnX;

b) State the date when Harnett became an employee at OnX;

c) For each communication with a client or customer of CTI by Harnett and OnX, list the name of the customer or client contacted, the date(s) of contact, the method of communication (e.g., in-person meeting, telephone call, email, text message, etc.), who initiated the contact (i.e., Harnett or client), and a summary of the substance of the communication; and

d) List all registrations for sales opportunities filed by Harnett on behalf of OnX including the date of the registration, the name of the potential client, and the name of the vendor.

2

3. **Depositions**

Plaintiff may schedule depositions to take place within ten (10) days from the date of this Order for the following:

a) Brian Harnett; and

b) OnX USA LLC d/b/a OnX Enterprise Solutions pursuant to Mass. R. Civ. P. 30(b)(6) covering the following topics:

- The recruitment and hiring of Brian Harnett;
- All communications by OnX and/or Harnett concerning Harnett's ND-NS Agreement with CTI;
- The announcement of the hiring of Brian Harnett;
- Brian Harnett's contact with CTI clients; and
- Brian Harnett's registered sales opportunities on behalf of OnX.

So Ordered.

_____
Justice of the Superior Court

Dated:  December __, 2012

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                    SUPERIOR COURT

```
                                    )
CORPORATE TECHNOLOGIES, INC.,       )
                                    )
            Plaintiff,              )
                                    )
v.                                  )    CIVIL ACTION NO. _____
                                    )
BRIAN HARNETT, and                  )
ONX USA LLC d/b/a                   )
ONX ENTERPRISE SOLUTIONS            )
                                    )
            Defendants.             )
                                    )
```

## PLAINTIFF CORPORATE TECHNOLOGIES, INC.'S
## MOTION FOR A SHORT ORDER OF NOTICE

Plaintiff Corporate Technologies, Inc. ("CTI") hereby moves, pursuant to Mass. R. Civ. P.

Rule 6(c), for a short order of notice on Plaintiff's Motion for Leave to Conduct Expedited

Discovery, filed with this Court on December 19, 2012. Specifically, Plaintiff respectfully

requests that this honorable Court schedule the Motion for a hearing on December 21, 2012.

Respectfully submitted,

CORPORATE TECHNOLOGIES, INC.

By its attorneys,

Kevin J. O'Connor (BBO #555250)
Timothy F. Holahan (BBO #672760)
James J. Nagelberg (BBO #675656)
John A. Gallagher (BBO #679148)
HINCKLEY, ALLEN & SNYDER, LLP
28 State Street
Boston, MA 02109
Tel: 617-378-4394
Fax: 617-345-9020

Date:  December 19, 2012

<u>CERTIFICATE OF SERVICE</u>

Brian Harnett                    OnX USA LLC
188 Crowell Road                 c/o CT Corporation System
Hopkinton, NH 03229              155 Federal Street, Ste. 700
                                 Boston, MA 02110

     I hereby certify that a copy of the foregoing was served upon all parties, by first class mail, on December 19, 2012.

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                      SUPERIOR COURT

```
                                    )
CORPORATE TECHNOLOGIES, INC.,       )
                                    )
            Plaintiff,              )            12-1910
                                    )
v.                                  )    CIVIL ACTION NO. _____
                                    )
BRIAN HARNETT, and                  )
ONX USA LLC d/b/a                   )
ONX ENTERPRISE SOLUTIONS            )
                                    )
            Defendants.             )
                                    )
```

### PLAINTIFF CORPORATE TECHNOLOGIES, INC.'S
### MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER

Plaintiff Corporate Technologies, Inc. ("CTI") respectfully requests that this Court

appoint DHR & Associates of 46 Second Street, Cambridge, Massachusetts, constables and

disinterested persons over the age of eighteen, as Special Process Server in the above-captioned

action.

Respectfully submitted,

CORPORATE TECHNOLOGIES, INC.

By its attorneys,

Kevin J. O'Connor (BBO #555250)
Timothy F. Holahan (BBO #672760)
James J. Nagelberg (BBO #675656)
John A. Gallagher (BBO #679148)
HINCKLEY, ALLEN & SNYDER, LLP
28 State Street
Boston, MA 02109
Tel: 617-378-4394
Fax: 617-345-9020

Date: December 19, 2012

12/19/12 Motion Allowed
Attest: _____
Deputy Assistant Clerk
( Kaplan J.)

# Commonwealth of Massachusetts
## County of Middlesex
## The Superior Court

MIDDLESEX, SS.                                    CIVIL DOCKET# **MICV2012-04910**

Corporate Technologies, Inc., Plaintiff
vs.
Brian Harnett, OnX USA LLC d/b/a OnX Enterprise Solutions, Defendants

## SUMMONS AND ORDER OF NOTICE

To the above-named Defendants:

    You are hereby summoned and required to serve upon **Timothy F Holahan, Esquire**, plaintiff's attorney, whose address is **Hinckley Allen & Snyder 28 State Street, Boston, MA 02109-1775,   ,** an answer to the complaint which is herewith served upon you. This must be done within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, Judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this Court at Woburn either before service upon plaintiff's attorney or within a reasonable time thereafter.

    Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

    **WE ALSO NOTIFY YOU** that application has been made in said action, as appears in the complaint, for a preliminary injunction and that a hearing upon such application will be held at the court house at said Middlesex County Superior Court, in Woburn on **12/21/2012, at 02:00 PM in Civil J - Ct Rm 420 - 200 Trade Center, Woburn,** at which time you may appear and show cause why such application should not be granted.

    **Witness, Barbara J. Rouse,** Esquire, Chief Justice of the Superior Court, at Woburn, Massachusetts this 19th day of December, 2012.

.................................................                                Clerk

    **(AFFIX RETURN OF SERVICE ON BACK OF SUMMONS)**

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                   SUPERIOR COURT

|  |  |
|---|---|
| CORPORATE TECHNOLOGIES, INC., ) | **12-1910** |
| Plaintiff, ) | |
| v. ) | CIVIL ACTION NO. _____ |
| BRIAN HARNETT, and ) | |
| ONX USA LLC d/b/a ) | |
| ONX ENTERPRISE SOLUTIONS ) | |
| Defendants. ) | |

## PLAINTIFF'S EMERGENCY MOTION FOR EXPEDITED DISCOVERY

Plaintiff Corporate Technologies, Inc. ("CTI") respectfully submits this memorandum of law in support of its emergency motion for expedited discovery, pursuant to Mass. R. Civ. P. 30(a), 33(a)(3), and 34(b), and Mass. Super. Ct. R. 9A(e)(1), for limited expedited discovery regarding Plaintiff's Complaint filed contemporaneously with this motion and in order to determine whether a motion for preliminary injunction should be filed. As stated more fully in the memorandum submitted in support of this motion, as well as the Complaint and supporting affidavits, CTI has learned from multiple sources that a former employee is actively soliciting his former CTI clients in violation of a Nondisclosure and Nonsolicitation Agreement. To further investigate these breaches, CTI seeks expedited, limited discovery in the form of responses to requests for production of documents and interrogatories within five business days of an Order from this Court and depositions within ten business days of an Order from this Court.

FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX
DEC 19 2012

CLERK

# Commonwealth of Massachusetts
## County of Middlesex
## The Superior Court

CIVIL DOCKET # **MICV2012-04910-D**

**Courtroom Civil D- Ct Rm 620 - 200 TradeCenter, Woburn**

RE: **Corporate Technologies, Inc. v Harnett et al**

TO:

          Timothy F Holahan, Esquire
          Hinckley Allen & Snyder
          28 State Street
          Boston, MA 02109-1775

## SCHEDULING ORDER FOR  F  TRACK

    You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated, and case shall be resolved and judgment shall issue **10/10/2014.**

| STAGES OF LITIGATION | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | 03/19/2013 | 03/19/2013 | |
| Response to the complaint filed (also see MRCP 12) | | 04/18/2013 | |
| All motions under MRCP 12, 19, and 20 | 04/18/2013 | 05/18/2013 | 06/17/2013 |
| All motions under MRCP 15 | 04/18/2013 | 05/18/2013 | 06/17/2013 |
| All discovery requests and depositions served and non-expert depositions completed | 10/15/2013 | | |
| All motions under MRCP 56 | 11/14/2013 | 12/14/2013 | |
| Final pre-trial conference held and/or firm trial date set | | | 04/13/2014 |
| Case shall be resolved and judgment shall issue by **10/10/2014** | | | **10/10/2014** |

- **The final pre-trial deadline is <u>not the scheduled date of the conference.</u>**
- **You will be notified of that date at a later time.**
- **Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

Dated: 12/19/2012

                                             Michael A. Sullivan
                                           Clerk of the Court

Telephone: 781-939-2760

Disabled individuals who need handicap accommodations should contact the Administrative Office of the Superior Court at (617) 788-8130 --Check website as to status of case: http://ma-trialcourts.org/tcic 3938981 inidoc01 macirobe

| CIVIL ACTION COVER SHEET | DOCKET NO.(S) | Trial Court of Massachusetts Superior Court Department County: _Middlesex_  |
|---|---|---|

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| *Corporate Technologies, Inc.* | *Brian Harnett, and OnX USA LLC d/b/a OnX Enterprise Solutions* |

| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE *Timothy Holahan Esq.* | ATTORNEY (if known) |
|---|---|
| Kevin J. O'Connor, Hinckley, Allen & Snyder LLP | *Unknown* |
| 28 State Street, Boston, MA 02109-1775 (617) 345-9000 *BBO #C72760* | |
| Board of Bar Overseers number: **555250** | |

## Origin code and track designation

Place an x in one box only:
- ☒ 1. FO1 Original Complaint
- ☐ 2. FO2 Removal to Sup.Ct. C.231, s.104 (Before trial) (F)
- ☐ 3. FO3 Retransfer to Sup.Ct. C.231, s. 102C (X)

- ☐ 4. FO4 District Court Appeal c. 231, s. 97 & 104 (After trial) (X)
- ☐ 5. FO5 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
- ☐ 6. E10 Summary Process Appeal (X)

## TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| *A01* | *Breach of Contract* | (F) | (X) Yes   ( ) No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
   1. Total hospital expenses ............................................................. $
   2. Total Doctor expenses ............................................................. $
   3. Total chiropractic expenses ...................................................... $
   4. Total physical therapy expenses ................................................. $
   5. Total other expenses (describe) ................................................. $
                                                               Subtotal $

B. Document lost wages and compensation to date ......................................... $
C. Documented property damages to date ................................................... $
D. Reasonably anticipated future medical and hospital expenses ........................... $
E. Reasonably anticipated lost wages .................................................... $
F. Other documented items of damages (describe)

                                       $

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

                                                  TOTAL $ *N/A*

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claims(s):

Plaintiff Computer Technologies, Inc. ("CTI") brings this action for breach of a Nondisclosure and Nonsolicatation Agreement by Defendant Brian Harnett ("Harnett") and related torts by Harnett and his new employer Defendant OnX USA LLC d/b/a OnX Enterprise Solutions ("OnX"). Specifically, Harnett and OnX have been contacting and soliciting business from existing CTI clients in violation of the Agreement. Plaintiff's damages exceed $25,000.00.

                                                  TOTAL $   *25,000.00+*

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____   DATE: *December 19, 2012*

## CIVIL ACTION COVER SHEET
## INSTRUCTIONS

## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

| CONTRACT | | | REAL PROPERTY | | | MISCELLANEOUS | | |
|---|---|---|---|---|---|---|---|---|
| A01 | Services, labor and materials | (F) | C01 | Land taking (eminent domain) | (F) | E02 | Appeal from administrative | (X) |
| A02 | Goods sold and delivered | (F) | C02 | Zoning Appeal, G.L. c.40A | (F) | | Agency G.L. c. 30A | |
| A03 | Commercial Paper | (F) | C03 | Dispute concerning title | (F) | E03 | Action against Commonwealth | |
| A08 | Sale or lease of real estate | (F) | C04 | Foreclosure of mortgage | (X) | | Municipality, G.L. c.258 | (A) |
| A12 | Construction Dispute | (A) | C05 | Condominium lien and charges | (X) | E05 | All Arbitration | (X) |
| A99 | Other (Specify) | (F) | C99 | Other (Specify) | (F) | E07 | c. 112,s. 12S (Mary Moe) | (X) |
| | **TORT** | | | | | E08 | Appointment of Receiver | (X) |
| B03 | Motor Vehicle negligence | | | **EQUITABLE REMEDIES** | | E09 | General contractor bond, | |
| | personal injury/property damage | (F) | D01 | Specific performance of contract | (A) | | G.L. c.149,s.29,29a | (A) |
| B04 | Other negligence-personal | | D02 | Reach and Apply | (F) | E11 | Workman's Compensation | (X) |
| | injury/property damage | (F) | D06 | Contribution or Indemnification | (F) | E14 | Chapter 123A Petition-SDP | (X) |
| B05 | Products Liability | (A) | D07 | Imposition of Trust | (A) | E15 | Abuse Petition, G.L.c.209A | (X) |
| B06 | Malpractice-medical | (A) | D08 | Minority Stockholder's Suit | (A) | E16 | Auto Surcharge Appeal | (X) |
| B07 | Malpractice-other(Specify) | (A) | D10 | Accounting | (A) | E17 | Civil Rights Act, G.L.c.23,s.11H | (A) |
| B08 | Wrongful death, G.L.c.229, s2A | (A) | D12 | Dissolution of Partnership | (F) | E18 | Foreign Discovery proceeding | (X) |
| B15 | Defamation (Libel-Slander) | (A) | D13 | Declatory Judgment G.L.c.231A | (A) | E96 | Prisoner Cases | (F) |
| B19 | Asbestos | (A) | D99 | Other (Specify) | (F) | E97 | Prisoner Habeas Corpus | (X) |
| B20 | Personal Injury-Slip&Fall | (F) | | | | E99 | Other (Specify) | (X) |
| B21 | Environmental | (A) | | | | | | |
| B22 | Employment Discrimination | (F) | | | | | | |
| B99 | Other (Specify) | (F) | | | | | | |

## TRANSFER YOUR SELECTION TO THE FACE SHEET.

EXAMPLE:

| CODE NO. | TYPE OF ACTION (SPECIFY) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | (F) | ☒YES   ☐NO |

## SUPERIOR COURT RULE 29

**DUTY OF THE PLAINTIFF.** The plaintiff or his/her counsel shall set forth, on the face sheet (or attach additional sheets as necessary), a statement specifying in full and itemized detail the facts upon which the plaintiff then relies as constituting money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served on the defendant together with the complaint. If a statement of money damages, where appropriate is not filed, the Clerk-Magistrate shall transfer the action as provided in Rule 29(5) (C).

**DUTY OF THE DEFENDANT.** Should the defendant believe the statement of damages filed by the plaintiff in any respect inadequate, he or his counsel may file with the answer a statement specifying in reasonable detail the potential damages which may result should the plaintiff prevail. Such statement, if any, shall be served with the answer.

## A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT, BUFF COLOR PAPER

## FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY
## MAY RESULT IN DISMISSAL OF THIS ACTION