UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CORPORATE TECHNOLOGIES, INC.,      )
                                   )
          Plaintiff,               )     CIVIL ACTION NO.
                                   )     12-12385-DPW
v.                                 )
                                   )
BRIAN HARNETT, and                 )
ONX USA LLC d/b/a                  )
ONX ENTERPRISE SOLUTIONS           )
                                   )
          Defendants.              )
                                   )

MEMORANDUM AND ORDER
May 3, 2013

Plaintiff Corporate Technologies, Inc. ("CTI") brings this action against its former employee, Brian Harnett, and his new employer, OnX USA LLC, for breach of contract and tortious interference with advantageous business relationships.  Plaintiff alleges that Harnett took confidential information he learned at CTI and has used it to solicit his former CTI clients to transfer their business to OnX in violation of the Non-Disclosure and Non-Solicitation Agreement that was a part of his employment contract with CTI.

Both Plaintiff and Defendants move for preliminary injunctive orders.  CTI seeks to enjoin Harnett from doing business with clients he worked with while at CTI.  Defendants seek to enjoin Plaintiff from describing Harnett's Non-Solicitation and Non-Disclosure Agreement as a non-competition agreement to potential customers.  I granted Plaintiff's motion for preliminary injunction orally during the March 11, 2013

motion hearing in this case.  This memorandum provides a more extended explanation for that ruling and resolves some lingering disputes over the particular written formulation of the injunctive order.  This memorandum also addresses Defendants' separate motion for preliminary injunction, which I decline to grant.

## I.  BACKGROUND

### A. Facts

CTI and OnX are competitors providing Information Technology solutions to corporations and universities, integrating software, hardware, consulting, maintenance, and support.  Harnett worked as a salesman for CTI from February 2003 until October 2012, when he left to work for CTI's competitor, OnX.  While working at CTI, Harnett's five largest clients were EBSCO Publishing, Demandware, Liberty Mutual, Harvard University, and Putnam Investments.

When Harnett joined CTI, he signed a Non-Disclosure and Non-Solicitation Agreement, precluding him from divulging confidential information he learned while employed with CTI and also precluding him from soliciting business from CTI's customers for one year following his departure from CTI.  Specifically, the Non-Disclosure undertaking provides,

> [t]he Employee shall not at any time . . . reveal to any person or entity any Confidential Information or Development or information or development belonging to any third party which the Company is under an obligation to keep confidential, and shall keep secret

2

> all matters which have or may be entrusted to him or
> her and shall not use or attempt to use any
> Confidential Information or Development . . . for his
> or her own benefit or for the benefit of any third
> party.

The Non-Solicitation undertaking specifically provides that,

> for twelve (12) months following the last date on which
> the Employee provided Services, the Employee shall not
> . . . directly or indirectly, alone or as a partner,
> officer, director employee, independent contractor,
> [etc.] . . . , solicit, divert or entice away existing
> customers or business of the Company.

OnX moved into the New England area in 2011.  On August 27, 2012, OnX made Harnett a formal employment offer, which he declined.  On October 5th, 2012, OnX made him a new offer, raising its promised compensation and offering to indemnify him fully for any disputes with CTI over breach of the Non-Disclosure and Non-Solicitation Agreement.  Harnett signed this employment offer on October 10, 2012, but did not announce his resignation to CTI until about one week later.  October 26, 2012 was his last day at CTI and he began work at OnX on the next business day, October 29, 2012.  On his last day in the office, Harnett met with CTI's Human Resources manager and he confirmed that he understood and would comply with his obligations under the Agreement.

When he left CTI, Harnett took about 25 pages of notes from his employment spanning a time period from 2010-2012, which he kept on his personal iPad.  He also copied his 2012 consumer

price quotes onto a USB memory drive, which he claims he left with CTI, but which CTI contends he took with him.  No party has yet uncovered or produced the drive.

On Harnett's first day at his new job, OnX sent an announcement to just over 100 potential clients notifying them of Harnett's new position with OnX.  This list included Harnett's eight most active CTI clients in 2012:  EBSCO Publishing, Demandware, Harvard University, Liberty Mutual, Putnam Investments, Convexity Capital, Interactive Data, and Wellington Management.  OnX contends that Harnett played no role in determining the list of recipients.  While CTI does not yet affirmatively dispute this fact, having engaged in only limited and expedited discovery, its skepticism is evident.

Four of Harnett's former clients from his time at CTI responded to OnX's announcement, and Harnett has met with them to discuss and encourage their business on behalf of OnX.  At least one of these contacts has ripened into an agreement between OnX and one of Harnett's former CTI clients.  Through his sales efforts, Harnett has persuaded Demandware to enter into a contract with OnX to provide services substantially similar to those it previously sought from CTI.  The parties have represented that, although Demandware and OnX have reached an agreement, they have not moved forward with the deal in light of the preliminary injunction entered against the Defendants.

In addition, Harnett has submitted more than 10 requests to various venders for "registered opportunities."  Registered opportunities are exclusive pricing discount arrangements between the vendor and the IT service provider (such as CTI or OnX) so that the service provider can sell the vendor's products to its client for a discounted price.  So far, Harnett's efforts have resulted in a rare "dual registration" with a vendor called NetApp which Harnett has pursued in his attempt to acquire business from EBSCO Publishing and Demandware.

**B. Procedural History**

CTI filed this case in state court on December 19, 2012.  Defendants removed the action to this court two days later on December 21, 2012.  Harnett filed counterclaims for intentional interference with an advantageous business relationship and unfair business practices on January 9, 2013.

Plaintiff filed a motion for preliminary injunction on February 15, 2013.  At the motion hearing on March 11, 2013, I granted Plaintiff's motion orally and directed the parties to confer on the text of a written order in accordance with my rulings.  The parties have been unable to reach agreement on two discrete issues: (1) whether Harnett and OnX should be enjoined from doing business with Harvard University entirely, or whether the injunction should be tailored to allow them to do business with discrete independent business units within Harvard as to

which Harnett had not previously provided services, and (2) whether *Plaintiff* should be enjoined from referring to Harnett's post-employment covenant as a non-competition rather than a non-solicitation agreement.  I heard further oral argument on April 3, 2013, directed the parties to file supplementary briefing with respect to the Harvard issue, and directed Defendants to file their own separate preliminary injunction motion with respect to the non-solicitation/non-competition issue.  After the parties made supplementary submissions, I heard further argument on May 1, 2013.

## II. CTI MOTION FOR PRELIMINARY INJUNCTION

In order to justify a request for the extraordinary remedy of a preliminary injunction, a movant must demonstrate the applicability of four basic factors - (1) likelihood of success on the merits, (2) irreparable harm, (3) that the balance of the hardships between the parties favors injunctive relief, and (4) that the injunction would not harm the public interest. *Swarovski Aktiengesllschaft* v. *Building No. 19, Inc.*, 704 F.3d 44, 48 (1st Cir. 2013).  In the final analysis, the first factor, likelihood of success, "is the main bearing wall of the four-factor framework."  *Ross-Simons of Warwick, Inc.* v. *Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996).

### A. Likelihood of Success

The parties do not dispute that Massachusetts law allows and enforces non-solicitation and non-disclosure agreements. *BNY Melon, N.A.* v. *Schauer*, No. 06-3958, 2010 WL 3326965, *8 (Mass. Super. May 14, 2010) ("There is no real dispute that each covenant . . . protect[s] a legitimate business interest[] . . . or that the confidentiality and nonsolicitation provisions are generally enforceable."); *see also People's Choice Mortg., Inc.* v. *Premium Capital Funding, LLC*, 2010 WL 1267373, *10 (Mass. Super. Mar. 31, 2010) (citing *All Stainless, Inc.* v. *Colby*, 308 N.E.2d 481 (Mass. 1974)).  The parties also do not dispute that Harnett has been competing with CTI for the business of those clients he worked with while employed at CTI.  Rather, Defendants draw an artificial distinction in order to argue that Harnett's admitted and open business dealings with his former CTI clients do not constitute solicitation and do not implicate the confidential information he learned while working at CTI.  They argue that as long as the client was the first to contact Harnett, any business he conducts cannot constitute solicitation. Neither the Agreement nor the law, however, draws such an arbitrary distinction.

The Agreement itself provides that Harnett may not "solicit, divert or entice away" CTI's customers.  Harnett's actions fall squarely within the unambiguous meaning of this clause.  While at

CTI, Harnett worked with Harvard, EBSCO, Demandware, and Convexity Capital.  Since leaving CTI and joining OnX, he has actively pursued business from these companies, seeking to convince them to do business with OnX.  This necessarily involves solicitation - by encouraging the companies to purchase products and services through OnX - as well as enticement - by offering incentives to do so, such as better pricing, purportedly better products and services, and whatever other comparative advantage Harnett, as a salesman, would customarily use to attract clients to his new company.  Neither the plain meaning of the word solicit, nor the plain meaning of the word entice requires some kind of first contact.  *See Webster's Third New International Dictionary* 757 (1993) ("entice . . . 2a: to draw on by arousing hope or desire . . . ."); *id.* at 2169 ("solicit . . . 7: to endeavor to obtain by asking or pleading . . . .").

Harnett's actions also fall squarely within the conduct proscribed by Massachusetts courts enforcing non-solicitation agreements.  Contrary to Defendants' contention, Massachusetts courts do not draw a bright-line distinction between those actions following first contact by the client and those following first contact by the employee.  *See Alexander & Alexander, Inc.* v. *Danahy,* 488 N.E.2d 22, 29-30 (Mass. App. Ct. 1986); *Gentman* v. *USI Holdings Corp.*, No. 05-3286, 2005 WL 2183159, *4 (Mass. Super. Sept. 1, 2005).  In *Alexander & Alexander*, the court held

8

that "[a]s a practical matter, the difference between accepting and receiving business, on the one hand, and indirectly soliciting on the other, may be more metaphysical than real . . . ." *Alexander & Alexander*, 488 N.E.2d at 30.  In *Gentman*, the court more specifically held that solicitation includes "deprecat[ing] [a] former employer . . . , or prais[ing] [a] new employer or *otherwise encourag[ing]* the client to bring his business [to the new employer]." *Getman*, 2005 WL 2183159, at *4 (emphasis added).  The undisputed accounts of Harnett's work with OnX fall within this definition of solicitation.  He has met with his former CTI clients and has *encouraged* them to bring their work to OnX.  As discussed above, this task of persuasion necessarily includes comparatively deprecating his former employer, CTI, and praising his new employer, OnX.  The nature of the sales job is to distinguish the products and services he sells as higher quality, better priced, or both.  This kind of persuasion constitutes solicitation under both *Getman* and *Alexander & Alexaner*.

Although both *Getman* and *Alexander & Alexander* do draw some distinction between situations in which a client makes first contact and those in which the employee makes first contact, this distinction is far too narrow to shield Harnett's conduct from liability.  Although *Getman* mentions that "there is plainly a real difference between an insurance agent initiating a telephone

call or meeting with a former client and the client initiating that contact himself," the court's concern extended only to any incidental limitations on *third parties'* conduct.  A non-solicitation agreement does not prevent a company from *receiving* business initiated by the client with no direct or indirect participation by the individual employee bound by the non-solicitation agreement.  *See Alexander & Alexander*, 488 N.E.2d at 30; *Getman*, 2005 WL 2183159, at *4.  To hold otherwise would bind third parties to agreements they did not sign or agree to.  However, this narrow carve-out from a non-solicitation agreement for *receiving* business does not allow a salesman to take active steps to persuade the client and actually solicit its business.  In this case, Harnett and OnX have done more than simply receive business.  They have actively pursued business from Harnett's former CTI clients – such as Harvard, Demandware, EBSCO Publishing, and Convexity Capital – and have together solicited and attempted to persuade them to bring their business to OnX.  In the case of Demandware, Harnett's encouragement and solicitation has proven successful.  Demandware has placed orders with OnX for services it previously purchased from CTI before staying the business relationship as a result of the injunctive order in this case.

Defendants objection that CTI's interpretation of the language in the agreement would impermissibly convert a narrow

non-solicitation agreement into a broad non-competition agreement, *Dynamics Research Corp.* v. *Analytic Sciences Corp.*, 400 N.E.2d 1274, 1288 n.32 (Mass. App. Ct. 1980), is untethered to the facts of this case.  A non-competition agreement would prevent Harnett from working for a company competing with CTI, including OnX.  The Non-Solicitation Agreement at issue prevents Harnett from doing business with certain specific clients, but allows OnX to employ him as a salesman otherwise.  Neither Plaintiff's interpretation of the agreement nor that articulated in this Memorandum can reasonably be construed as broadening the language into a non-competition agreement.

Moreover, even if the bright line "first contact" rule Defendants propose found some greater support in the case law - which it does not - it still could not shield Defendants from liability on the breach of contract claim for violation of the non-disclosure provision.

Harnett's agreement precludes him from "reveal[ing] . . . any Confidential Information or Development or information or development belonging to any third party which the Company is under and obligation to keep confidential."  In Massachusetts, courts assess six factors in determining whether information is confidential:

> (1) the extent to which the information is known
> outside of the business; (2) the extent to which it is
> known by employees and others involved in the business;
> (3) the extent of measures taken by the employer to

>      guard the secrecy of the information; (4) the value of
>      the information to the employer and to his competitors;
>      (5) the amount of effort or money expended by the
>      employer in developing the information; and (6) the
>      ease or difficulty with which the information could be
>      properly acquired or duplicated by others.

*Jet Spray Cooler, Inc.* v. *Crampton*, 282 N.E.2d 921, 925 (Mass.
1972).

This case is one in which the record before me makes it
"difficult to believe that in [his] time at [CTI], [Harnett] did
not pick up *any* confidential or proprietary information."
*Lombard Medical Techs., Inc.*, v. *Johannessen*, 729 F. Supp. 2d
432, 442 (D. Mass. 2010)(emphasis in original).  Harnett worked
as a salesman at CTI for the same kinds of products and services
he now sells on behalf of OnX, and because his territory has
remained the same, his potential client universe remains
substantially identical.  He is, of necessity, intimately
familiar with CTI confidential information and client
confidential information such as historical and contemplated
price quotes, clients' stated and anticipated future needs, and
lists of potential clients.

These data - especially price quotes - are not generally
known outside the business because CTI generates this information
over the course of its dealings with its clients.  The evidence
in the record indicates that the information is not widely known
even within the business.  Harnett's supervisor asked him to meet
with those CTI employees taking over his various accounts to

"transition" each account and provide them with the information Harnett knew about the accounts.  Harnett also downloaded the 2012 customer price quotes for his accounts to a USB memory drive, which he contends he provided to CTI.  The natural implication of Harnett's actions is that the price quotes are not widely known and even someone generally familiar with them, like Harnett, needs written backup to manage a refreshed recollection. Otherwise, there would be no need to download the information to provide it to others at CTI.  CTI has taken measures to guard the secrecy of this kind of information including by means of the non-disclosure agreements that its sales force must sign.  The parties' submissions are replete with argument and evidence that relationships and momentum are important factors in the IT solutions industry and that the confidential information a sales person has about pricing and future need can be instrumental in cultivating repeat clients, which CTI contends constitutes the majority of its business and in which both the entity parties before me invest substantial resources.

The parties dispute the difficulty with which "the information could be properly acquired or duplicated by others." *Jet Spray Cooler*, 282 N.E.2d at 925.  Defendants are correct that information is not confidential if competitors could get the same information from public sources or from the third party itself. *Chiswick, Inc.* v. *Constas*, No. 200400311, 2004 WL 1895044, *3

(Mass. Super. Jun. 17, 2004).  However "[t]he mere fact that one could obtain the name and contact information of a customer via public means does not negate confidentiality." *Oxford Global Resources, Inc.* v. *Guerriero*, No. Civ. A 03-12078, 2003 WL 23112398, *8 (D. Mass. Dec. 30, 2003).  In this case, CTI's consumer price quotes are indisputably confidential information that no third party could easily obtain.  Defendants argue that competitors could obtain *customer* information, including customers' anticipated future IT needs, by contacting the third party themselves.  Yet, this information still constitutes protectable confidential information for two reasons:  First, anticipated need is not necessarily the kind of information that clients would freely give to a competitor who asks for it. Unlike the kinds of basic information that, while not publicly available as a technical matter, would be readily given upon basic inquiry such as contact information, information about anticipated needs is not something to which companies generally give access freely absent some kind of existing or anticipated relationship with the asking party.  Second, even if such information were publicly or readily accessible, a "confidential superset of that information" may still be protectable.  *Id.* Harnett had access to such a superset of information synthesized and compiled from clients and specifically tailored to his work

14

as an IT solutions salesman in New England.  The confidential information he gleaned is therefore protectable.

CTI is also likely to succeed in showing that Harnett has disclosed such confidential information.  In similar circumstances, Judge Gertner, in *Lombard Medical,* held that disclosure would be inevitable.  She observed that "[e]ven if [Defendant] fully intend[ed] to protect [Plaintiff's] confidential information, [he] does not begin at [the Defendant company] with 'a tabula rasa with respect to [Plainitff's] . . . customers and other significant business information. . . .' Given the similarities among the products and the [individual] defendant['s] position[] at the companies, I find that disclosure would be inevitable." *Lombard Medical*, 729 F. Supp. 2d at 442. The same is true in this case.  Given the similarity of Harnett's position at both companies, he cannot simply forget the confidential information he has learned about his clients while employed with CTI, and he will inevitably call on this information in any dealings with those former clients during the course of his employment with OnX.

Defendants argue that inevitable disclosure is not an appropriate consideration in the likelihood of success analysis, but is reserved for analysis of irreparable harm.  *See U.S. Elec. Servs., Inc*. v. *Schmidt*, No. 12-cv-10845, 2012 WL 2317358, *8-9 (D. Mass. June 19, 2012)("[A]lthough the cases offered by USESI

make clear that the inevitable disclosure doctrine may be used to establish irreparable harm once a party seeking an injunction has already established a likelihood of success on the merits, they do not show that a party may rely solely on inevitable future conduct, rather than conduct that has actually occurred, to establish a likelihood of success on the merits of a trade secrets appropriation claim or a breach of confidentiality claim, as USESI seeks to do here."). However, in *U.S. Elec. Servs.*, Judge Casper focused on the fact that "an allegedly inevitable future breach of confidentiality obligations" if an employee were to compete with its old employer is too speculative to establish likelihood of success. *Id.* By contrast, the harm in this case is not speculative. Harnett has already consummated a deal with one of his former clients. There is a likelihood that Harnett will inevitably disclose confidential information to OnX by soliciting business from his former clients and he has already solicited and consummated deals with his former clients. The inevitable disclosure is fully grounded here as a proper consideration under the likelihood of success analysis. *See, e.g.*, *Aspect Software, Inc.*, v. *Barnett,* 787 F. Supp. 2d 118 (D. Mass. 2010)(considering inevitable disclosure under a likelihood of success analysis where some harm had already occurred). I therefore find that CTI is likely to succeed on the merits of its

breach of contract claim predicated on violation of the non-disclosure agreement.

Finally, I find that CTI is likely to succeed on its tortious interference claim against OnX.  In order to succeed on a tortious interference claim, a plaintiff must show that

> (1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract [by inhibiting the third party's or the plaintiff's performance thereof, depending on the theory]; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.

*O'Donnell* v. *Boggs*, 611 F.3d 50, 54 (1st Cir. 2010) (alterations in original) (quoting *Harrison* v. *NetCentric Corp.*, 744 N.E.2d 622, 632 (Mass. 2001)).  Defendants only dispute the "improper in motive or means" element.  They tacitly acknowledge, as they must, that CTI had a contract with Harnett, that it interfered with that contract by hiring him away from CTI and asking him to work with his former clients, and that such actions could harm CTI.  OnX's conduct also falls within the meaning of "improper in motive or means."

Improper means can include "violation of a statute or common-law precept, e.g., by means of threats, misrepresentation or defamation" including "misrepresent[ation] of facts." *Cavicchi* v. *Koski*, 855 N.E.2d 1137, 1142 (Mass. App. Ct. 2006); *see also United Truck Leasing Corp.* v. *Geltman*, 551 N.E.2d 20, 24 (Mass. 1990) ("misrepresent[ation] of facts").  The evidence in

the record supports the contention that OnX induced Harnett to leave CTI and join OnX, in part, by promising to indemnify him for any liability on the basis of the Non-Solicitation and Non-Disclosure Agreement, and has since encouraged him to do business with his former clients.  The specific offer to indemnify Harnett after he rejected OnX's first employment offer demonstrates the likelihood of improper motive and the misrepresentation that Harnett was free to conduct such business as long as clients contacted him first demonstrates potential improper means.  I conclude that CTI has specifically demonstrated a likelihood that OnX interfered with the contract between CTI and Harnett by improper means and more generally that CTI is likely to succeed on the merits of its tortious interference claim.

## B. Irreparable Harm

CTI will suffer irreparable harm in the absence of an injunction.  A showing of irreparable harm requires "an actual, viable, presently existing threat of serious harm" that cannot adequately be remedied through money damages alone. *Bio-Imaging Techs., Inc.* v. *Marchant*, 584 F. Supp. 2d 322, 330 (D. Mass. 2008) (quoting *Sierra Club* v. *Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991)).

First, Defendants tacitly concede that a plaintiff can show irreparable harm through inevitable disclosure by arguing - albeit incorrectly - that inevitable disclosure can *only* be used

to show irreparable harm.  As discussed above, *see supra* Section II(A), it is likely that Harnett will inevitably disclose confidential CTI information and confidential CTI-client information if OnX permits him to solicit and conduct business with his former CTI clients.  *See U.S. Elec. Servs.*, 2012 WL 2317358 at *9 ("[T]he cases offered by USESI make clear that the inevitable disclosure doctrine may be used to establish irreparable harm once a party seeking an injunction has already established a likelihood of success on the merits.").  This kind of inevitable disclosure of confidential information presents a sufficient risk of irreparable harm to justify a preliminary injunction.  *See Lombard Medical*, 729 F. Supp. 2d at 442. *Lombard Medical* held that even though the defendant "fully intended to protect [plaintiff's] confidential information . . . disclosure would be inevitable.  Plaintiffs have successfully demonstrated that without injunctive relief, they will suffer irreparable harm."  *Id.*  The same is true in this case.  No matter how hard Harnett may try (assuming he tries at all), he cannot wipe his mind of the confidential CTI and client information he learned while employed at CTI and will inevitably call upon that information in his capacity as an OnX salesman if he is permitted to do business with his former clients.

It would be extraordinarily difficult, if not impossible, to quantify this potential harm in dollars at this point.  As a

result, it constitutes irreparable harm meriting preliminary injunctive relief. *See Iron Mountain Information Mgmt., Inc.* v. *Viewpointe Archive Servs., Inc.*, 707 F. Supp. 2d 92, 112 (D. Mass. 2010)("If Congrave were to use his extensive knowledge of Iron Mountain's business or his relationships with Iron Mountain's customers or his knowledge of customer's needs in his new position with Viewpointe, the plaintiff would undoubtedly suffer harm that cannot be quantified in monetary terms. By its nature, the injury caused would be irreparable.").

Second, ongoing breaches of a non-solicitation agreement can separately constitute irreparable harm. *See Lawson Prods., Inc.* v. *Anderson*, No. 12-cv-2882, 2013 WL 1345499, *3 (D. Minn. Apr. 2, 2013). As the court noted in *Merrill Lynch* v. *Rodger*, 75 F. Supp. 2d 375, 381 (M.D.Pa. 1999), "[w]ere defendants permitted by law to exploit the clientele of their former employers, every investment that reasonably flowed from the exploitation should be included in the damages award. How such a figure could be arrived at escapes us." In this case, CTI sank significant investments of money and resources into its development of goodwill with its clients through Harnett. It would be practically impossible to calculate the extent of the damage to CTI if Harnett were permitted to poach his former clients in direct breach of his agreed-upon non-solicitation provision.

Defendants' two arguments - that CTI's harm is (1) purely
economic and therefore not irreparable, *Tri-Nel Mgmt., Inc.* v.
*Board of Health of Barnstable*, 741 N.E.2d 37, 46 (Mass. 2001) and
(2) purely speculative and therefore not sufficiently immediate
to justify injunctive relief, *Benoit* v. *Hillman*, No. 971361, 1998
WL 1181783, *3 (Mass. Super. May 18, 1998) - do not withstand
even cursory scrutiny.  As defendants concede, inevitable
disclosure of confidential information can constitute irreparable
harm, as can loss of goodwill from solicitation in violation of a
restrictive covenant.  Furthermore, CTI's harm falls well outside
the rule articulated in *Benoit*.  The harm in this case was
current and ongoing at the time I ordered the preliminary
injunction on March 11, 2013.  Harnett was actively soliciting
his former clients, inevitably utilizing confidential information
he learned while at CTI.  Moreover, the harm to CTI was
definitively crystalized when OnX consummated an agreement with
Demandware for services it formerly sought from CTI.  I therefore
find that CTI is likely to suffer irreparable harm absent the
requested injunction.

Because Harnett has ignored his non-solicitation obligations
between the time he began his employment with OnX and the time I
first ordered the preliminary injunction, the 12 months of non-
solicitation shall run from the date the preliminary injunction
order issued:  March 11, 2013.  To hold otherwise would allow

21

Harnett and OnX an inequitable mechanism to shorten the running of the contractual time period.

However, I will deny CTI's request that I specifically order Defendants to cease doing business with Demandware.  As discussed below, *see infra* Section II(D), there is a strong public policy interest in allowing third parties to choose those with whom they do business.  The parties represent that although OnX and Demandware have reached an agreement, neither has yet actd upon the agreement.  However, because Demandware has already consummated its agreement with OnX, any future harm flowing from that contract can be quantified on the basis of the value of the contract and will be compensable in monetary damages.  In this setting, I leave it to the parties to consider what remedy - money damages or contempt - might be pursued if Onx and Demandware continue their business.

**C. Balance of Hardships**

The balance of the hardships weighs decidedly in CTI's favor.  The difficulties and injury CTI will likely suffer if I do not impose the injunction far outweigh any difficulties and injury OnX and Harnett will suffer if I impose the requested injunction.

The requested injunction will only prohibit Harnett from soliciting business from "a fairly tiny slice of the total market.  Given this narrow scope, defendants will not suffer

severe hardship." *Oxford Global Resources, Inc.*, 2003 WL 23112398 at *11. Under the injunction, Harnett may solicit business from any company or university within his territory other than the few listed in the injunction for which he was responsible while employed at CTI. The injunction will not prevent OnX as an entity from doing business with *any* slice of the market at all as long it does not involve Harnett in that business initiative.

On the other hand, CTI stands to suffer substantial harm absent injunctive relief. OnX and Harnett have already demonstrated a willingness and intention to pursue the business of Harnett's former CTI clients. Because Harnett knows significant confidential information underlying CTI's relationship with those clients, CTI stands to lose substantial investments of time, resources, and money in their relationships with those clients as well as the goodwill and reputation it has built up with clients and in the industry. Absent an injunction, CTI stands to lose irretrievably aspects of its reputation and goodwill as well as the business of some of its most significant clients. Subject to the injunction, OnX stands only to lose the uncertain opportunity to benefit in the next year from business with new clients in the narrow pool of Harnett's former accounts at CTI. I therefore find that the balance of hardships weighs in favor of issuing the injunction.

The parties dispute whether the injunction should include doing business with Harvard University entirely, or whether it should extend only to those discrete Harvard entities with which Harnett has done business in the past.  Specifically, Defendants request a clarification that Harvard University, as listed in the preliminary injunction does not include "any independent sub-entities."  I conclude the balance of hardships weighs in favor of prohibiting Harnett from doing business with Harvard as a whole for the length of the one-year Non-Solicitation Agreement.  Although Allen Rines, librarian for Defendants' counsel, described Harvard, not inaccurately, as "a decentralized institution [in which] there is no single place where requisitions for goods or services are processed," and in which several departments have separate contracting and purchasing power, there is also substantial interaction between the various departments and the central, university-wide Harvard University Information Technology ("HUIT") department, which can and sometimes does purchase IT solutions for the entire university. The process of developing IT solutions at Harvard is sufficiently porous among the several component entities to justify a broad prophylactic.  Certainly, an independent sub-entity of Harvard University, with which Harnett has had no specific interaction and knows no confidential information, may have the power to make independent purchasing decisions.  However, these same

independent sub-agencies may also source certain of their IT
solutions though master license agreements available to the
entire university and negotiated by HUIT, with which Harnett has
had specific interactions.  Conversely, Harvard sub-entities may
seek an individual IT solution through HUIT but outside of any
university-wide master agreement.  Thus if Harnett were permitted
to do business with "independent sub-entities," there is
substantial risk that he will indirectly solicit his former
clients, resulting in substantial risk, hardship, and damage to
CTI.  The identification of Harvard in the listed excluded
entities is meant to include the independent Harvard sub-entities
in the injunction.

In weighing the balance of hardships, I have further refined
the calibration by imposing a bond in the amount of $475,000 on
Plaintiff as security against the improvident grant of
interlocutory relief.  This bond is based on Harnett's
anticipated first-year compensation at OnX, which stands as a
proxy for the economic benefit OnX sought to obtain from his
services.

### D. Public Interest

The public interest element of the preliminary injunction
standard is rarely in dispute in cases involving restrictive
covenants and analysis "is usually confined to brief platitudes."
*Oxford Global Resources, Inc.*, 2003 WL 23112398 at *10.  However,

this case presents a small wrinkle involving the effect that the covenants may have on third parties.

As a matter of long-standing Massachusetts case law, it is "beneficial to the public that contracts for the partial restraint of trade should be upheld to a reasonable extent." *New England Tree Expert Co.* v. *Russell*, 28 N.E.2d 997 (Mass. 1940). The time-bound non-solicitation and non-disclosure obligations in this case are less restrictive than other covenants that Massachusetts courts frequently uphold. *See, e.g., Lombard Medical*, 729 F. Supp. 2d at 442-43 (upholding a non-competition agreement). I therefore find that enforcing the Non-Solicitation and Non-Disclosure Agreement against Harnett is "consonant with the public interest." *Novelty Bias Binding Co.* v. *Shevrin*, 175 N.E.2d 374, 376 (Mass. 1961).

But CTI further requests that I enjoin OnX from doing business with Harnett's former CTI clients in addition to enjoining Harnett himself from engaging in that business. I decline that request. There is a strong public policy interest in allowing third parties, not bound by the restrictive covenant, to make unencumbered decisions regarding those individuals and entities with whom they would like to do business. *See BNY Mellon, N.A.* v. *Schauer*, No. 201001344BLS1, 2010 WL 3326965, *8 (Mass. Super. May 14, 2010). Furthermore, and as discussed above, Massachusetts courts have recognized a public interest in

allowing a company to receive business from a client even where an employee is bound by a non-solicitation covenant. *See, e.g., Alexander & Alexander*, 488 N.E.2d at 29-30; *Getman*, 2005 WL 2183159 at *4. To enjoin OnX, as an entity, from conducting business with Harnett's former CTI clients would effectively prevent those third parties from choosing their preferred provider of IT solutions, contrary to public policy.

Thus, the relevant public policy focus for purposes of a preliminary injunction to enforce the provisions of the Non-Solicitation and Non-Disclosure Agreement is the conduct of Harnett himself. I have enjoined Harnett from doing business with his former CTI clients for one year in accordance with his Non-Solicitation Agreement, but I will not enjoin OnX from doing business with those clients so long as Harnett does not participate, directly or indirectly, in those business initiatives. In addition, I will require OnX and Harnett to withdraw the "registered opportunities" that Harnett filed with vendors requesting preferred pricing for sales of products to OnX's clients. Registered opportunities trade on the goodwill of the individual salesman's relationship with the vendor and the client. It therefore runs both to Harnett as an individual, and the goodwill he built up between the vendor and client on behalf of CTI and is subject to the non-solicitation agreement.

###### III.   DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION

Defendants, in their Opposition to CTI's motion for
preliminary injunction, argue that I should enjoin CTI from
characterizing Harnett's agreement in the marketplace as a
non-competition rather than a non-solicitation and non-disclosure
agreement during its interactions with common contacts in the IT
industry.  Harnett formalized this request as a separate motion
on April 10, 2013.  He predicates his request for preliminary
injunctive relief on his counterclaim against CTI for tortious
interference with advantageous business relationships.  The
standard for injunctive relief is the same as discussed above in
the analysis of CTI's requested injunction, *see supra* Section II.
Although Harnett otherwise meets the standard for a preliminary
injunction, I will deny his motion because he cannot show any
likelihood of irreparable harm *prospectively*.

Harnett appears likely to succeed on the merits of his claim
at least to a limited degree.  To succeed on a claim for
intentional interference with advantageous business relationship,
the complaining party must show: (1) an advantageous business
relationship, (2) that the defendant knowingly induced the third
party to break off the relationship, (3) the defendant did so by
improper motive or means, and (4) harm.  *See Blackstone* v.
*Cashman*, 860 N.E.2d 7, 13 (Mass. 2007).  The advantageous
relationship can be present or prospective.  *See id; see also*

28

*Zyla* v. *Wadsworth*, 360 F.3d 243, 253 (1st Cir. 2004).  Harnett
presents evidence that CTI has dissuaded third-party vendors from
doing business with him by falsely stating that he is bound by a
non-competition agreement.  In his Declaration, Harnett swears
that NetApp sales representatives for the Demandware, Convexity
Capital, and EBSCO accounts informed him that CTI called and
stated that Harnett had a "non-compete" agreement, and warned
them that if they did business with Harnett, they could be pulled
into the lawsuit.  He swears to similar events involving the
sales representatives at F5, another third-party vendor like
NetApp.  Finally, he swears that vendors have refused to return
his calls and have cut short negotiations as a result of
statements by CTI representatives regarding a purported
"non-compete" agreement.  Harnett has demonstrated a sufficient
likelihood of success on the elements of his counterclaim showing
that CTI representatives have purposefully interfered with
Harnett's prospective relationships with NetApp, F5 and other
vendors to Harnett's harm.

CTI's conduct also falls within the meaning of "improper
motive or means."  As discussed above, improper means includes
"violation of a statute or common-law precept, e.g., by means of
threats, misrepresentation, or defamation."  *Cavicchi*, 855 N.E.2d
at 1142.  CTI has interfered by means of misrepresentation.  Its
admonitions to vendors that they could get drawn into the

litigation also potentially constitute threats.  Harnett is not
bound by a non-competition agreement.  A non-competition
agreement would prevent him from working for any of CTI's
competitors, such as OnX, for some period of time.  However, his
agreement with CTI includes no such restriction.  Rather the
agreement permits him to work for a competitor so long as he does
not disclose any confidential information and so long as he does
not solicit his former clients.  The evidence of record at this
point demonstrates that CTI misrepresented the nature of the
agreement to vendors.

Thus, there is a likelihood that CTI has purposefully and
improperly interfered with Harnett's relationship with vendors by
contacting those third parties and falsely stating that Harnett
was bound by a non-competition agreement.

This type of past harm appears to have occurred.  However,
Harnett cannot demonstrate a likelihood of *future* irreparable
harm.  CTI has contacted entities with whom Harnett seeks to do
business in the future and has accused him of violating a
non-competition agreement.  These actions likely did serious harm
to Harnett's reputation and goodwill at the time, and that kind
of harm is plainly irreparable.  *See Ross-Simons of Warwick, Inc.*
v. *Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000)("[I]njury to
goodwill and reputation are not easily quantifiable. . . . courts
often find this type of harm irreparable.").  However, in order

to show irreparable harm, a movant must demonstrate "an actual, viable *presently existing* threat of serious harm." *Bio-Imaging Techs., Inc.* v. *Marchant*, 584 F. Supp. 2d 322, 330 (D. Mass. 2008) (emphasis added). Harnett has shown past harm, but has not demonstrated any present threat. Harnett attests in his declaration to instances in which CTI employees called vendors and warned them away from doing business with him, describing his agreement with CTI as a "non-compete." His declaration concerns calls that occurred between late November 2012 and early February 2013, after Harnett had already filed his counterclaim for tortious interference with advantageous business relationships on January 9, 2013 on the basis of the misrepresentations, but at least one month before the initial hearing on the preliminary injunction motion on March 11, 2013 and more than two months before Harnett filed his motion for preliminary injunction on April 10, 2013. However, counsel for CTI has represented and CTI's CEO, Harry Kasparian, has attested in a declaration, that following a March 7, 2013 discussion with Defendants' counsel, he promptly spoke with his employees and directed them not to characterize Harnett's agreement as a "non-compete." Each of the CTI employees that Harnett contends mischaracterized his contract has also attested to having agreed to abide by Kasparian's directive and to not having characterized the agreement as a non-compete since. Harnett has offered no evidence to contradict

these attestations, nor has he provided any argument or contention that the complained of conduct continues.  Although any future mischaracterizations of his agreement would likely constitute tortious interference, an injunction would be inappropriate in the absense of evidence of some present threat of future harm.

The balance of the hardships would otherwise tip decidedly in favor of the injunction.  Absent an injunction, Harnett might suffer irreparable harm to his reputation and goodwill if he could show that future mischaracterizations were likely.  In the presence of an injunction, CTI would suffer no harm whatsoever, because it is still free to characterize the agreement accurately as a Non-Disclosure and Non-Solicitation Agreement preventing Harnett from disclosing confidential information and preventing him from doing business with his former CTI clients as identified.

It goes without saying that Harnett's requested injunction would support the existing public policy interest in precluding misrepresentations.  *See Cavicchi*, 855 N.E.2d at 1142.

## IV.   CONCLUSION

For the foregoing reasons, I have granted the Plaintiff's motion for preliminary injunction (Dkt. 22) and I deny Defendants' motion for preliminary injunction (Dkt. 62).  The written form of this injunction shall be docketed separately.


**_/s/ Douglas P. Woodlock_**
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE